# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| STATE OF NEW YORK, *et al.*, |
| Plaintiffs, |
| v. |
| DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*, |
| Defendants. |

C.A. No. ____25-1144____

## PLAINTIFF STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

    I.        Statutory Framework ................................................................................... 4

    II.      Treasury Department ................................................................................... 6

    III.    Treasury's Access Policy Change ............................................................. 10

ARGUMENT ........................................................................................................................... 11

    I.        The States Have Standing .......................................................................... 11

    II.      The States Are Entitled to a Temporary Restraining Order ...................... 15

      A.    The States Are Likely to Succeed on the Merits ...................................... 16

         1.    The Agency Action Violates the APA (Counts 1-3) ............................... 16

         2.    The Agency Action Granting Expanded Access to BFS Payment Systems Is *Ultra Vires* (Count 4) ...................................................................... 22

         3.    The Agency Action Violates the Separation of Powers Doctrine (Count 5) ......... 22

         4.    The Agency Action Violates the Take Care Clause (Count 6) .............................. 24

      B.    States Face Irreparable Harm .................................................................... 25

      C.    The Equities and Public Interest Strongly Favor Plaintiff States ............................ 26

CONCLUSION ........................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for Retired Americans v. Bessent*,
No. 1:25-cv-313 (D.D.C.) ........................................................................................26

*Amadei v. Nielsen*,
348 F. Supp. 3d 145 (E.D.N.Y. 2018) ......................................................................16

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) ...........................................................................15

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................................17

*Bohnak v. Marsh & McLennan Cos., Inc.*,
79 F.4th 276 (2d Cir. 2023) ................................................................................. 12-14

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ..................................................................................................17

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016) ........................................................................................14

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ..................................................................................................20

*Clinton v. City of New York*,
524 U.S. 417 (1998) ............................................................................................ 23-24

*De La Mota v. United States Dep't of Educ.*,
No. 02-cv-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) .............................16

*Deferio v. City of Syracuse*,
193 F. Supp. 3d 119 (N.D.N.Y. 2016) ......................................................................27

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ......................................................................................................20

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2020) ....................................................................................20

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .................................................................... 11

*Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*,
    118 F.4th 505 (2d Cir. 2024) .................................................................... 15

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................................................ 21

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................ 21

*Ferguson v. Ashcroft*,
    248 F. Supp. 2d 547 (M.D. La. 2003) ...................................................... 20

*Food & Drug Admin. v. All. For Hippocratic Med.*,
    602 U.S. 367 (2024) ......................................................................... 14, 15

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ................................................................. 24

*In re United Mine Workers of Am. Int'l Union*,
    190 F.3d 545 (D.C. Cir. 1999) ................................................................. 24

*Kendall v. United States*,
    37 U.S. 524 (1838) .................................................................................. 24

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ................................................................................ 22

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................... 26

*Loper Bright Enter. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................................ 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 14

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................ 11

*McMorris v. Carlos Lopez & Associates*,
    995 F.3d 295 (2d Cir. 2021) .................................................................... 12

iii

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) .........................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................................................20

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010) ...............................................................................25

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ...........................................................................22

*Nat. Res. Def. Council v. Abraham*,
    355 F.3d 179 (2d Cir. 2004) .............................................................................17

*Nat. Res. Def. Council v. Dep't of Interior*,
    410 F. Supp. 3d 582 (S.D.N.Y. 2019) ..............................................................21

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ...............................................................................17

*New York v. United States Dep't of Educ.*,
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) ..............................................................15

*New York v. United States Dep't of Health & Hum. Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...................................................... 17, 23-24

*New York v. United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) ......................................................................... 14-15

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................................26

*Nnebe v. Daus*,
    510 F. Supp. 3d 179 (S.D.N.Y. 2020) ..............................................................15

*Planned Parenthood of N.Y.C. v. United States Dep't of Health & Hum. Servs.*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ..............................................................27

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................................27

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) .........................................................21, 26

iv

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)......................................................................22-23

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).........................................................................11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014).........................................................................12

*TransUnion, LLC v. Ramirez*,
    549 U.S. 413, 141 S. Ct. 2190 (2021)................................................12

*Trump v. United States*,
    603 U.S. 593 (2024).........................................................................23

*UARG v. EPA*,
    573 U.S. 302 (2014)......................................................................24-25

*West Virginia v. EPA*,
    597 U.S. 697 (2022).........................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................15, 26

*XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*,
    874 F. Supp. 2d 263 (S.D.N.Y. 2012)................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*,
    103 F. Supp. 569 (D.D.C. 1952).......................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).........................................................................23

## Constitutions

U.S. Const.
    art. I, § 1......................................................................................22
    art. I, § 8, cl. 1.............................................................................23
    art. II, § 3....................................................................................24

**Federal Statutes**

5 U.S.C.
    § 552a ...................................................................................................4, 6, 18, 24
    § 705 .............................................................................................................15
    § 706 ..............................................................................................16, 17, 20, 21


18 U.S.C.
    § 208 ..................................................................................................5-6, 19, 20

26 U.S.C.
    § 6103 .......................................................................................................5, 19

31 U.S.C.
    § 3301 ...........................................................................................................6
    § 3321 ...........................................................................................................6

44 U.S.C.
    § 3501 .......................................................................................................5, 18

**Federal Regulations**

31 C.F.R. § 1.32 .................................................................................................5, 19

85 Fed. Reg. 11776 (Feb. 27, 2020) .........................................................................10

87 Fed. Reg. 16244 (Mar. 22, 2022).........................................................................4

Exec. Order No. 14158 (Jan. 20, 2025), 90 Fed. Reg. 8441 .........................................10

**Rules**

Fed. R. Civ. P. 65..............................................................................................15

**Miscellaneous Authorities**

Cybersecurity & Infrastructure Security Agency, *Weak Controls and Practices Routinely Exploited for Initial Access* (Dec. 8, 2022), available at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a ...................................................................14

Donald J. Trump (@realDonaldTrump), Truth Social .............................................2, 10

Elon Musk (@elonmusk), X .........................................................................................2

*Final Monthly Treasury Statement for Fiscal Year 2024 Through Sept. 30, 2024 and Other Periods* (Sept. 2024), available at https://www.fiscal.treasury.gov/files/reports-statements/mts/mts0924.pdf..........................................................................................7

Fiscal Service, *Fiscal Service Overview* (last accessed Feb. 7, 2025), available at https://www.fiscal.treasury.gov/about.html......................................................... 7-8

Gov. Ethics, *Standards of Ethical Conduct for Employees of the Executive Branch* (last accessed Feb. 7, 2025), available at *https://www.oge.gov/web/oge.nsf/resources_standards-of-conduct*.........................................6

Jack Newsham, *Some members of Elon Musk's DOGE squad aren't sharing their last names as they attempt to remake the federal workforce*, Yahoo!News, Feb. 4, 2025, available at https://www.yahoo.com/news/members-elon-musks-doge-squad-220811368.html ..........................................................................................................22

Jonathan Blum, Principal Deputy Assistant Secretary, U.S. Dep't of the Treasury (Feb. 4, 2025), available at https://home.treasury.gov/news/press-releases/sb0009......................... 8-9

U.S. Dep't of the Treasury, Role of the Treasury (last accessed Feb. 7, 2025), available at https://home.treasury.gov/about/general-information/role-of-the-treasury .............................7

## INTRODUCTION

The U.S. Treasury Department maintains and safeguards our nation's central bank account. The Bureau of Fiscal Services ("BFS") within Treasury is in charge of the account checkbook. BFS receives coded payment instructions in the form of payment files from a host of federal agencies to disburse billions of dollars in funds directly to the Plaintiff States under federal grant programs and to millions of their residents every year – money that is critically important to all beneficiaries. The funds disbursed directly to the States by BFS flow from federal programs that provide vital services for the States' residents, including Medicaid, Federal Emergency Management Agency ("FEMA") funds for disaster relief and management, Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program funds essential to law enforcement and criminal justice programs, education funding, and foster care programs, to name just a few. The funds disbursed by BFS directly to the States' residents include, among other things, social security benefits, veterans benefits, childcare tax credits, federal employee wages, and federal tax refunds. The payment files uploaded to BFS's payment systems to effectuate the disbursement of these funds contain a variety of sensitive personally identifiable information ("PII"), including social security and bank account numbers, as well as confidential financial information about the amount and type of payment being made.

Until several days ago, consistent with laws and regulations governing the collection, storage, handling, and disclosure of PII and sensitive financial information, only a limited number of career civil servants at BFS with appropriate security clearance had access to the BFS payment systems necessary for them to perform their duty of ensuring the security and functionality of BFS's operations when disbursing the federal dollars appropriated by Congress to the States and their residents. But as of February 2, 2025, at the direction of the President and the Treasury

Secretary, Treasury adopted and began implementing a new policy that grants expanded access to BFS payment systems to political appointees and "special government employees" ("SGEs") for reasons that have yet to be adequately explained, but at a minimum are intended to achieve the stated goal of the Department of Government Efficiency ("DOGE") to gain access to BFS payment systems for the purpose of blocking federal funds from reaching beneficiaries who do not align with the President's agenda. The Trump Administration has made no secret that this is a prime objective of DOGE. Indeed, in the weeks leading up to President Trump's January 20, 2025, executive order directing the creation of DOGE, President Trump stated that DOGE will "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[1] And Elon Musk, head of DOGE, recently posted on social media that his DOGE team, with newly-granted access to BFS payment systems, is "rapidly shutting down" payments to federal grant recipients.[2]

Beyond affording the DOGE team of SGEs the unprecedented and unlawful ability to block BFS disbursements, this new expanded access policy poses huge cybersecurity risks that put vast amounts of funding for the States and their residents in peril. All of the States' residents whose PII and sensitive financial information is stored in the payment files that reside within the payment systems are at risk of having that information compromised and used against them.

---

[1] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024 7:46 PM), available at https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

[2] Elon Musk (@elonmusk), X (Feb. 2, 2025 3:14 AM), available at https://x.com/elonmusk/status/1885964969335808217 ("The @DOGE team is rapidly shutting down these illegal payments.").

Nineteen States[3] bring this action against Treasury, the Treasury Secretary, and the President to put an end to this new dangerous expanded access policy. The States seek preliminary and permanent injunctive relief to bar Defendants from continuing to implement Treasury's new policy of allowing access to the BFS payment systems containing PII and confidential financial information by SGEs rather than limiting access to civil servants appropriately vetted and permitted access as necessary to perform their job duties, and a declaration that Treasury's policy change is unlawful and unconstitutional.

The States are entitled to emergency injunctive relief to maintain the status quo on multiple grounds. First, Treasury's change in policy violates the Administrative Procedures Act in numerous ways; the change is a final agency action that exceeds statutory authority, is contrary to law, and is arbitrary and capricious. Second, Treasury's new expanded access policy granting BFS payment system access to DOGE personnel, which permits them to block and/or impede the payment of funds appropriated by Congress, exceeds Treasury's statutory authority and therefore is *ultra vires*. Third, by permitting expanded access to those that may then block payments contrary to Congressional appropriation and statutory authority, the new policy violates both the Separation of Powers doctrine and the Take Care Clause of the United States Constitution.

---

[3] In addition to New York, the following 18 states are plaintiffs in this action: Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, North Carolina, Oregon, Rhode Island, Vermont, Wisconsin.

# BACKGROUND

## I.    STATUTORY FRAMEWORK

- **Privacy Act of 1974**

The Privacy Act of 1974 "provides certain safeguards for an individual against an invasion of personal privacy," by requiring governmental agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves. Privacy Act of 1974; System of Records, 87 Fed. Reg. 16244, 16245 (Mar. 22, 2022); 5 U.S.C. § 552a. To accomplish this purpose, the Privacy Act sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains. *See* 5 U.S.C. § 552a(b). The Privacy Act lists 13 exceptions to the bar on disclosure, only one of which is relevant here: (i) an agency may disclose the records it maintains within the agency "to those officers and employees *of the agency*…who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1) (emphasis added). Moreover, each agency that "maintains a system of records" is required to publish a system of records notice ("SORN") in the Federal Register identifying the "existence and character" of that system. *Id.* § 552a(e)(4). Agencies are required to give 30 days' notice of new or revised SORNs, allowing public comments. 5 U.S.C. § 552a(e)(11). A SORN must include information on the categories of individuals and records in the system, the routine uses of the records, and the agency's policies on storage, access, retention, and disposal. 5 U.S.C. § 552a(e)(4).[4]

- **E-Government Act of 2002**

Section 208 of the E-Government Act of 2002, codified at 44 U.S.C. § 3501 ("E-Government Act"), mandates that an agency conduct a privacy impact assessment before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form." E-Government Act § 208(b)(1)(A)(i). The purpose of this provision "is to ensure sufficient protections for the privacy of personal information" maintained by government agencies. *Id.* § 208(a). Defendants failed to conduct a privacy impact assessment before adopting and implementing the Agency Action in violation of Section 208.

- **Tax Reform Act of 1976**

Pursuant to the Tax Reform Act of 1976, 26 U.S.C. § 6103, tax information, including returns and return information, is to be treated as confidential and subject to disclosure only when expressly authorized by statute. For employees of the Treasury Department, disclosure of tax information is strictly limited to those "officers and employees … whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1).

- **31 CFR 1.32**

Pursuant to the Code of Federal Regulations, title 31, subtitle A, Part 1, section 1.32, there are provisions concerning Treasury's collection, use, disclosure and protection of Social Security numbers ("SSNs"). Specifically, the Office of the Secretary of the Treasury, within Treasury, has specific guidelines on when the Secretary must collect and maintain full SSNs, as well as restrictions on disclosure of SSNs. As required by this regulation, "[w]henever feasible, Treasury must mask, or truncate/partially redact Social Security numbers visible to authorized Treasury/component information technology users so they only see the portion (if any) of the Social Security number required to perform their official Treasury duties." 31 C.F.R. § 1.32(d).

- **Government Ethics Laws**

The federal government maintains a compilation of ethics laws that constitute an ethics code to govern the conduct of federal employees.[5] Included amongst the ethics rules, title 18 of the U.S. Code provides restrictions on federal employee conduct in order to ensure such employees avoid conflicts, including personal interests that affect official action. *See* 18 U.S.C. § 208(a).[6] SGEs are governed by these ethics rules, including § 208(a), and subject to penalties under section 216 of the Code. *See* 18 U.S.C. § 216 (describing the penalties and injunctions for violating, inter alia, §§207 and 208, including civil penalties up to $50,000 for each violation, and/or an injunction against further violations). The only exception from § 208(a)'s requirements relevant here would be for the appointing official of an SGE (with a duly filed financial disclosure pursuant to chapter 131 of title 5) to review the SGE's disclosure and certify that the SGE's work "outweighs the potential for a conflict of interest." 18 U.S.C. § 208(b)(3).

## II.    TREASURY DEPARTMENT

The Treasury Department is responsible for managing the finances of the U.S. government, including collecting receipts and making payments to recipients of public funds. 31 U.S.C.

---

[5] *See generally* U.S. Office of Gov. Ethics, *Standards of Ethical Conduct for Employees of the Executive Branch* (last accessed Feb. 7, 2025), available at *https://www.oge.gov/web/oge.nsf/resources_standards-of-conduct*.

[6] "Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—Shall be subject to the penalties set forth in section 216 of this title."

6

§§ 3301, 3321. Part of Treasury's function is to collect all federal taxes through the Internal Revenue Service; manage U.S. government debt instruments; supervise banks and thrift institutions; and advise the executive branch on matters of fiscal policy.[7] In fiscal year 2024, it processed nearly $5 trillion in receipts, including $2.4 trillion from income taxes, and $6.752 trillion in outlays, such as $1.46 trillion for social security and $874 billion for defense spending.[8] The Bureau of Fiscal Service, a Treasury component, handles the government's financial transactions, including revenue collection and disbursements to millions of Americans.[9]

Treasury is split into two main organized components: departmental offices and operating bureaus. Treasury's departmental offices are "primarily responsible for the formulation of policy and management of the Department as a whole, while the operating bureaus carry out the specific operations assigned to the Department."[10]

BFS is one of Treasury's operational bureaus. As described in its mission statement, BFS seeks to "[p]romote the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services."[11] BFS's

---

[7] *See* U.S. Dep't of the Treasury, Role of the Treasury (last accessed Feb. 7, 2025), available at https://home.treasury.gov/about/general-information/role-of-the-treasury.

[8] U.S. Dep't of the Treasury, Bureau of the Fiscal Service, *Final Monthly Treasury Statement for Fiscal Year 2024 Through Sept. 30, 2024 and Other Periods* (Sept. 2024), available at https://www.fiscal.treasury.gov/files/reports-statements/mts/mts0924.pdf.

[9] U.S. Dep't of the Treasury, Bureau of the Fiscal Service, *Fiscal Service Overview* (last accessed Feb. 7, 2025), available at https://www.fiscal.treasury.gov/about.html.

[10] U.S. Dep't of the Treasury, Role of the Treasury (last accessed Feb. 7, 2025), available at https://home.treasury.gov/about/general-information/role-of-the-treasury.

[11] U.S. Dep't of the Treasury, Bureau of the Fiscal Service, *Fiscal Service Overview* (last accessed Feb. 7, 2025), available at https://www.fiscal.treasury.gov/about.html.

executive functions include (i) collecting funds: "Provid[ing] citizens a variety of modern electronic options for paying federal taxes, charges, and fees. Minimiz[ing] lockboxes and paper processing"; (ii) disbursing funds: "[c]reat[ing] a seamless end-to-end process that is all-electronic from the initiating transaction through settlement: more agile, efficient, and resilient."; (iii) financing: "…offering Treasury securities to investors through modern, secure, and reliable technology"; (iv) reporting: "[p]rovid[ing] federal agencies and the American public information that is accurate, accessible, and transparent [and s]treamlin[ing] the federal reporting process to reduce agency reporting burden"; and (v) servicing: [p]rovid[ing] customer-centric services and solutions to agencies that enable improved decision-making and high-performance through innovation, standardization, operational efficiency, and risk reduction."[12]

Handling 1.2 billion transactions a year, BFS disburses 90% of all federal payments.[13] Relevant here, BFS is responsible for the following federal agency disbursements to individuals, to name some: social security benefits, veterans benefits, childcare tax credits, federal employee wages, and federal tax refunds. And it is responsible for disbursing directly to the States funds for the following federal programs, to name just a few: social security, FEMA, Byrne JAG program funds, education funding, and foster care programs.

The two relevant systems that BFS relies on to perform its functions are the Payment Automation Manager ("PAM") and the Secure Payment System ("SPS"). For BFS to issue disbursement of federal funds through these payment systems, federal agencies prepare and send

---

[12] *Id.*

[13] *See* Jonathan Blum, Principal Deputy Assistant Secretary, U.S. Dep't of the Treasury (Feb. 4, 2025), available at https://home.treasury.gov/news/press-releases/sb0009.

to BFS a "payment file" containing the coded payment instructions for the desired disbursements after they certify that the payees are eligible to receive the funds. These payment files contain PII, such as social security numbers, home addresses, bank account numbers, as well as confidential financial information consisting of the amount of the funds being disbursed and the type of payment (*e.g.*, whether the payment is a veterans benefit or tax refund). Once the agency certifies the payee is eligible by checking various "bad actor" databases (including, for example, lists of those deemed bad contractors or subject to sanctions), the agency sends the payment file to BFS, which then utilizes its PAM and/or SPS to disburse the funds as directed by the sending agency.

Importantly, until several days ago, it was the longstanding policy at BFS to process the disbursement of funds in accordance with the coded data in the payment file as received from the sending agency, with the sending agency (and not BFS) bearing the responsibility of conducting a review of the propriety of the payment or eligibility of the payee; in other words, "the agency responsible for making the payment always drives the payment process."[14] Housed on a secure mainframe, the PAM and SPS control government payments that in their totality amount to more than a fifth of the US economy.

Because, as described herein, BFS needs to collect and maintains extensive personal and financial information about payees in its systems, in accordance with the requirements of the Privacy Act, the Bureau publishes record notices (SORN), to describe the types of information collected and the policies governing their use. The Bureau has 20 systems of records, including three notable examples:

- **SORN .002** involves payment records for individuals receiving payments from the U.S. government, containing personal data like SSNs, payment amounts, and bank account

---

[14] *Id.*

9

information (Privacy Act of 1974; System of Records, 85 Fed. Reg. 11776, 11779 (Feb. 27, 2020)).

- **SORN .012** pertains to individuals who owe debts to the government, including detailed financial information like income, assets, and liabilities (*id.* at 11793-94).

- **SORN .013** includes records about individuals who electronically authorize payments to the federal government, containing information such as bank account details and user credentials (*id.* at 11796-97).

## III.    TREASURY'S ACCESS POLICY CHANGE

On January 20, 2025, President Trump issued an executive order directing the creation of DOGE.[15] President Trump has stated that DOGE will "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[16]

Even before its inception, DOGE leader Elon Musk, and his DOGE team of SGEs, sought sensitive data information about the BFS payment systems, including the code underwriting the systems. Consistent with policy, a non-Treasury employee was denied access to the payment systems and any such code information. Compl. ¶ 146. By Jan. 29, 2025, however, Secretary Bessent changed the longstanding policy of restricting access to BFS payment systems to career civil servants with a need for access to perform their duties and granted the DOGE team SGEs access to those systems (the "Agency Action"). *Id.* By adopting and implementing this expanded access policy, Secretary Bessent materially changed the existing access policy put into place to maintain the security of BFS's critical payment systems. Pursuant to the Agency Action, DOGE team SGEs have had access to the BFS payment systems since February 2, 2025. Secretary Bessent

---

[15] Exec. Order No. 14158 (Jan. 20, 2025), 90 Fed. Reg. 8441.

[16] On November 12, 2024, President Trump announced the creation of DOGE and stated "that the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy," would lead the newly-formed entity. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

has no acceptable explanation for why Treasury changed its access policy in a manner that exceeds the agency's statutory authority and contravenes the laws and regulations in place to safeguard PII and confidential financial information of the States and their residents.

## ARGUMENT

## I.    THE STATES HAVE STANDING

To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) ("At this very preliminary stage, the [plaintiffs] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden.") (quotation marks and citation omitted). And a state plaintiff is owed "special solicitude" when assessing Article III standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

"To establish injury-in-fact, a plaintiff must demonstrate an injury that is 'concrete, particularized, and actual or imminent.'" *State*, 315 F. Supp. 3d at 781 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "[A] plaintiff may allege a 'future injury' if he or she shows that 'the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *State*, 315 F. Supp. 3d at 782 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) and *Clapper*, 568 U.S. at 409, 414 n.5 (2013)).

Here, the States have suffered a "concrete, particularized" injury because their sensitive bank account information and other sensitive financial data are stored on the BFS payment systems that are now accessible to an expanded group of people at Treasury who are not authorized to view

this information under existing law, including DOGE SGEs. That expanded access, which includes the ability to alter code, constitutes a present injury because it tramples on the States' reasonable expectation that their sensitive financial information will be securely held in accordance with governing law and basic cybersecurity principles, and puts state's finances at an increased risk of interference, fraud, and unauthorized access.

And the expanded access policy also gives rise to a "substantial risk" of future harm. *Driehaus*, 573 U.S. at 157. Relevant here, the Second Circuit in *Bohnak v. Marsh & McLennan Cos., Inc.,* 79 F.4th 276 (2d Cir. 2023), recently clarified the "substantial risk of future harm" standing test in data breach cases it had previously articulated in *McMorris v. Carlos Lopez & Associates*, 995 F.3d 295, 303 (2d Cir. 2021), in the wake of the Supreme Court's decision in *TransUnion, LLC v. Ramirez*, 549 U.S. 413, 141 S. Ct. 2190 (2021). Summarizing important principles of the holding in *TransUnion*, the Second Circuit noted: (i) "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial," 79 F.4th at 285 (quoting *TransUnion*, 141 S. Ct. at 2210); (ii) a risk of future harm could "'itself cause[ ] a *separate* concrete harm,'" "such as emotional injury" from a data breach, "in which case the plaintiff would have standing to pursue damages premised on that separate concrete harm," 79 F.4th at 285 (quoting *TransUnion*, 141 S.Ct. at 2211 (emphasis in original)); and (iii) "'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts'" such that "an injury arising from such disclosure" is "'concrete' for purposes of the Article III analysis" 79 F.4th at 285 (quoting *TransUnion*, 141 S.Ct. at 2204).

Applying these principles, the Second Circuit concluded that "[f]or the purposes of the 'concreteness' analysis under *TransUnion*, what matters is that the *intangible harm arising from*

*disclosure of one's PII* bears a relationship to an injury with a 'close historical or common-law analogue' … but need not be 'an exact duplicate,'" 79 F.4th at 286 (quoting *TransUnion*, 141 S.Ct. at 2204, 2209) (emphasis added). Based on finding a close relationship between the plaintiff's data exposure injury and the common law analog of public disclosure of private facts, as well as plaintiff's "allegations that she suffered concrete present harms *due to the increased risk that she will in the future fall victim to identity theft as a result of the data breach*," the court held that the plaintiff "alleged an injury that is sufficiently concrete to constitute an injury in fact" for purposes of Article III standing. 79 F.4th at 287 (emphasis added).

The same is true here with respect to the "data breach" caused by the Agency Action, which allows political appointees and SGEs access to very sensitive state and individual information. That access causes the same type of "intangible harm" to the States as it did to the plaintiff in *Bohnak*. 79 F.4th at 286. For one, allowing this expanded access to sensitive financial and personal information compromises the cybersecurity of State financial systems and information. Indeed, this expanded access significantly heightens the risk that the BFS payment systems—and the States that interact with them—will be far more vulnerable to hacking or activities that render the information corrupted or compromised. For another, allowing access to this information enables those with newly-gained access to block or impede critical funding payments to the States under their federal grants—which they have recently expressed as their prime objective. Compl. ¶¶ 136, 141, 174. Such concerns are not speculative; indeed, DOGE personnel have publicly stated that one of the purposes of accessing the BFS payment system is to facilitate the termination of grant payments. Compl. ¶¶ 4, 141. And the federal government has itself previously acknowledged that strict controls on access to sensitive information are critical to reducing the risk of breaches and

data leaks.[17] Those factual allegations are sufficient to establish that the States have standing to challenge the Agency Action. *See Bohnak,* 79 F. 4th at 287 ("[W]e conclude that Bohnak has alleged an injury that is sufficiently concrete to constitute an injury in fact" based on disclosure of her PII from a data breach); *accord New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59-60 (2d Cir. 2020) (holding plaintiff states "sufficiently established actual imminent harms" based on factual allegations and evidence about the predictable effect of the agency's action).

In addition to establishing injury in fact, a plaintiff must also demonstrate that his or her injury is "fairly traceable" to the challenged actions of the defendant. *Lujan*, 504 U.S. at 560 (cleaned up). In other words, a plaintiff "must demonstrate a causal nexus between the defendant's conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Here, the present injury and substantial risk of future injury from the disclosure of the States' sensitive financial information is "fairly traceable" to the Agency Action because it is the Agency Action that has expanded access to the BFS payment systems. Indeed, but for the Agency Action, there would be no disclosure to political appointees and SGEs, including the DOGE team, which is the cause of the injuries to the plaintiff States.

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008)). If a defendant's action causes an injury, enjoining the action will typically redress that injury. *See Food*

---

[17] Cybersecurity & Infrastructure Security Agency, *Weak Controls and Practices Routinely Exploited for Initial Access* (Dec. 8, 2022), available at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a.

& *Drug Admin.*, 602 U.S. at 380–81. And the injunction need not "completely redress the asserted injury," only to a sufficient degree to eliminate any effects of the challenged conduct. *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024). That is certainly the case here. The States' injury is indisputably caused by the continued implementation of the Agency Action. It inexorably follows that enjoining the continued implementation of the Agency Action will redress the States' injury. *See id.*

## II.    THE STATES ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER

A temporary restraining order is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020); *see also Nnebe v. Daus*, 510 F. Supp. 3d 179, 189 (S.D.N.Y. 2020), *aff'd,* No. 21-170-CV, 2022 WL 1220204 (2d Cir. Apr. 26, 2022). In addition, the Administrative Procedure Act ("APA") authorizes courts "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *See New York v. United States Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).

All factors strongly weigh in favor of the Plaintiff States who have made a similarly strong showing of standing and that pre-enforcement relief is appropriate. Accordingly, this Court should enter a TRO to enjoin Defendants from continuing to implement the Agency Action granting to political appointees, SGEs, and any government employee detailed from an agency outside the

Treasury Department access to any Treasury Department payment systems or any other Treasury Department data systems containing PII and/or confidential financial information of the States and their residents.

### A. The States Are Likely to Succeed on the Merits

#### 1. The Agency Action Violates the APA (Counts 1-3)

The APA provides that courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; that is "without observance of procedure required by law"; or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C), (D). Treasury's change in policy to expand access to the BFS payment systems is unlawful for all of these reasons.

As a threshold matter, Treasury's decision to change the policy to allow political appointees and SGEs, a category that includes DOGE team members, to gain access to BFS payment systems constitutes final agency action subject to judicial review under the APA. *See Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (collecting cases and observing that "numerous courts have found that a plaintiff can satisfy the finality requirement without offering evidence of a formal or official statement regarding the agency's position"); *De La Mota v. United States Dep't of Educ.*, No. 02-cv-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) ("The practical effect of the [agency's] action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the [agency's] action was 'final.'"). Under this pragmatic approach, Treasury's change in access policy is a final agency determination subject to review under the APA because it "mark[s] the 'consummation' of the agency's decision-making process—[and is not] of a merely tentative or interlocutory nature," and is a determination "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S.

16

154, 178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (internal citation omitted).

### a. Exceeds Statutory Authority and Contrary to Law

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) ("*NRDC*") ("It is well settled that an agency may only act within the authority granted to it by statute."). A federal administrative agency is a "creature of statute, having no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress." *NRDC*, 894 F.3d at 108 (emphasis added) (quoting *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002)); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (noting "well-established principle" that "an agency literally has no power to act ... unless and until Congress confers power upon it" (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))). An agency's statutory authority will "not be lightly presumed." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001).

The APA instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory ... authority." 5 U.S.C. § 706(2)(C). "In reviewing an agency's statutory authority, or lack thereof, 'the question ... is always whether the agency has gone beyond what Congress has permitted it to do.'" *New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 517 (S.D.N.Y. 2019) (quoting *NRDC*, 894 F.3d at 108).

There are a number of statutes and regulations that govern the handling and disclosure of PII and other sensitive financial information and place various restrictions on those who may

lawfully access such information. None of these laws and regulations authorizes Treasury to grant the expansive disclosure allowed by the Agency Action.

The Privacy Act of 1974 sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains. *See* 5 U.S.C. § 552a(b). The Privacy Act lists 13 exceptions to the bar on disclosure, but none can be reasonably construed to permit disclosure to SGEs or political appointees who have no "need for the record in the performance of their duties," 5 U.S.C. § 552a(b)(1). Nor does the Privacy Act authorize disclosure without following a notice protocol,[18] which the Agency Action does not do. *See* 5 U.S.C. § 552a(e)(11). The notice must include information on the categories of individuals and records in the system, the routine uses of the records, and the agency's policies on storage, access, retention, and disposal. 5 U.S.C. § 552a(e)(4).[19] The Treasury Department exceeded its authority by providing records pertaining to individuals, without their consent, to DOGE team member who are not Treasury Department employees.

Section 208 of the E-Government Act of 2002, codified in 44 U.S.C. § 3501, mandates that an agency conduct a privacy impact assessment before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form." Section 208(b)(1)(A)(i). There is no authority under this statute to develop a plan to disseminate PII or other sensitive information without conducting in advance a privacy impact assessment, which Defendants did not do before adopting and implementing the Agency Action.

---

[18] Under the Privacy Act, an agency must publish a SORN in the Federal Register. 5 U.S.C. § 552a(e)(4).

[19] "Routine use" refers to using records for purposes compatible with their original collection. 5 U.S.C. § 552a(a)(7).

Pursuant to the Tax Reform Act of 1976, 26 U.S.C. § 6103, tax information, including returns and return information, is to be treated as confidential and subject to disclosure only when expressly authorized by statute. For employees of the Treasury Department, disclosure of tax information is strictly limited to those "officers and employees" "whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). There is no authority under the statute to allow disclosure to SGEs, such as DOGE team members, or any other employees who perform no duties that relate to tax administration purposes.

There are also regulations that govern Treasury's collection, use, disclosure and protection of SSNs. Specifically, the Office of the Secretary of the Treasury, within Treasury, has specific guidelines on when the Secretary must collect and maintain full SSNs, as well as restrictions on disclosure of SSNs: "[w]henever feasible, Treasury must mask, or truncate/partially redact Social Security numbers visible to authorized Treasury/component information technology users so they only see the portion (if any) of the Social Security number required to perform their official Treasury duties." 31 C.F.R. § 1.32(d). These regulations do not authorize Treasury to grant indiscriminate access to full SSNs, particularly to those such as DOGE team members who have no job-related need for access.

Finally, title 18 of the U.S. Code provides ethics rules applicable to federal employee conduct in order to avoid conflicts, including those that arise from personal interests that affect official action. *See* 18 U.S.C. § 208(a). SGEs are governed by these ethics rules, including § 208(a), and subject to penalties under section 216 of the Code. *See* 18 U.S.C. § 216 (describing the penalties and injunctions for violating, inter alia, §§ 207 and 208, including civil penalties up to $50,000 for each violation, or an injunction to enjoin further violations). The only exception from § 208(a)'s requirements relevant here would be for the appointing official of an SGE (with a duly

19

filed financial disclosure pursuant to chapter 131 of title 5) to review the SGE's disclosure and certify that the SGE's work "outweighs the potential for a conflict of interest." 18 U.S.C. § 208(b)(3). The statute does not authorize disclosure to an SGE without such a certification, yet such disclosures have been made to DOGE team members.

Similar to the concept of "excess of statutory authority," agency action is "contrary to law" where it rests on an impermissible and irrational construction of the law that flies in the face of established agency precedent, conflicts with other important statutory and constitutional protections, and would lead to absurd results. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 400-01 (2024); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 979 (9th Cir. 2020); *Ferguson v. Ashcroft*, 248 F. Supp. 2d 547, 572 (M.D. La. 2003). When an agency's action is "not in accordance with law," courts have a duty to set it aside. 5 U.S.C. § 706(2)(A). An agency's decision to disclose information in violation of law is the type of agency action for which the courts can provide redress. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979).

For the same reasons that the Agency Action exceeds Treasury's statutory authority, it is also contrary to law.

### b.  *Arbitrary And Capricious*

The Administrative Procedure Act (APA) requires agencies to engage in "reasoned decision making." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). An agency's decision is considered arbitrary if it fails to "consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Consistent with this requirement that agency action be neither arbitrary nor capricious, it is a "longstanding principle of administrative law that '[a]n administrative agency has a duty to

20

explain its ultimate action.'" *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 596 (S.D.N.Y. 2019) (quoting *Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 92 (2d Cir. 2009)). This requirement, "that an agency provide reasoned explanation for its action would ordinarily demand that [the agency] display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio.*" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009) (emphasis in original); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

The explanation requirement "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct." *Saget v. Trump*, 375 F. Supp. 3d 280, 355 (E.D.N.Y. 2019). Through the APA, Congress imposes "the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *Fox Television Stations, Inc.*, 556 U.S. at 537 (Kennedy, J., concurring in part and concurring in the judgment). The APA therefore requires courts to set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §§ 706(1), (2)(A).

In this case, Secretary Bessent changed a longstanding policy protecting PII and sensitive financial information within days of being sworn in to allow DOGE-affiliated SGEs to access BFS's payment systems that contain protected information. This decision failed to account for legal obligations to protect such data and ignored the privacy expectations of federal fund recipients interacting with federal agencies, including States, veterans, retirees, and taxpayers. Furthermore, allowing DOGE SGEs access to sensitive information lacked a rational basis and

was unreasonable, particularly given the lack of transparency about DOGE's members, their qualifications, security clearance, their job duties, and the scope of their access.[20]

### 2. The Agency Action Granting Expanded Access to BFS Payment Systems Is *Ultra Vires* (Count 4)

Courts are empowered to review and enjoin actions by Executive Branch officials that extend beyond delegated statutory authority—*i.e.*, *ultra vires* actions. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949); *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1111 (2024). For the same reasons that the Agency Action exceeds statutory authority under the APA analysis, *see supra* at Part II.A.1, the same statutory authority provides no basis for Treasury to adopt and implement the Agency Action expanding access to BFS's payment systems to political appointees and DOGE team SGEs.

### 3. The Agency Action Violates the Separation of Powers Doctrine (Count 5)

Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in Congress." U.S. Const. art. I, § 1. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350)). "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature

---

[20] Jack Newsham, *Some members of Elon Musk's DOGE squad aren't sharing their last names as they attempt to remake the federal workforce*, Yahoo!News, Feb. 4, 2025 ("Elon Musk's federal efficiency team is shielding the identities of some of its members during meetings with federal workers"), available at https://www.yahoo.com/news/members-elon-musks-doge-squad-220811368.html.

itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)). The separation of powers doctrine thus represents a central tenet of our constitution. *See*, *e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *Seila Law LLC*, 591 U.S. at 227.

Consistent with these principles, executive branch powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power. The United States Constitution does not authorize the Executive Branch to "enact, amend, or repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Indeed, Executive Branch officials act at the "lowest ebb" of their constitutional authority and power when they act contrary to the "express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). This Court is authorized to enjoin any action by the Executive Branch that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

The Constitution vests the spending power in Congress alone. U.S. Const. art. I, § 8, cl. 1. Congress may delegate its spending authority to an executive agency, and the agency, in turn, may exercise a degree of discretion in deciding how to spend appropriated funds. *See*, *e.g.*, *Clinton*, 524 U.S. at 466–67 (1998) (Scalia, J., concurring) (listing examples of spending authority delegated to Executive Branch dating to Founding, and noting that "[t]he constitutionality of such appropriations has never seriously been questioned"). However, "[a]n agency may not withhold funds in a manner, or to an extent, unauthorized by Congress." *New York v. HHS*, 414 F. Supp. 3d at 562 (citing *Train v. City of New York*, 420 U.S. 35, 44-46 (1975) and *City and Cty. of San*

*Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018)); *see also In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Executive Branch "does not have unilateral authority to refuse to spend" "the full amount [of funding] appropriated by Congress for a particular project or program").

Here, the only reason that has been publicly articulated for the Agency Action is to enable the DOGE team to block payments to States and their residents of federal funds that have been appropriated by Congress. Compl. ¶ 10, 140-41. As this is the only basis that exists to explain the Agency Action, it is an attempt to usurp Congress's power of the purse in violation of the Separation of Powers doctrine. *New York v. HHS.*, 414 F. Supp. 3d at 562. And for the same reasons explained in the APA analysis that the Agency Action exceeds statutory authority, it also usurps Congress's exclusive legislative authority and contravenes its express statutory mandates restricting the disclosure of private information by federal agencies. *See Clinton*, 524 U.S. at 438 (holding the Executive Branch may not "enact, amend, or repeal statutes"); *see also, e.g.*, 5 U.C.S. sec. 552a(b).

### 4.  The Agency Action Violates the Take Care Clause (Count 6)

The Take Care Clause provides that the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *UARG v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President … faithfully executes them.") (internal quotation marks omitted).

The President violates the Take Care Clause where he declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by

charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

As demonstrated above, the Agency Action is contrary to statutory authority governing how PII and sensitive financial information must be collected, stored, and handled, and how federal funds should be disbursed. *See, supra*, at Part II.A.1. By directing that Treasury adopt and implement the Agency Action, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause. *See UARG*, 573 U.S. at 327.

### B. *States Face Irreparable Harm*

As this Court has recognized, "[a] showing of irreparable harm 'is the single most important prerequisite for the issuance of a preliminary injunction.'" *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 270 (S.D.N.Y. 2012) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Plaintiffs need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).

Absent a TRO, the States will face immediate and irreparable harm in a number of forms. As noted above in discussing the States' injury in fact, the Agency Action gives rise to an immediate harm by violating the States' reasonable expectation that their sensitive financial information will be securely held in accordance with governing law. Instead, under the expanded access policy, their confidential information is being disclosed to individuals who have no lawful right to access such information. In addition, the Agency Action has compromised the cybersecurity of the States' financial information, significantly heightening the risk that the BFS payment systems will be far more vulnerable to hacking or the information will be corrupted or

compromised, and will enable those with newly-gained access to block or impede critical funding payments to the States under their federal grants. Compl. ¶¶ 10, 140-41.

The temporary restraining order entered yesterday by the D.C. District Court in *Alliance for Retired Americans v. Bessent*, No. 1:25-cv-313 (D.D.C.) ("*ARA*"), does not change this conclusion. That order continues to permit two SGEs affiliated with DOGE to have access to the BFS payment records and payment systems, restricts their access to "read only" just for payment records and not payment systems, and does not direct that any copies of data from the systems made since the Agency Action took effect be destroyed. *ARA*, Dkt No. 13.

### C. The Equities and Public Interest Strongly Favor Plaintiff States

To obtain preliminary relief, Plaintiffs must also show that the balance of the equities tips in their favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the federal government is a party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As an initial matter, the States have established both an overwhelming likelihood of prevailing on the merits of their challenge to the Agency Action and irreparable harm. The States' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

Moreover, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d

at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Conversely, courts routinely observe that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C. v. United States Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (internal quotation marks, citations, and alterations omitted) (collecting cases). As the States have shown, the Agency Action exceeds statutory authority, violates the APA in multiple respects, and violates the Separation of Powers doctrine and the Take Care Clause. There is, therefore, a strong public interest in enjoining Defendants from continuing to implement the Agency Action that affords expanded access to BFS payment systems beyond career civil servants with a need for access to perform their duties. Put simply, the public has a strong interest in the federal government playing by the rules. *See*, *e.g.*, *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) ("[I]t is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law.").

On the other end of the scale, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). There is no public interest served by allowing Defendants to continue implementing the Agency Action that is ultra vires, violates the APA, and is unconstitutional. A TRO enjoining the exercise of such unlawful conduct will protect the interests of the States and their residents in the privacy and confidential of their sensitive information that resides in the BFS payment systems.

## CONCLUSION

For the foregoing reasons, the States respectfully request that a TRO be entered to maintain

the status quo pending adjudication of a preliminary injunction motion.

Dated: New York, New York
       February 7, 2025

                                        Respectfully submitted,

LETITIA JAMES
  ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Colleen K. Faherty
  *Special Trial Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*

ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

By: /s/ *Michael S. Cohen*
Michael S. Cohen*
  *Deputy Attorney General*
Thomas S. Patterson*
  *Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
  *Supervising Deputy Attorneys General*
Nicholas Green*
Jay Russell*
  *Deputy Attorneys General*
California Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6090
Michael.Cohen@doj.ca.gov

*Counsel for the State of California*

KRISTEN K. MAYES
  ATTORNEY GENERAL OF ARIZONA

By: */s Joshua D. Bendor*\*
Joshua D. Bendor*
Joshua A. Katz*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

PHIL WEISER
  ATTORNEY GENERAL OF COLORADO

By: */s Shannon Stevenson*
Shannon Stevenson*
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

By: */s Matthew Fitzsimmons**
Matthew Fitzsimmons*
  *Chief Counsel*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Matthew.fitzsimmons@ct.gov


*Counsel for the State of Connecticut*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAI'I

By: */s Kaliko'onālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


*Counsel for the State of Hawai'i*


**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
jason.anton@maine.gov


*Counsel for the State of Maine*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

By: /s/ *Vanessa L. Kassab*
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


*Counsel for the State of Delaware*


**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead
  *Public Interest Counsel*
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


*Counsel for the State of Illinois*


**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

By: */s Adam D. Kirschner**
Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
akirschner@oag.state.md.us


*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL
  COMMONWEALTH OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz
  *State Solicitor*
One Ashburton Place
Boston, MA 02108
617-963-2427
david.kravitz@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: /s *Liz Kramer*
Liz Kramer*
  *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

By: /s *David Leit*
David Leit
  *Assistant Attorney General*
(609) 414-4301
david.leit@law.njoag.gov

Kashif Chand
  *Chief, Deputy Attorney General*
(609) 696-5160
kashif.chand@law.njoag.gov

124 Halsey Street
Newark, NJ 07101

*Counsel for the State of New Jersey*

**JEFF JACKSON**
   ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
   CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
   *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**PETER F. NERONHA**
   ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Alex Carnevale*
Alex Carnevale*
   *Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSH KAUL**
   ATTORNEY GENERAL OF WISCONSIN

By: /s/ Brian P. Keenan
Brian P. Keenan
   State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us

*Counsel for the State of Wisconsin*

**DAN RAYFIELD**
   ATTORNEY GENERAL OF OREGON

By: /s/ Elleanor H. Chin
Elleanor H. Chin
   *Senior Assistant Attorney General*
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
   ATTORNEY GENERAL OF VERMONT

By: /s/ Jonathan Rose
Jonathan Rose*
   *Solicitor General*
Appellate Unit
Office of the Attorney General
109 State Street, 3rd Floor
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 8,420 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
       February 7, 2025

<div style="margin-left: 40%;">

LETITIA JAMES
Attorney General of the State of New York

By: /s Andrew Amer
Andrew Amer
  Special Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

</div>