# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK; STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; U.S. DEPARTMENT OF THE TREASURY; and SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF U.S. DEPARTMENT OF THE TREASURY, <br><br> Defendants. | C.A. No. _____25-CV-1144_____ <br><br> **REQUEST FOR EMERGENCY TEMPORARY RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(B)** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      The U.S. Treasury Department maintains and safeguards our nation's central bank account. Treasury's Bureau of Fiscal Services ("BFS") receives coded payment instructions in the form of payment files from a host of federal agencies to disburse funds to tens of millions of Americans every year – money they depend on to live. These funds include social security

benefits, veteran's benefits, childcare tax credits, federal employee wages, and federal tax refunds. Plaintiff States also receive billions of dollars in funds every year directly from Treasury through BFS under federal grant programs. The States rely on these federal programs to provide vital services for their residents, including Medicaid (the single largest federal funding stream to the Plaintiffs), FEMA funds for disaster relief and management, Edward Byrne JAG grants essential to law enforcement and criminal justice programs, education funding, and foster care programs.

2.    The payment files, which are uploaded to BFS's payment systems, contain a variety of sensitive personally identifiable information ("PII"), including social security and bank account numbers, as well as confidential financial information about the amount and type of payment being made. BFS also contains Federal Tax Information (FTI) regulated by Internal Revenue Code section 6103 and 26 CFR Part 301, and Automated Clearing House (ACH) data subject to 31 CFR Part 210.

3.    Until several days ago, consistent with laws and regulations governing the collection, storage, handling, and disclosure of PII, only a limited number of career civil servants employed at BFS with appropriate security clearance had access to the BFS payment systems – access necessary for them to perform their job function of ensuring BFS operates securely as intended when disbursing the federal dollars appropriated by Congress to the States and their residents.

4.    That all began to change with the creation of the Department of Government Efficiency ("DOGE"). The President announced DOGE in November 2024, advertising that it

would be co-led by billionaire Elon Musk and cut federal government spending.[1] That idea came to fruition on Inauguration Day, with a January 20, 2025 Executive Order entitled "Establishing and Implementing the President's 'Department of Government Efficiency.'"[2] One of DOGE's primary missions is to try to cut federal spending. Plaintiffs are informed and believe that DOGE is attempting to access government data to support initiatives to block federal funds from reaching certain disfavored beneficiaries. For instance, as the President prepares to attempt to shut down the Department of Education, DOGE has been accessing student financial records.[3] DOGE has also gained access to Consumer Financial Protection Bureau systems data in support of Mr. Musk's effort to, in his own words, "[d]elete CFPB."[4]

5.    As of February 2, 2025, the President and Treasury Secretary, directed Treasury to grant expanded access to BFS payment systems to political appointees and "special government employees" for reasons that have yet to be provided, although one apparent purpose, upon information and belief. Upon information and belief, one purpose is to allow DOGE to advance a stated goal to block federal funds from reaching beneficiaries who do not align with the President's political agenda. For example, DOGE was tasked with freezing payments issued by the U.S. Agency for International Development ("USAID") and sought access to BFS payment systems to accomplish that goal.[5] Virtually unfettered access to BFS payment systems

---

[1] Elon Musk and Vivek Ramaswamy will lead new 'Department of Government Efficiency' in Trump administration | CNN Politics

[2] Establishing And Implementing The President's "Department Of Government Efficiency" – The White House

[3] Trump preps order to dismantle Education Dept. as DOGE probes data

[4] Musk's DOGE Descends on CFPB With Eyes on Shutting It Down

[5] DOGE was tasked with stopping Treasury payments to USAID, AP sources say

was granted to at least one 25-year-old DOGE associate, Mark Elez, who, on information and belief, had the authority to view or modify numerous critical files.[6] Indeed, reports indicate that Elez had administrative privileges over the BFS payment system's code, giving him the ability to alter user permissions and "read and write" code—even if the associate had "read-only" access to the system's data.[7] Elez has since resigned from DOGE after being linked to racist social media posts.[8]

6.      Around the same time that DOGE associates were unlawfully granted access to BFS systems, Mr. Musk began publicly stating his intention to recklessly freeze streams of federal funding without warning. On February 2, 2024, Mr. Musk posted on X (formerly Twitter), an online social media platform, that DOGE is "rapidly shutting down" various "illegal payments" made by the government to grant recipients, including payments to Lutheran Family Services to provide services to migrant children.[9] That same day, Mr. Musk posted that his team "spent the weekend feeding USAID into the wood chipper." Since then, Mr. Musk has unambiguously called for the cancellation of various streams of federal funding. For instance, on February 6, 2025, he alleged: "Billions of taxpayer dollars to known FRAUDULENT entities are STILL being APPROVED by Treasury. This needs to STOP NOW!"[10] Mr. Musk has also made

---

[6] A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System | WIRED

[7] https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/

[8] DOGE Staffer Resigns Over Racist Posts

[9] Elon Musk on X: "The @DOGE team is rapidly shutting down these illegal payments" / X

[10] Elon Musk on X: "Billions of taxpayer dollars to known FRAUDULENT entities are STILL being APPROVED by Treasury. This needs to STOP NOW!" / X

wild, unsubstantiated claims about the BFS payment system and suggested putting it on the blockchain.[11]

7.    Consistent with Mr. Musk's statements, there have been numerous interruptions to federal fundings streams in recent weeks, impacting health clinics,[12] preschools,[13] climate initiatives,[14] and more.[15]

8.    The Treasury has represented that DOGE associates have "read only" access—i.e., the ability to view content, but not the ability to modify it.[16] But the true limitations on DOGE's access remain unclear, and DOGE may still be able to modify the systems in consequential ways.[17] It is also possible that DOGE maintains the ability to collect data from BFS systems and route it to individuals with the ability to, for example, freeze particular payments

9.    Mr. Musk has publicly identified himself as co-head of DOGE and recently posted on social media that his personal associates, all described as "special government

---

[11] Fatima Hussein, "Elon Musk's task force has gained access to sensitive Treasury payment systems, sources say," *PBS News*, Feb. 2, 2025, https://www.pbs.org/newshour/politics/elon-musks-task-force-has-gained-access-to-sensitive-treasury-payment-systems-sources-say; Billy Bambrough, "'This Needs To Stop Now'—Elon Musk Confirms Radical Doge U.S. Treasury Plan," *Forbes*, Feb. 2, 2025, https://www.forbes.com/sites/digital-assets/2025/02/02/this-needs-to-stop-now-elon-musk-confirms-radical-doge-us-treasury-plan/.

[12] Health clinics face cuts, closures as Trump's funding fight ripples outside of Washington

[13] Still locked out of federal funding, several Head Start preschools may need to close temporarily | AP News

[14] How 3 IRA projects are dealing with the spending freeze

[15] Trump's Attempt to Freeze Grant Funding Leaves Nonprofits Reeling - The New York Times

[16] Treasury says Elon Musk's DOGE has "read only" access to payment systems

[17] Day Seven of the Trump-Musk Treasury Payments Crisis of 2025: "Yours and WIRED's Reporting is Actually Doing Something"

employees," have access to BFS payment systems,[18] and are "rapidly shutting down" payments to federal grant recipients.[19] He has also made wild, unsubstantiated claims about the BFS payment system and suggested putting it on the blockchain.[20]

10.     Beyond affording Mr. Musk and his associates the ability to block BFS payments, Defendants' new expanded access policy poses huge cybersecurity risks, including risks to States and States' residents that their information will be used and processed, unchecked, in a manner not permitted by federal law.  Other reports indicate that data from other federal agencies is being fed into an open-source Artificial Intelligence ("AI") system owned and controlled by a private third party without measures taken to ensure the privacy and security of U.S. citizens' and residents' data.[21] The very third party cloud computing service that DOGE is reportedly using for this effort has experienced at least one major security breach.[22]

11.     States cannot bear the risk that sensitive BFS data may also be being fed into AI systems.

12.     The States have not received even basic information about whether sensitive information is being shared with third parties and how that information is being used.  Concerned

---

[18] Treasury Department Letter to Members of Congress Regarding Payment Systems | U.S. Department of the Treasury

[19] Elon Musk on X: "The @DOGE team is rapidly shutting down these illegal payments" / X.

[20] Fatima Hussein, "Elon Musk's task force has gained access to sensitive Treasury payment systems, sources say," *PBS News*, Feb. 2, 2025, https://www.pbs.org/newshour/politics/elon-musks-task-force-has-gained-access-to-sensitive-treasury-payment-systems-sources-say; Billy Bambrough, "'This Needs To Stop Now'—Elon Musk Confirms Radical Doge U.S. Treasury Plan," *Forbes*, Feb. 2, 2025, https://www.forbes.com/sites/digital-assets/2025/02/02/this-needs-to-stop-now-elon-musk-confirms-radical-doge-us-treasury-plan/.

[21] Trump Vs. Education Department: Musk's DOGE Reportedly Running Sensitive Data Through AI

[22] Azure and Microsoft Exchange Servers Victim to Active Exploitation by Hackers – Spiceworks.

residents have turned to state agencies for guidance, directly impacting state resources, despite having no more information than the residents.

13.    DOGE's access of BFS records puts vast amounts of funding for the States and their residents in peril and endangers the PII of States' residents whose information is stored on the payment systems.

14.    Plaintiffs the State of New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, North Carolina, Oregon, Rhode Island, Vermont, and Wisconsin (collectively "States") bring this action against Donald J. Trump, in his official capacity as President of the United States, the United States Department of the Treasury, and Scott Bessent, in his official capacity as Secretary of the U.S. Department of the Treasury ("Defendants"), to end to this new and dangerous expanded access policy.  The States seek preliminary and permanent injunctive relief enjoining Defendants from continuing to implement Treasury's new policy of allowing access to the BFS payment systems containing PII and confidential financial information of tens of millions of the States' residents to anyone other than career civil servants historically permitted access by law to perform their job functions, and a declaration that Treasury's policy change is unlawful and unconstitutional.

15.    The States are entitled to relief on multiple grounds. First, Treasury's new policy granting payment system access to individuals associated with Mr. Musk's DOGE initiative risks interference with the payment of funds appropriated by Congress, exceeds Treasury's statutory authority and therefore is *ultra vires*. Second, Treasury's change in policy violates the Administrative Procedures Act in numerous ways: the change is a final agency action that exceeds statutory authority, is contrary to law, and is arbitrary and capricious. Third, by

permitting expanded access to those that may then block payments contrary to Congressional appropriation, the new policy violates both the Separation of Powers doctrine and the Take Care Clause of the United States Constitution.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction under 28 U.S.C. § § 1331 and 2201(a). *See* 5 U.S.C. § 552a(g)(1)(D).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. §§ 702, 704.

17.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201– 2202, and 5 U.S.C. §§ 705–706.

18.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are an agency of the United States government and officers sued in their official capacities. Plaintiff the State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

### *1. Plaintiffs*

19.    Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

20.     Plaintiff the State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Arizona's chief law enforcement officer and is authorized under Arizona Revised Statute § 41-193(A)(3) to pursue this action.

21.     The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

22.     Plaintiff the State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state of the United States. The Attorney General acts as the chief legal representative of the state, and is authorized under section 24-31-101, C.R.S., to pursue this action.

23.     Plaintiff the State of Connecticut, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Connecticut's chief legal officer and is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

24.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. 29 Del. C. § 2504.

25.     Plaintiff the State of Hawai'i, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

26.     Plaintiff the State of Illinois is a sovereign state of the United States. It is represented in this action by the Attorney General of Illinois, who is the chief legal officer of the State and is authorized to pursue this action on behalf of the State pursuant to Article V, Section 15 of the Illinois Constitution and 15 ILCS 205/4.

27.     Plaintiff the State of Maine, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Maine's chief law officer and is authorized under 5 Me. Rev. Stat. Ann. sec. 191 to pursue this action.

28.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

29.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States.  The Attorney General is the chief law officer of the Commonwealth and is authorized under Mass. Gen. Laws ch. 12, s. 3, to pursue this action.

30.     The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison who is the chief law enforcement officer of Minnesota.

31.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

32.     Plaintiff State of New Jersey is a sovereign state of the United States. The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

33.     Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

34.     Plaintiff the State of Oregon, represented by and through Attorney General Dan Rayfield, is a sovereign state of the United States. The Oregon Attorney General is Oregon's chief law enforcement officer and authorized to pursue this action by Oregon Revised Statutes Chapter 180. Oregon's more than 4.2 million residents have numerous contacts with federal financial systems and the Defendants have now exposed their sensitive financial information not just individuals lacking qualifications and security clearance, but potential hostile actors and malware attacks. In addition to the majority of Oregonians who pay taxes, residents of the State of Oregon include veterans, employees of multiple federal agencies who received their wages through federal payment systems, and vulnerable individuals participating in federal programs for children, crime victims, and persons with disabilities.

35.     Plaintiff the State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

36.     The State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer of Vermont.

11

37.    The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul who is the chief law enforcement officer of Wisconsin.

### 2. Defendants

38.    Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.

39.    Defendant the United States Department of the Treasury ("Treasury") is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. Treasury is responsible for ensuring the financial security of the United States.

40.    Defendant Scott Bessent is sued in his official capacity as the Secretary of the U.S. Department of the Treasury and in that role is responsible for the operations of Treasury and management the finances of the United States.

ALLEGATIONS

### 1. The Administrative Procedure Act

41.    The APA permits judicial review by persons "suffering legal wrong because of agency action, or adversely aggrieved by agency action." 5 U.S.C. § 702; *see id.* §§ 7031.

42.    The APA provides that courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; that is "not in accordance with law"; or that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. §§ 706(2)(A), (C), (D).

### 2. *Laws and Regulations Governing Sensitive Information*

43.     Federal laws and regulations protect sensitive personal and financial information from improper disclosure and misuse, including by barring disclosure to individuals who lack a lawful and legitimate need for access.

### a. *Privacy Act of 1974*

44.     Congress enacted the Privacy Act of 1974 to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring governmental agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves. 5 U.S.C. § 552a.

45.     To accomplish this purpose, the Privacy Act sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains. *See* 5 U.S.C. § 552a(b). One condition under which disclosure is permitted without consent of the individual is to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties[.]" *Id.* § 552a(b)(1). When such disclosures are made to another U.S. agency, the activity must be "authorized by law" and the "head of the agency" must have made a "a written request ... specifying the particular portion desired and the law enforcement activity for which the record is sought[.]" Id. § 552a(b)(7). The Privacy Act's other allowances for disclosure of private information are similarly specific.

46.     The Privacy Act was passed largely out of concern over "the impact of computer data banks on individual privacy." H.R.Rep. No. 93–1416, p. 7 (1974). The Privacy Act provides generally that "[n]o agency shall disclose any record which is contained in a system of records ...

except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b) (1982 ed., Supp. V).

47.    The Privacy Act lists 13 exceptions to the bar on disclosure, two of which are relevant here. Specifically, an agency may disclose the records it maintains within the agency "to those officers and employees of the agency…who have a need for the record in the performance of their duties." *Id*. § 552a(b)(1). Second, pursuant to the Act's record notice protocol,[23] an agency must give 30 days' notice of new or revised record SORNs, allowing public comments (5 U.S.C. § 552a(e)(11)). A SORN must include information on the categories of individuals and records in the system, the routine uses of the records, and the agency's policies on storage, access, retention, and disposal. (5 U.S.C. § 552a(e)(4)).[24]

48.    The Bureau has 20 systems of records, for which it has issued a system of record notice. As relevant here, (i) **SORN .002** involves payment records for individuals receiving payments from the U.S. government, containing personal data like Social Security numbers, payment amounts, and bank account information (85 Fed. Reg. at 11779); (ii) **SORN .012** pertains to individuals who owe debts to the government, including detailed financial information like income, assets, and liabilities (85 Fed. Reg. at 11794); and (iii) **SORN .013** includes records about individuals who electronically authorize payments to the federal government, containing information such as bank account details and user credentials (85 Fed. Reg. at 11796-97).

---

[23] Under the Privacy Act, an agency that has a system of records about individuals must publish a notice in the Federal Register "of the existence and character" of that system ("SORN"). 5 U.S.C. § 552a(e)(4).

[24] "Routine use" refers to using records for purposes compatible with their original collection (5 U.S.C. § 552a(a)(7)).

###### b. *E-Government Act of 2002*

49.    The E-Government Act of 2002 recognizes the importance of information security to the economy and national security interests of the United States. 44 U.S.C. § 3501.

50.    Congress passed the E-Government Act to "promote the use of the Internet and electronic government services," "to make the Federal Government more transparent and accountable," as well as "to provide enhanced access to Government information and services in a manner consistent with laws regarding protection of personal privacy, national security, records retention, access for persons with disabilities, and other relevant laws." *Id.*

51.    Section 208 of the E-Government Act requires agencies to perform and publish a privacy impact assessment ("PIA") in certain circumstances involving collection, maintenance, or dissemination of personal information in an identifiable form. The purpose of this section is to ensure sufficient protections for the privacy of PII as agencies implement citizen-centered electronic Government.

52.    The Federal Information Security Management Act ("FISMA") is a federal law enacted under Title III of the E-Government Act of 2002.

53.    The "FISMA 2002"[25] required each federal agency to develop, document, and implement an agency-wide program to provide information security for the information and systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other sources.[26]

---

[25] The FISMA as enacted under the E-Government Act of 2002 in that year, "FISMA 2002," was amended by the Federal Information Security Management Act of 2014.

[26] As defined in FISMA 2002, "[t]he term 'Federal information system' means an information system used or operated by an executive agency, by a contractor of an executive agency, or by another organization on behalf of an executive agency."

54.     Updates to FISMA in 2014 provided several modifications that modernized federal security practices to address evolving security concerns. The changes, amongst other things, strengthened the use of continuous monitoring in systems and increased focus on the agencies for compliance and reporting that is more focused on the issues caused by security incidents. FISMA 2014 also required the Office of Management and Budget (OMB) to amend/revise OMB Circular A-130 to eliminate inefficient and wasteful reporting and reflect changes in law and advances in technology.[27]

55.     In support of and reinforcing FISMA, OMB through Circular A-130, *"Managing Federal Information as a Strategic Resource*," requires executive agencies within the federal government to: (i) Plan for security; (ii) Ensure that appropriate officials are assigned security responsibility; (iii) Periodically review the security controls in their systems; (iv) Authorize system processing prior to operations and, periodically, thereafter. *Id.*

56.     Under FISMA, the National Institute of Standards and Technology ("NIST") must set standards and best practices for information security at federal agencies, and agencies must meet security standards and conduct annual, independent evaluations of their information security. 44 USC §§ 3543-3545.[28]

57.     Accordingly, under FISMA, federal agencies need to provide "information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of (i) information collected or maintained by or on behalf of an agency; and (ii) information systems used or

---

[27] http://csrc.nist.gov/projects/risk-management/fisma-background

[28] *See also* NIST, NIST Risk Management Framework (updated Sept. 24, 2024) https://csrc.nist.gov/projects/risk-management/fisma-background

operated by an agency or a contractor of an agency or other organization on behalf of an agency, in addition to also "comply[ing] with the information and security standards and guidelines, and mandatory required standards developed by NIST."[29]

### c. 26 U.S.C. § 6103

58.     Pursuant to the Tax Reform Act of 1976, tax information, including returns and return information, must be treated as confidential and subject to disclosure only when authorized by statute. According to the legislative history of the enactment, Congress was concerned about abuses related to the treatment and disclosure of such information.  Staff of Joint Comm. on Int. Rev. Tax., 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) at 326-27. Among the specific abuses enumerated by Congress were the use of tax return information by the White House for non-tax matters, use by the Justice Department and United States Attorney offices in both tax and non-tax civil and criminal proceedings to impeach witnesses or discredit their testimony, and the lack of adequate safeguards over the access to and improper use of such information at the state and local levels.

59.     Accordingly, under Section 6103, Congress has authorized disclosure of tax returns and/or return information under only thirteen limited circumstances, and subject to criminal penalties for violating the disclosure prohibitions. 26 U.S.C. § 6103(c).

60.     Relevant here, § 6103(h)(1) specifies that authorized disclosures to federal officers and employees in Treasury "be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes."

---

[29] *Id.*

### d. 31 CFR 1.32.

61.    Pursuant to the Code of Federal Regulations, title 31, subtitle A, Part 1, section 1.32, there are restraints on Treasury's collection, use, disclosure and protection of social security numbers ("SSNs"). Specifically, the Office of the Secretary of the Treasury, within Treasury, has specific guidelines on when the Secretary must collect and maintain full SSNs, as well as prohibitions on disclosure of SSNs.

62.    Section 1.32(d) further specifies that, "[w]henever feasible, Treasury must mask, or truncate/partially redact Social Security numbers visible to authorized Treasury/component information technology users so they only see the portion (if any) of the Social Security number required to perform their official Treasury duties."

### e. 18 U.S.C. §§ 207, 208

63.    The federal government maintains a compilation of ethics laws that constitute an ethics code to govern the conduct of federal employees. Title 18 of the U.S. Code provides restrictions on federal employee conduct in order to ensure such employees avoid conflicts, including personal interests that affect official action. *See* 18 U.S.C. § 208(a);[30] *see also* 5 C.F.R. part 260. Special government employees are contemplated in these ethics rules, including § 208(a), and subject to penalties under section 216 of the Code. *See* 18 U.S.C. § 216 (describing

---

[30] "Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest— Shall be subject to the penalties set forth in section 216 of this title."

18

the remedies for violating, *inter alia*, §§207 and 208, include civil penalties up to $50,000 for each violation, or an injunction to enjoin further violations).  The only exception from § 208(a)'s requirements relevant here would be for the appointing official of a special government employee (with a duly filed financial disclosure pursuant to chapter 5 of title 31), to review the SGE's disclosure and certify that the special government employee's work "outweighs the conflict of interest." 18 U.S.C. § 207(c).

### 3. *Treasury and the Bureau of Fiscal Services*

64.    Treasury is an executive branch department of the United States government; it functions as the national treasury and the finance department for the federal government. 31 U.S.C. § 301. Part of Treasury's function is to collect all federal taxes through the Internal Revenue Service; manage U.S. government debt instruments; license and supervise banks and thrift institutions; and advise the legislative and executive branches on matters of fiscal policy.[31]

65.    Treasury is responsible for managing the finances of the United States Government. Its responsibilities include collecting receipts owed to the government and making payments to recipients of public funds. 31 U.S.C. §§ 3301, 3321. In fiscal year 2024, Treasury handled $6.752 trillion in disbursements, including $1.46 trillion for social security benefits.[32] Treasury is the largest collections, payments, cash management, and financial operation in the world.

---

[31] *See* https://home.treasury.gov/about/general-information/role-of-the-treasury.

[32] U.S. Dep't of Treas., Bur. of Fiscal Serv., Final Monthly Treasury Statement, Receipts and Outlays of the United States Government For Fiscal Year 2024 Through September 30, 2024, and Other Periods 4.

66.    Treasury is split into two main organized components: departmental offices and operating bureaus. Treasury's departmental offices are "primarily responsible for the formulation of policy and management of the Department as a whole, while the operating bureaus carry out the specific operations assigned to the Department." *Id.*

67.    BFS is one of Treasury's operational bureaus. As described in its mission statement, BFS seeks to "promote financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services."[33]

68.    BFS's executive functions include (i) collecting funds: "Provid[ing] citizens a variety of modern electronic options for paying federal taxes, charges, and fees. Minimiz[ing] lockboxes and paper processing"; (ii) disbursing funds: "[c]reat[ing] a seamless end-to-end process that is all-electronic from the initiating transaction through settlement: more agile, efficient, and resilient."; (iii) financing: "…offering Treasury securities to investors through modern, secure, and reliable technology"; (iv) reporting: "[p]roviding federal agencies and the American public information that is accurate, accessible, and transparent [and s]treamlining the federal reporting process to reduce agency reporting burden"; and (v) servicing: "[p]rovid[ing] customer-centric services and solutions to agencies that enable improved decision-making and high-performance through innovation, standardization, operational efficiency, and risk reduction."[34]

---

[33] https://fiscal.treasury.gov/about.html.

[34] https://fiscal.treasury.gov/about.html.

69.     Handling 1.2 billion transactions a year, BFS disburses 90% of all federal payments.[35] Relevant here, BFS is responsible for the following federal agency disbursements to individuals: social security benefits, veteran's benefits, childcare tax credits, federal employee wages, and federal tax refunds. BFS is also responsible for disbursing directly to the States funds for the following federal programs, to name just a few: Medicaid, FEMA, Edward Byrne JAG grants, education funding, and foster care programs.

70.     The two relevant systems that BFS relies on to perform its executive functions are the Payment Automation Manager ("PAM") and the Secure Payment System ("SPS").

71.     For BFS to issue disbursement of federal funds through these payment systems, federal agencies who owe payments to recipients outside of the federal government prepare and send to BFS a "payment file" containing the coded payment instructions for the desired disbursements after they certify that the payees are eligible to receive the funds.  These payment files contain PII, such as social security numbers, home addresses, and bank account numbers, as well as confidential financial information consisting of the amount of the funds being disbursed and the type of payment (*e.g*., whether the payment is a veterans benefit, or tax refund, etc.). Once the agency certifies the payee is eligible by checking various "bad actor" databases (including, for example, lists of those deemed bad contractors or subject to sanctions), the agency sends the payment file to BFS, which then utilizes its PAM and/or SPS systems to disburse the funds as directed by the sending agency.

72.     Because the responsible agency has certified the payment file, and other Treasury officials have checked the bad actor database, BFS's role is to process the disbursement of funds

---

[35] *See* Treasury Department Letter to Members of Congress Regarding Payment Systems | U.S. Department of the Treasury.

in accordance with the coded data in the payment file as received from the sending agency. In other words, "the agency responsible for making the payment always drives the payment process."[36]

73.    Housed on a secure mainframe, the PAM and SPS systems control government payments that in their totality amount to more than a fifth of the US economy.

### a. *BFS Disbursements to States and Their Residents*

74.    BFS disburses billions of dollars directly to the States through a host of federal programs that are critical for the States to provide vital services for their residents. Such funding streams include distributions from Medicaid funds, FEMA, Edward Byrne Jag Memorial Justice Assistance grants, education funding, and foster care programs.  Across our Plaintiff State coalition, the States and their residents receive billions of dollars flowing from federal distributions.

75.    BFS disbursements also include payments to the States' residents in various forms, including for example through social security benefits, veteran's benefits, childcare tax credits, federal employee wages, and federal tax refunds.  BFS also disburses billions of dollars directly to the States through a host of federal programs that are critical for the States to provide vital services for their residents.

76.    In total, New York received $94.3 billion in federal funds to the State's general checking bank account for NYS governmental funds for fiscal year ending 3/31/24.  The majority of the receipts are received using a UPIC account, which only allows deposits.  If the

---

[36] Treasury Department Letter to Members of Congress Regarding Payment Systems | U.S. Department of the Treasury.

Federal government sends a wire, the State's general checking bank account information would be used, which is minimal, but is sensitive banking information.

77.    New York has $4 billion in FEMA reimbursements provided as public assistance for the 2024-25 State Fiscal Year distributed to the State and municipalities for rebuilding, recovery and improved resiliency after a disaster declaration.

78.    New York's Department of Labor's receives approximately $868 million, 86% of its 2024-2025 enacted budget, from federal distributions to deliver federal and state programs related to administering unemployment insurance, engaging in workforce development, and enforcing the New York State Labor Law.

79.    BFS disbursements that flow into New York include the Social Security Administration program which provides social security retirement benefits distributed directly from the federal government to the individual New York recipients.  In 2024, 3,764,852 New Yorkers received Social Security benefits distributed from the federal program; as well as 562,775 New Yorkers who received SSI benefits distributed directly, and 506,323 New Yorkers who directly received their SSDI benefits directly from the federal program.

80.    For New York to receive its billions of dollars in federal funds, it operates in a reimbursement model.  The State pays from its treasury for State administered federal programs, and on the back end seeks federal reimbursement through the federal government's funding portal system.  In those instances where federal reimbursement is sent by wire, sensitive New York wiring and ACH bank account information is provided in order for the funds to be directed to New York.

81.     New York receives $70 billion from the federal government in Medicaid funds. There are approximately 6.8 million Medicaid beneficiaries in New York State, nearly all of whom receive federally-funded Medicaid distributions.

82.     Arizona, for example, expects to receive a total of $30 billion in federal funding, dispersed via BFS, during fiscal year 2025.[37]

    a.   Much of that money funds health and human service ($24.7 billion).  The Arizona Healthcare Cost Containment System (AHCCCS, Arizona's Medicaid service) expects to receive $17.6 billion in fiscal year 2025 through Medicaid.

    b.   AHCCCS also receives a total of $186 million annually in federal assistance programs.  This takes the form of $23.8 million in Mental Health Block Grants and $47.8 million in Substance Abuse Block Grants.

    c.   The Arizona Department of Veterans' Services also receives large amounts of federal dollars via BFS in order to serve those who served this Nation.  Each year, the Department receives about $44 million, most of which supports skilled nursing facilities for this Nation's veterans.  That money also funds the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program ($750 thousand) and helps the Department to ensure that colleges about by the G.I. Bill's requirements ($482 thousand).

    d.   Funding received via BFS also protects Arizonans from disaster.  The Arizona Department of Homeland Security has open federal grant awards from FEMA totaling $141 million for fiscal years 2021–24.  Considering all sources of federal

---

[37] Absent the funding freeze implicated in other litigation involving many plaintiff States and the federal government.  *See State of New York v. Trump*, No. 25-0039 (D. R.I. filed Jan. 28, 2025).

funding, Arizona should receive $63 million in total disaster preparation and relief funds in fiscal year 2025.

e.  Funding received via BFS also keeps Arizonans safe from crime via the Edward Byrne Memorial Justice Assistance Grant Program.  That program provides the State and its subdivisions with funds to support justice-related programs.  Arizona receives $5.4 million in grants under this program.

f.  Funding received via BFS is also used to educate Arizonans.  In total, Arizona receives $2.2 billion in federal funding for K-12 education and $1.3 billion for higher education.  Arizona State University, for instance, receives grants from 25 different federal agencies.  Those grants totaled to $510 million in fiscal year 2023.

83.  California receives BFS disbursements for its States' residents in various forms, including:

a.  Social Security Benefits:  In 2023, California citizens received $128.7 billion in Social Security and retirement benefits.

b.  Veterans Benefits:  In 2025, Californians are set to receive $4.3 billion in veterans compensation.

c.  Federal Employees:  In 2024, the federal government paid salaries and wages to 147,487 Californians.

84.  BFS also disburses billions of dollars directly to the States through a host of federal programs that are critical for the States to provide vital services for their residents, including:

a.  Overall:  For 2025-2026, the California Governor's proposed state budget includes more than $170 billion in federal funds, amounting to over one-third of the total state budget.

b.  Education:  The 2025-2026 budget includes $7.9 billion in federal funding for K-12 education, and $7.3 billion for higher education.

c.  Medicaid:  For 2025-2026, California has budgeted $112.1 billion in federal funding for Medi-Cal to provide healthcare services to low-income Californians.

d.  Social Services:  For 2025-2026, California has budgeted $11.7 billion in federal funds for the California Department of Social Services to support child welfare services, foster care, the CalWORKs program, and other services for low-income and vulnerable Californians.

e.  Employment Development Department (EDD):  Currently, California expects $1.3 billion in open grants from the federal government, which are used to support unemployment insurance administration, the Workforce Innovation and Opportunity Act program, Wagner-Peyser program, Jobs for Veterans state grant, and integral job training and placement services.

f.  Edward Byrne Memorial Justice Assistance Grant (JAG):  In 2023, California received $35.7 million in allocations from the JAG fund. (https://bjs.ojp.gov/library/publications/justice-assistance-grant-jag-program-2023)

85.    In the aggregate, Connecticut residents receive approximately $656,760,797 in veterans' benefits annually. In SFY 2024, the State of Connecticut received $6,868,967,920 in federal funding for Medicaid; $1,560,395 under the Edward Byrne JAG program;

$1,221,252,405 in federal grants for education; $28,705,050 in Title IV-E Foster Care payments; $54,702,152 in Title IV-E Adoption Assistance payments; and $5,734,375 in Title IV-E Subsidized Guardian payment.

86.    Based on the Delaware fiscal year, Delaware State has received federal funding distributions in the following ways:

    **a.**  Delaware Byrne JAG Grants:

        **i.**  DE FY 2024 Byrne JAG grants: Total Awarded = $923,744.00

        **ii.**  DE FY 2023 Byrne JAG grants: Total Awarded = $1,079,646.00

        iii.  DE FY 2022 Byrne JAG grants: Total Awarded = $1,006,656.00

    b.  Delaware Medicaid/MCHIP/DE Healthy Children:

        i.  DE FFY 2024 Medicaid Services Federal Share = $2,149,308,652.00

        ii.  DE FFY 2024 Medical Administration Federal Share = $91,151,953.00

        iii.  DE FFY 2024 Maternal and Child Health Integrated Program (MCHIP) Federal Share = $6,653,611.00

        iv.  DE FFY 2024 Delaware Healthy Children Federal Share = $27,810,795.00

    c.  Delaware Emergency Management Agency, DE FY 2024 DEMA grants

        i.  Operational/pass-thru:
            1.  Emergency Management Performance Grant = $2.980M

            2.  Homeland Security Grant Program = $4.320M

            3.  State Local Cyber = $4.545M

        ii.  Disaster/mitigation:
            1.  3 disasters – COVID, Hurricane Isaias, and Hurricane Ida = $290M total, $277M has already been awarded

            2.  Hazard mitigation for above disasters = $4M

       iii.  Competitive
           1.  Non-profit security = $2.311M

    d.  Building Resilient Infrastructure and Communities $1.079M

87.    The State of Hawaiʻi and its residents receive billions of dollars per year from the federal government.  For example:

    a.  According to the 2023 State of Hawaiʻi Data Book, in 2022, the estimated total of Social Security benefits received by Hawaiʻi residents was $5,474,000,000.

    b.  According to the 2023 State of Hawaiʻi Data Book, in 2023, Hawaiʻi residents received $1,511,542,000 in veterans' benefits.

    c.  For Fiscal Year 2024, the State of Hawaiʻi received over $2.365 billion in federal funding for Medicaid as the federal share.

    d.  For Fiscal Year 2024, the State of Hawaii's Child Welfare Services received $81,898,541 in federal funds.

    e.  From Fiscal Year 2021 to Fiscal Year 2024, the State of Hawaiʻi received $3,764,101 from the federal Byrne JAG program.

88.    The State of Illinois has received, and expects to continue to receive, billions of dollars per year from the federal government. For example, Illinois anticipates receiving around $10 billion in Medicaid reimbursements from the federal government in Fiscal Year 2025. In addition, Illinois has received more than $4 billion from the federal government relating to K-12 education in Fiscal Year 2025. In Fiscal Year 2024, Illinois received more than $6.3 million from the federal Byrne JAG program for criminal justice initiatives. Illinois residents also receive, and expect to continue to receive, substantial disbursements from the federal government. For example, Illinois residents and businesses have received more than $72 million from the federal government in Fiscal Year 2025 for disaster relief.

28

89.     Maryland estimates that it received federal disbursements of over $11 billion to the State in FY24, and over $50 billion in federal disbursements to Maryland residents in FY24.

90.     Minnesotans are the recipients of billions of dollars of federal funds per year through federal government programs that are paid out, and through, BFS payment systems. These payments include, for example, social security benefits, earned compensation and benefits from the U.S. Department of Veterans Affairs, and reimbursements for healthcare covered by under Medicare programs.

91.     The State of Minnesota and its agencies have budgeted for $22.6 billion in federal grants revenue for FY 2025. This equates to roughly $1.9 billion per month in FY2025. Approximately 90 percent of federal funds flowing to Minnesota programs are processed via BFS, though the precise amount is not known at this time.

    a.  The Minnesota Department of Transportation receives approximately $1 billion per year from the U.S. Department of Transportation, which are processed by BFS payment systems. These federal dollars fund road construction projects, transit, and airport improvement projects.

    b.  The Minnesota Department of Health receives federal funds via BFS payment systems for programs that include, for example, services for sex-trafficking victims, reduce opioid abuse and overdose fatalities, monitoring and remediating water supply contamination.

    c.  The Minnesota Department of Human Services receives federal funding via BFS payment systems that support its Medicaid programs, IV-E programs that fund child welfare services, Temporary Assistance for Needy Families ("TANF"), Child Care and Development Block Grants ("CCDBG"), and Supplemental

Nutritional Assistance Program. Minnesota's Medicaid program is projected to spend approximately $11.3 billion in federal funds in the current budget year.

     d.   Minnesota local law enforcement agencies annually receive Byrne JAG grants that provide money used to fund local law enforcement initiatives. In Fiscal Year 2024, Minnesota received approximately $1.014 million in Byrne JAG grants that were processed by BFS payment systems.

92.    In 2024, Nevada residents received $435,791,000 in SSI benefits.[38]

93.    As of the end of FY 2022, Nevada Veterans were estimated to have received $1,494,640,188 in compensation benefits and $24,848,212 in pension benefits.[39]

94.    In 2021, Nevada families received more $600,956,000 in the form of childcare tax credits.[40]

95.    As of March 2024, data from the Office of Personnel Management showed that the executive branch of the federal government employed 13,697[41] people in Nevada and Census Bureau data estimated that 40,267 Nevadans self-reported as federal government employees. [42]

---

[38] https://www.ssa.gov/policy/docs/statcomps/supplement/2024/7b.html

[39] https://www.benefits.va.gov/REPORTS/abr/docs/2022-abr.pdf at 42.

[40] https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fhome.treasury.gov%2Fsystem%2Ffiles%2F131%2FAdvance-CTC-Payments-Disbursed-October-2021-by-State-10142021.xlsx&wdOrigin=BROWSELINK

[41] https://crsreports.congress.gov/product/pdf/R/R47716#:~:text=This%20report%20provides%20a%20snapshot%20of%20recent%20statistics,district%20as%20configured%20in%20the%20118th%20Congress%20%282023-2024%29 at 2.

[42] https://crsreports.congress.gov/product/pdf/R/R47716#:~:text=This%20report%20provides%20a%20snap

In 2017, the average salary for a federal employee in Nevada was $74,275,[43] and reports citing OPM data indicate that by March 2023 the average salary reached $92,084.[44]

96.     For FY 2022, Nevadans received approximately $5,772,153,000 in refunds from the Internal Revenue Service.[45]

97.     For FY 2023, total Medicaid spending for Nevada was $5,572,000,000, with the Federal Government responsible for $4,421,000,000 of that total.[46]

98.     Nevada received FEMA grants in the amount of $305,854 for FY 2024 Fall and $86,804 for FY 2024 Spring.[47] And Nevada also recently received a $10,000,000 grant from FEMA for a critical infrastructure project on the Marlette Lake Dam in the Lake Tahoe Basin.[48]

99.     For FY 2024, Nevada law enforcement agencies received $1,221,750 from the Edward Byrne Memorial Justice Assistance Program.[49]

100.    For FY 2023, Nevada received more than $359 million from the Department. In FY 2024, Nevada was slated to receive more than $347 million from the Department and for FY

---

shot%20of%20%recent%20statistics,district%20as%20configured%20in%20the%20118th%20Congress%20
0%282023-2024%29 at 3-4, 10-11.

[43] https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/salary-information-for-the-executive-branch.pdf

[44] https://usafacts.org/articles/how-much-money-do-federal-employees-make/

[45] https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.irs.gov%2Fpub%2Firs-soi%2F22dbnevada.xlsx&wdOrigin=BROWSELINK

[46] https://www.macpac.gov/wp-content/uploads/2024/12/EXHIBIT-16.-Medicaid-Spending-by-State-Category-and-Source-of-Funds-FY-2023.pdf

[47] https://www.fema.gov/emergency-managers/risk-management/dam-safety/grants

[48] https://www.kolotv.com/2024/10/22/nevada-will-get-10-million-fema-prevent-breach-marlette-lake-dam/

[49] https://bja.ojp.gov/funding/jag-local-allocations-nv.pdf

2025 is projected to receive more than $351 million dollars. For FY 2023, Nevada received over $182 million for postsecondary education programs from the Department. For FY 2024, Nevada was slated to receive nearly $209 million for postsecondary education from the Department and for FY 2025 is projected to receive over $230 million for postsecondary education programs.[50]

    101.    The State of New Jersey has received, and expects to continue to receive, billions of dollars per year from the federal government.  For example:

    a.    <u>Social Security:</u>  In New Jersey, 1,689,504 individuals receive Old-Age, Survivors, and Disability Insurance ("OASDI")—popularly known as Social Security—monthly benefits. *Congressional Statistics, 2023*, Social Security Administration, https://www.ssa.gov/policy/docs/factsheets/cong_stats/2023/nj.pdf. 163,405 individuals in New Jersey receive federally administered Social Security Income (SSI) payments. *Id.*

    b.    Medicare: New Jersey, there are 1,768,445 Medicare beneficiaries. *Medicare Enrollment Dashboard*, Data.CMS.gov – Centers for Medicare & Medicaid Services, https://data.cms.gov/tools/medicare-enrollment-dashboard.

    c.    Veteran's Benefits: In New Jersey, there are 299,271 veterans, with 1,864 receiving a pension, 73,675 unique patients treated, 65,451 receiving disability compensation, 7,102 education beneficiaries, 130,929 enrollees in the VA Healthcare system, and 6,983 dependency and indemnity compensation

---

[50]

https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ed.gov%2Fsites%2Fed%2Ffiles%2F2024-10%2F25stbystate.xlsx&wdOrigin=BROWSELINK

beneficiaries. *Distribution of Veterans by County (FY2023), U.S. Department of Veterans Affairs – New Jersey,* https://www.data.va.gov/stories/s/df26-ez7w.

d. Internal Revenue Service (IRS) Tax Refunds and Benefits: In New Jersey there were 4,638,3000 individualized income tax returns filed. *SOI Tax Stats – Data by Congressional District 2022 – New Jersey*, IRS, https://www.irs.gov/statistics/soi-tax-stats-data-by-congressional-district-2022. As an example of just one tax benefit received by New Jersey residents, 1,121,040 returns received a nonrefundable child and other dependent tax credit. *Id.* In New Jersey there were 468,820 refund anticipation check returns. *Id.*

102.   Based on enacted federal laws and federal grant commitments, New Jersey is expected to directly receive approximately $27.5 billion in federal funding across a broad range of programs for fiscal year 2025, including, but not limited to:

a. more than $17 billion for the State's Department of Human Services;
b. more than $2.8 billion for the State's Department of Transportation
c. more than $1.2 billion for the State's Department of Education
d. more than $1.2 billion for the State's Department of Agriculture;
e. more than $700 million for the State's Department of Health;
f. more than $1 billion for the State's Department of Environmental Protection; and
g. almost $600 million for the State's Department of Labor & Workforce Development.

*See e.g.*, The New Jersey Legislature Fiscal Year 2025 Appropriations Act, P.L. 2024, c. 22; Motion for Temporary Restraining Order at 116, *State of New York et al v. Trump et al*, No. 1:25-cv-00039, (D.R.I. Jan. 28, 2025), ECF No. 3-1. New Jersey relies on federal funding to operate critical programs that New Jersey residents depend on, including for healthcare, education, unemployment insurance, and infrastructure. Furthermore, salaries and benefits for approximately 10,000 state employees—representing approximately 15 percent of the State's

payroll—are funded by the federal government. *Id.* at 117. New Jersey relies on approximately

$56 million in federal funding per pay period to pay these employees' salaries and benefits. *Id.*

103.    The State of North Carolina's General Fund received nearly $31 billion in federal

funds in Fiscal Year 2024.  Additional payments from the federal government to the State of

North Carolina and its public institutions are deposited into specialized accounts, including the

Highway Fund.  Most or all of these recipes are believed to come through BFS.

104.    Oregon: Oregonians engaging directly with federal payment systems tied to their

individual banking and tax ID information include:

    a.    Over 700,000 Oregonians over the age of 65 who receive social security
        payments
    b.    Over 270,000 Oregonians are veterans, eligible for various medical and pension
        benefits
    c.    Approximately 19,000 Oregonians employed by federal agencies throughout
        Oregon, in numerous capacities including law enforcement and disaster relief.
    d.    Over 500,000 Oregonians receiving or who have previously received some form
        of federal student aid.

105.    Oregon state agencies that receive payments include but are not limited to Oregon

Department of Emergency Management; Oregon Department of Corrections; Oregon

Department of Veterans' Affairs, Oregon Health Authority, the Oregon Department of Human

Services, the Oregon Department of Forestry, The Oregon Department of Education, the Oregon

State Fire Marshall, Oregon Department of Geology and Mineral Industries, Oregon Water

Resources Department, Oregon Department of Land Conservation and Development, and the

Oregon Criminal Justice Commission

106.    The Oregon Department of Revenue ("DOR") sends state debtor information to

Treasury for offset against federal moneys owed to that debtor.  These payments go through

BFS. DOR shares confidential taxpayer information with the Internal Revenue Service and has

agreements that require the IRS keep state taxpayer information confidential and that require

DOR to keep IRS information confidential too. 26 USC 6103 protects taxpayer identification from disclosure.

107.    Agencies of the State of Oregon receive funds from federal programs, and other federal programs make payments directly to individuals or entities (such as health care providers) in the State of Oregon. Participation in many of these programs is tied to PII of individual Oregonians, including medical information, social security numbers, and banking details. The affected individuals and programs include but are not limited to:

    a.    Over 900,000 Oregonians are eligible for Medicare and Medicare payments in the State of Oregon exceed $12 billion.

    b.    Approximately $1.4 million Oregon residents receive Medicaid, administered through the Oregon Health Plan. Between $8-10 billion dollars in federal Medicaid funds pass through Oregon Health Plan Coordinated Care Organizations and fee for service program each year. These funds are associated with multiple categories of personal information of Oregonians.

    c.    Over $149 million in Self-Sufficiency and nutrition funds and $20 million in Employment Related Day Care funds pass through ODHS each month.

108.    Over 1.5 million Oregonians participate in either supplemental nutrition assistance, temporary cash assistance (including programs for domestic violence survivors), childcare support, or Medicaid. Program participants' PII is in the Public Assistance Reporting Information System, reported quarterly by participating state agencies. BFS has access to the PARIS system and the highly sensitive information in it.

109.    Rhode Island residents annually receive billions in federal benefits, including social security benefits, veteran's benefits, childcare tax credits, Medicaid and Medicare

reimbursements, federal employee wages, and federal tax refunds. In FY 2022[51] Rhode Island residents received: $4,452,000,000 in social security benefits; $464,786,000 in veteran's benefits; $311,911,348 in childcare tax credits; $2,082,600,000 in Medicaid reimbursements; $909,848,149 in Medicare reimbursements; $1,059,652,000 in Federal employee wages; and $1,134,863,000 in federal tax refunds.

110.    Rhode Island also receives hundreds of millions annually from the federal government to fund a host of federal programs. In FY 2025 to date (7/1/2024-2/6/2025), the State of Rhode Island received: $1,457,700,000 for Medicaid; $8.99 million for FEMA; $1.01 million for Byrne JAG education awards; and $8.24 million foster care programs.

111.    Vermont residents receive millions of dollars in social security benefits.  In 2022, for example, over 5,500 Vermont residents received almost $9 million in Supplemental Security Income from the Social Security Administration.  In 2023, over 250,000 Vermont residents received almost $300 million in Old-Age, Survivor, and Disability (OASD) benefits from the Social Security Administration.

112.    In 2024, approximately 3,200 federal civilian employees were based in Vermont. Many of those employees received direct salary payments in Vermont.

113.    In fiscal year 2023, more than 260,000 Vermonters received federal tax refunds.

114.    Also in fiscal year 2023, Vermont had nearly 39,000 veterans, who received over $193 million in compensation and pension benefits from the Veterans Administration.

---

[51] FY 2022 is the most recent year the State of Rhode Island has readily available data. The following data may be slight undercounts of the amount of federal benefits received by Rhode Islanders because it is based on the 91 percent of federal tax returns Rhode Island has access to and publicly available data that may underestimate the proportion of funds being received by residents of Rhode Island.

115.    In state fiscal year 2025, Vermont is anticipated to receive over $1.5 billion in federal Medicaid funding.  As of October 2024, Vermont had enrolled 157,471 individuals in Medicaid and CHIP.

116.    In state fiscal year 2025, Vermont is anticipated to receive nearly $200 million in federal funding to support the work of its Department for Children and Families, including funding to support Vermont's foster care system.

117.    In 2024, Vermont municipalities were awarded over $150,000 in Byrne JAG grants.

118.    In November 2024, FEMA released over $83 million to help Vermont communities rebuild after devastating storms and flooding that occurred in July of 2023. And in 2023, FEMA sent Vermont approximately $22 million to Vermont to reimburse the costs of providing hotel lodging and wraparound services to the homeless and other vulnerable Vermonters during the COVID-19 pandemic.

119.    Wisconsin residents receive federal payments. Approximately 1,275,000 Wisconsinites receive federal Social Security benefits, amounting to billions of dollars of payments. There are approximately 225,000 veterans in Wisconsin who may be eligible for payments of federal benefits. As of March 2024, there are 18,022 federal employees in Wisconsin who receive payments for their services. And Wisconsin, as a state, receives tens of billions of dollars annually in federal aid, with more than half of the money going to the state's Department of Health Services to fund Medicaid programs that make payments to individuals.

120.    The States have a strong interest in ensuring that they and their residents continue to receive disbursement under these critical federal programs, while also not exposing the private information of millions of Americans to security breaches, misuse, malware, or foreign actors.

Without such disbursements by BFS, States would be required to provide additional services to residents denied federal benefits and services and make additional expenditures to ensure the continued welfare of their citizens.

### b. *Treasury Offset Program*

121.    Defendant Treasury, via its Bureau of Fiscal Services, also operates the Treasury Offset Program (TOP). This automated and centralized program intercepts both federal and state payments (for participating reciprocal states, as explained below) to satisfy debts owed to federal or state agencies. Depending on the nature of the debt and the federal source from which it is withheld, offsets range from 15% to 100%.[52]

122.    States are often recipients of offset funds, i.e. they are often the creditors to whom money is owed. This occurs when debtors owe state taxes, child support, SNAP debt, unemployment debt, and others. Not all states participate in all collection programs, though. Through TOP, states recovered $720.9 million in state income tax debt in fiscal year 2024.[53] They also recovered $197.9 million in delinquent SNAP debt, in addition to $343.7 million in debts related to state unemployment insurance (arising from fraud or failure to report earnings, on the one hand, and unpaid employer unemployment tax debt, on the other).[54]

123.    Some states enter into an agreement whereby TOP offsets federal non-tax payments against other debts owed to state agencies. In return, those states offset their own payments for delinquent debt owed to the federal government. This is known as the State

---

[52] United States Dep't of the Treasury, Bureau of the Fiscal Serv., Treasury Offset Program Fact Sheet, available at https://fiscal.treasury.gov/files/top/TOP-rules-reqs-fact-sheet.pdf (last visited Feb. 5, 2025).

[53] United States Dep't of the Treasury, Bureau of the Fiscal Serv., Treasury Offset Program, How the Treasury Offset Program Collects Money for State Agencies, https://www.fiscal.treasury.gov/top/state-programs.html (last visited Feb. 5, 2025).

[54] *Id.*

38

Reciprocal Program. States participating in this program recovered $76.2 million in fiscal year 2024.

124.    In fiscal year 2024, TOP recovered $1.4 billion in child support obligations. These payments benefit the recipients, but also the States where those recipients reside. Those States enjoy a widened tax base, and might be subject to reduced entitlement claims by those families. Additionally, the States may themselves receive money from those child-support offsets. For example, the Temporary Assistance for Needy Families (TANF) program requires families receiving assistance to assign their right to child support to the State. 42 U.S.C. § 608(a)(3); *see, e.g.*, Ariz. Rev. Stat. § 46-407(A) (assigning support rights to the State where the parent entitled to the support has benefited from TANF). Therefore, a child support obligation that goes unfulfilled is often a monetary harm to the State.

125.    To facilitate child support offsets, States report to defendant Treasury those individuals who owe child support to state residents. In response, Treasury diverts payments (primarily but not exclusively federal tax refunds) meant for those debtors, to the state agency responsible for child support. That agency then distributes the money to the recipients (or assignees). Those reports necessarily include such personally identifiable information as names, dates of birth, and social security numbers.

126.    States are also, at times, recipients of federal funds subject to offsetting. That is, a State may owe the federal government money, and as a result see an offset against its federal payments.

127.    Much information regarding child support is protected from general disclosure. *See* Safeguarding Child Support Information Rule, 45 C.F.R. § 303.21. With certain exceptions, state agencies "may not disclose any confidential information, obtained in connection with the

performance of IV-D[55] functions, outside the administration of the IV-D program." *Id.* (c). Violations are subject to civil monetary penalties and other sanctions under other statutes. *Id.* (f).

128.    That information is also subject to further regulation at the state level. For instance, in Arizona, Ariz. Rev. Stat. § 41-1959(A) protects personally identifiable information of "any applicant, claimant, recipient, employer or client" of the Department of Economic Security. A violation of that statute is a class 2 misdemeanor under state law. *Id.* (D).

129.    Of course, States provide other sensitive data, too. That includes not only the personally identifiable information the States provide about others, but also their own banking information. *See* Treasury/Fiscal Service SORN .002, Categories of Records.

130.    The relevant State agencies, then, have an interest in the privacy and security of the data they provide to the Treasury.

131.    The unauthorized access puts those privacy and security interests at risk.

132.    States also have an interest in the integrity and smooth functioning of the offset program. As creditors receiving offsets, States recover millions of dollars each year from the program. Any threat to its functioning and effectiveness is a clear pocketbook risk to the plaintiff States.

133.    As recipients of federal funds subject to offsets, States also have an interest in the accuracy of the offset system. For example, unaccountable personnel with the ability to write to the payment system could create offsets where no legitimate debt exists, or misrepresent the amount of the debt. Even those with read access could use information from the payment system to encourage an agency to withhold a payment.

---

[55] Title IV-D of the Social Security Act requires states to provide child support services.

### c. *Treasury's Change in Access Policy*

134.    Until several days ago, access to BFS's payment systems was restricted to very

few government employees, all of whom were career civil servants with a need for access to

perform their duties of ensuring the smooth and secure operations of BFS. On information and

belief, neither political appointees nor "special government employees" were permitted to access

the systems.[56]

### d. *Creation of DOGE*

135.    Treasury recently changed its policy to allow for broader access to BFS's

payment systems. As of February 2, 2025, political appointees and special government

employees, including DOGE leader Elon Musk and team members Tom Krause, the chief

executive officer of Citrix and Cloud Software group, Marko Elez, and newly-hired "special

government employee[s]," were granted access.[57] Notably, Elez spent several days with

'administrator privilege access' with the ability to overwrite code.[58]

136.    When he initially announced DOGE, President Trump stated that it would not be

a formal part of the government, despite its governmental-sounding name.[59] Instead, DOGE

---

[56] "Special government employee" refers to an advisor, expert, or consultant who is appointed to work with the federal government for a limited period of time, 18 U.S.C. § 202, subject to some, but not all of the ethics provisions that govern the conduct of regular employees. *See* *https://crsreports.congress.gov/product/pdf/LSB/LSB10183*.

[57] *See* Leader Schumer Floor Remarks On Presiden... | The Senate Democratic Caucus; *also*, Senator Ron Wyden (@wyden.senate.gov), Blue Sky (Feb. 1, 2025, 3:37 PM), *https://bsky.app/profile/wyden.senate.gov/post/3lh5ejpwncc23* (describing it as "full" access to the Treasury's payments system).

[58] https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/

[59] On November 12, 2024, President Trump announced the creation of DOGE and stated "that the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy," would lead the newly-

would "provide advice and guidance from outside of Government" to "the White House" in the form of recommendations that President Trump said he expects will "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[60]

137.    As implemented, DOGE is a suborganization within the former U.S. Digital Service ("USDS"), a technology unit housed within the Executive Office of the President of the United States. DOGE was established by Executive Order 14158 on January 20, 2025 (the "Order"), as a temporary organization under 5 U.S.C. § 3161. Exec. Order 14,158, 90 Fed. Reg. 18 (Jan. 29, 2025). The Order also renames USDS to the United States DOGE Service (USDS), and establishes the "U.S. DOGE Service Temporary Organization" within USDS.

138.    While most members of DOGE appear to have been hired as "special government employees" under the color of 18 U.S.C. § 202(a), many of the DOGE members given access to BFS were not employees of Treasury, a violation of the Privacy Act. In addition, when these special government employees' 130 days of federal service is up, they will be able to return to positions in the private sector.

139.    The conduct of DOGE members presents a unique security risk to States and State residents whose data is held by BFS, given that DOGE employees have already reportedly set up an unauthorized commercial server at another federal agency without a privacy impact assessment as required by the 2002 E-Government Act. Access by DOGE employees to BFS is likely to present even greater risks to the security and privacy of States' and their residents' data.

---

formed entity. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

[60] Id.

140.    Unsecure data is susceptible to cyber attacks and identity theft.  Identity theft has a significant impact on States, beyond the financial well-being of its residents.  It strains law enforcement resources, damages state economies through lost productivity and consumer confidence, and raises costs for the state to redress fraudulent claims made from stolen identities for unemployment and healthcare benefits.

141.    DOGE has rapidly accumulated immense power within the Trump administration, and there is reason for the States to be concerned that Treasure payments are beginning to be blocked. Responding to a social media post about certain federal program grants awarded by the Department of Health and Human Services disbursed by BFS, Musk put it more directly in a post on February 2, 2025 – the day he and his DOGE team gained access to BFS's payment systems: "The @DOGE team is rapidly shutting down these illegal payments."[61] Defendants have not provided any basis to assert that transactions pursuant to numerous federal programs created to carry out laws duly enacted by Congress are "illegal payments." Nor have they identified any authority in DOGE, or BFS for that matter, to "shut[] down" payments.

142.    Secretary Bessent's implementation of Treasury's new broader access policy, allowing Musk and his DOGE team[62] to access BFS's payment systems, was adopted without any public announcement or explanation. To date, Defendants have provided no reasons at all to

---

[61] Elon Musk on X: "The @DOGE team is rapidly shutting down these illegal payments" / X

[62] According to public reporting members of Musk's DOGE team include Tom Krause, the CEO at Cloud Software Group, https://www.crn.com/news/cloud/2025/krause-keeps-citrix-parent-ceo-role-amid-work-with-treasury-musk-s-doge, and, until his resignation yesterday, a twenty-five year old individual named Marko Elez, who had been granted "access and alteration privileges" prior to his resignation. https://www.wired.com/story/treasury-department-doge-marko-elez-access/

justify the new policy, nor did Treasury conduct a privacy impact assessment prior to implementing the change.

143.    According to public reporting, access by Mr. Musk, Mr. Krause, and other unidentified DOGE team members[63] under the new policy to BFS's payment systems includes "administrator-level privileges, including the ability to write code on the Payment Automation Manager [(PAM)] and the Secure Payment System [(SPS)]."[64]

144.    "Administrator level" privileges includes the ability to log into agency servers through secure shell access, navigate the entire system file, change user permissions, and delete or modify files, including critical files.

145.    "Administrator level" access allows the user to have more than a "read only" functionality within the information system.

146.    Even before its inception, DOGE members sought sensitive data information about the Treasury Payment Systems, including the code underwriting the Treasury payment systems. Consistent with policy, a non-Treasury employee was denied access from any such information or access at that time. By Jan. 29, 2025, however, Secretary Bessent changed policies and granted Mr. Musk and his DOGE team members access to the BFS Treasury payment systems. By granting DOGE members to access, the agency ignored the already existent policies and practices put into place to maintain the security of Treasury's sensitive

---

[63] One news media outlet reports that among the DOGE team members who have been granted access to BFS's payment systems as a "special government employee" is a 25-year old engineer who previously worked on search AI for Musk's companies X and SpaceX. A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System | WIRED.

[64] https://www.huffpost.com/entry/elon-musk-doge-aide-treasury-payments-administrative-privileges_n_67a25541e4b042f60737bd47

systems.  Secretary Bessent failed to offer any reasoning or findings as to why Treasury would change policies in contravention of the privacy policies.

### e. *The prior policy in place under Acting Secretary Lebryk*

147.    Upon information and belief, Musk and DOGE had signaled interest in accessing the Treasury systems between December of 2024[65] through January 20, 2025, but any of Musk's particular requests to access the Treasury systems was denied by then-Acting Treasury Secretary David Lebryk.[66]

148.    Upon information and belief, in connection with his role working with DOGE, Krause previously sought, but was denied, Treasury code information from Lebryk.[67]

149.    According to public reporting, despite DOGE team's representations that their goal was "to undertake a review of the [Treasury's] system," as evidenced in a Jan. 24, 2025 email exchange, Krause's DOGE-affiliated push for access to the Treasury payment system were actually intended to "receive access to the closely held payment system so that Treasury could freeze disbursements to the U.S. Agency for International Development ("U.S.A.I.D.")."[68]

---

[65] According to public reporting, DOGE representatives began asking Lebryk for source code information related to the Treasury's payment system during the Presidential transition period. Lebryk "raised the request to Treasury officials at that time, noting that it was the type of proprietary information that should not be shared ith people who did not work for the federal government." Treasury Official Quits After Resisting Musk's Requests on Payments - The New York Times

[66] https://www.theguardian.com/technology/2025/feb/02/elon-musk-doge-access-federal-payment-system

[67] Treasury Official Quits After Resisting Musk's Requests on Payments - The New York Times

[68] Treasury Sought to Freeze Foreign Aid Payments, Emails Show - The New York Times

150.    Emails identified in the public reporting stated the that the purpose of Mr. Krause's DOGE-related access to the system was to "pause U.S.A.I.D. payments and comply with Mr. Trump's Jan. 20 executive order to halt foreign aid."[69]

151.    According to public reporting, Lebryk denied the request to grant Krause access to the systems; in a Jan. 24, 2025 email, Lebryk wrote, "I don't believe we have the legal authority to stop an authorized payment certified by an agency."[70]

152.    Upon information and belief, shortly after Lebryk denied Krause's access, Defendant Bessent placed former Secretary Lebryk (a career civil servant) on administrative leave, eventually pushing Lebryk out of the job days later, before granting Musk's DOGE access request to the Treasury systems.[71]

153.    According to public reporting, in further communicating about the denial of his access request, Krause urged Treasury to "hold payment at least to review the underlying payment requests from U.S.A.I.D. now so that we can be given more time to consult [the] State [Department]."[72]

## CAUSES OF ACTION

### COUNT ONE

### (Violation of APA § 706(2) – Exceeding Statutory Authority)

154.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

---

[69] *Id.*

[70] *Id.*

[71] Treasury Official Quits After Resisting Musk's Requests on Payments - The New York Times; Treasury Sought to Freeze Foreign Aid Payments, Emails Show - The New York Times.

[72] Treasury Sought to Freeze Foreign Aid Payments, Emails Show - The New York Times..

155.    Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

156.    Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

157.    Defendants have no authority under the federal laws or regulations to adopt or implement the new policy of granting BFS payment system access to political appointees or special government employees and/or for the unauthorized purpose of blocking or impeding payments (the "Agency Action").

158.    The Agency Action exceeds Defendants' authority under the statutes that govern the collection, storage, handling, and disclosure of PII and confidential financial information because it grants payment system access to political appointees and special government employees and/or for unauthorized purposes.

159.    The Agency Action also exceeds Defendants' authority under the statutes that govern the collection, storage, handling, and disclosure of PII and confidential financial information because it permits payment systems to be accessed on non-government third-party servers.

160.    The Agency Action is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA. 5 U.S.C. § 706(2)(C).

161.    Defendants' violation causes ongoing harm to States and their residents.

## COUNT TWO

## (Violation of APA § 706(2)(A) – Contrary to Law)

162.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

163.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

164.    Section 208 of the E-Government Act of 2002, 44 U.S.C. § 101 *et seq.*, mandates that an agency conduct a privacy impact assessment before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form." Section 208(b)(1)(A)(i). The purpose of this provision "is to ensure sufficient protections for the privacy of personal information" maintained by government agencies. Section 208(a). There is no authority under this statute to develop a plan to disseminate PII or other sensitive information without conducting in advance a privacy impact assessment, which Defendants did not do before adopting and implementing the Agency Action.

165.    Pursuant to the Code of Federal Regulations, title 31, subtitle A, Part 1, section 1.32, there are restraints concerning Treasury's collection, use, disclosure and protection of SSNs. Specifically, the Office of the Secretary of the Treasury, within Treasury, has specific guidelines on when the Secretary must collect and maintain full SSNs, as well as the prohibitions on disclosure of SSNs.

166.    The Privacy Act of    1974    sets    forth    conditions    for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains. *See* 5 U.S.C. § 552a(b). The Privacy Act lists 13 exceptions to the bar on disclosure, but none can be reasonably construed to permit disclosure to SGEs or political appointees who have no "need for the record in the performance of their duties," 5 U.S.C. § 552a(b)(1). Nor does the

Privacy Act authorize disclosure without following a notice protocol,[73] which the Agency Action does not do. *See* 5 U.S.C. § 552a(e)(11). The notice must include information on the categories of individuals and records in the system, the routine uses of the records, and the agency's policies on storage, access, retention, and disposal. 5 U.S.C. § 552a(e)(4).[74]

167.    Pursuant to the Tax Reform Act of 1976, 26 U.S.C. § 6103, tax information, including returns and return information, is to be treated as confidential and subject to disclosure only when expressly authorized by statute. For employees of the Treasury Department, disclosure of tax information is strictly limited to those "officers and employees" "whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). There is no authority under the statute to allow disclosure to SGEs or any other employees who perform no duties that relate to tax administration purposes.

168.    There are also regulations that govern Treasury's collection, use, disclosure and protection of SSNs. Specifically, the Office of the Secretary of the Treasury, within Treasury, has specific guidelines on when the Secretary must collect and maintain full SSNs, as well as restrictions on disclosure of SSNs: "[w]henever feasible, Treasury must mask, or truncate/partially redact Social Security numbers visible to authorized Treasury/component information technology users so they only see the portion (if any) of the Social Security number required to perform their official Treasury duties." 31 C.F.R. § 1.32(d). These regulations do not authorize Treasury to grant indiscriminate access to full SSNs, particularly to those who have no job-related need for access.

---

[73] Under the Privacy Act, an agency that has a system of records about individuals must publish a notice  in the Federal Register "of the existence and character" of that system ("SORN"). 5 U.S.C. § 552a(e)(4).

[74] "Routine use" refers to using records for purposes compatible with their original collection (5 U.S.C. § 552a(a)(7)).

169.    Finally, Title 18 of the U.S. Code imposes ethics rules onto federal employee conduct in order to avoid conflicts, including those that arise from personal interests that affect official action. *See* 18 U.S.C. § 208(a)[75]; *see also* 5 C.F.R. part 260. SGEs are governed by these ethics rules, including § 208(a), and subject to penalties under section 216 of the Code. See 18 U.S.C. § 216 (describing the penalties and injunctions for violating, inter alia, §§207 and 208, include civil penalties up to $50,000 for each violation, or an injunction to enjoin further violations).  The only exception from § 208(a)'s requirements relevant here would be for the appointing official of an SGE (with a duly filed financial disclosure pursuant to chapter 5 of title 31) to review the SGE's disclosure and certify that the SGE's work "outweighs the conflict of interest." 18 U.S.C. § 207(c). The statute does not authorize disclosure to an SGE without such a certification. Defendants' violations cause ongoing harm to States and their residents.

170.    The Agency Action fails to comply with the dictates of each of these regulations.

## COUNT THREE

### (Violation of APA § 706(2)(A) – Arbitrary and Capricious)

171.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

---

[75] "Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—
Shall be subject to the penalties set forth in section 216 of this title."

172.    The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

173.    The Agency Action is arbitrary and capricious because when adopting and implementing the Agency Action Defendants failed to provide a reasoned explanation for the change in longstanding Treasury policy restricting access to BFS payment systems to career civil servants who need access to perform their job functions and who have demonstrated compliance with the numerous privacy and security requirements for access to the system and sensitive information contained therein.

174.    The Agency Action is arbitrary and capricious because when adopting and implementing the Agency Action Defendants failed to consider harms that flow from expanding access to BFS payment systems to political appointees and special government employees, especially where as here they have stated that their objective is to block payments to beneficiaries who are not aligned with the President's agenda.

175.    The Agency Action is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

176.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## COUNT FOUR
### (Ultra Vires)

177.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

178.    Defendants have no authority under the federal laws or regulations to adopt or implement the new policy of granting BFS payment system access to political appointees or

special government employees and/or for the unauthorized purpose of blocking or impeding payments.

179.    Because Defendants have adopted and implemented the Agency Action by granting payment system access to DOGE personnel for the purpose of identifying, blocking, and/or impeding the payment of funds appropriated by Congress, their conduct is *ultra vires* and a preliminary and permanent injunction barring the Defendants from continuing to implement the Agency Action should issue.

## COUNT FIVE

### (Violation of the Separation of Powers Doctrine— Usurping Legislative Authority)

180.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

181.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in Congress."  U.S. Const. Art. I, Sec. 1.  "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350)).

182.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *West Virginia v. EPA*, 597 U.S. 697, 737

(2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

183.    The separation of powers doctrine thus represents a central tenet of our constitution. *See e.g., Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*, 591 U.S. at 227.

184.    Consistent with these principles, executive branch powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

185.    The United States Constitution does not authorize the Executive Branch to enact, amend, or repeal statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

186.    Indeed, Executive Branch officials act at the lowest ebb of their constitutional authority and power when they act contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

187.    Executive Branch agencies derive their rulemaking authority from statutes enacted by Congress, which prescribe the manner in which agencies are to regulate.

188.    Where the President, by Executive Order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress, violates the Separation of Powers doctrine.

189.    Here, the only reason that has been publicly articulated for the Agency Action is to enable the DOGE team to block payments to States and their residents of federal funds that have been appropriated by Congress.

190.    The only basis to explain the Agency Action is an attempt to usurp Congress's power of the purse in violation of the Separation of Powers doctrine.

191.    And for the same reasons that the Agency Action exceeds statutory authority, it also usurps Congress's exclusive legislative authority and contravenes its express statutory mandates restricting the disclosure of private information by federal agencies.  *See Clinton*, 524 U.S. at 438; *also*, 5 U.C.S. sec. 552a(b).

192.    This Court is authorized to enjoin any action by the Executive Branch that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569 (D.D.C. 1952), aff'd, 343 U.S. 579 (1952).

193.    The States are further entitled to a preliminary and permanent injunction enjoining the Defendants from adopting and implementing the Agency Action.

## COUNT SIX

### (Violation of the Take Care Clause)

194.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

195.    The Take Care Clause provides that the President must "take Care that the Laws be faithfully executed…."  U.S. Const. Art. II, Sec. 3, Clause 3; *UARG v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President…faithfully executes them.").

196.    In many instances, Congress has delegated to federal agencies the authority to implement laws through regulation.

197.    By directing that the Agency Action be adopted and implemented, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

54

198.    Pursuant to 28 U.S.C. § 2201, the States are entitled to a declaration that the

Agency Action violates the Take Care clause of the U.S. Constitution.

199.    The States are further entitled to a preliminary and permanent injunction

preventing Defendants from continuing to implement the Agency Action.

## PRAYER FOR RELIEF

WHEREFORE, the States pray that this Court:

a.    Issue a temporary restraining order and preliminary and permanent injunctions barring Defendants from granting to political appointees, special government employees, and any government employee detailed from an agency outside the Treasury Department access to any Treasury Department payment systems or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees, and ordering any such person who has unlawfully received such information to destroy or return it;

b.    Issue a temporary restraining order and preliminary and permanent injunction barring Defendants from granting access to Treasury Department payments or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees to any person unless that person has passed all background checks, security clearance, and information security training called for in federal statutes and Treasury Department regulations, and otherwise excluding political appointees and special government employees.

c.    Issue a declaration that granting access to political appointees, special government employees, and any government employee detailed from an agency outside the Treasury Department to any Treasury Department payment systems or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees is agency action that is *ultra vires*, unlawful, and unconstitutional;

d.    Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

e.    Award such other relief as this Court may deem just and proper.


Dated: New York, New York
        February 7, 2025

Respectfully submitted,

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK


By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Colleen K. Faherty
  *Special Trial Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*


**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA


By: /s/ *Michael S. Cohen*
Michael S. Cohen*
  *Deputy Attorney General*
Thomas S. Patterson*
  *Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
  *Supervising Deputy Attorneys General*
Nicholas Green*
Jay Russell*
  *Deputy Attorneys General*
California Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6090
Michael.Cohen@doj.ca.gov


*Counsel for the State of California*

**KRISTEN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA


By: */s Joshua D. Bendor**
Joshua D. Bendor*
Joshua A. Katz*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Katz@azag.gov


*Counsel for the State of Arizona*


**PHIL WEISER**
  ATTORNEY GENERAL OF COLORADO


By: /s *Shannon Stevenson*
 Shannon Stevenson*
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
   ATTORNEY GENERAL OF CONNECTICUT

By: */s Matthew Fitzsimmons**
Matthew Fitzsimmons*
   *Chief Counsel*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Matthew.fitzsimmons@ct.gov


*Counsel for the State of Connecticut*


**ANNE E. LOPEZ**
   ATTORNEY GENERAL OF HAWAIʻI

By: */s Kalikoʻonālani D. Fernandes*
David D. Day*
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
   *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


*Counsel for the State of Hawaiʻi*


**AARON M. FREY**
   ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
jason.anton@maine.gov


*Counsel for the State of Maine*


**KATHLEEN JENNINGS**
   ATTORNEY GENERAL OF DELAWARE

By: */s/ Vanessa L. Kassab*
Ian R. Liston
   *Director of Impact Litigation*
Vanessa L. Kassab
   *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


*Counsel for the State of Delaware*


**KWAME RAOUL**
   ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead
   *Public Interest Counsel*
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


*Counsel for the State of Illinois*


**ANTHONY G. BROWN**
   ATTORNEY GENERAL OF MARYLAND

By: */s Adam D. Kirschner**
Adam D. Kirschner
   *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
akirschner@oag.state.md.us


*Counsel for the State of Maryland*

ANDREA JOY CAMPBELL
   ATTORNEY GENERAL
   COMMONWEALTH OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz
  *State Solicitor*
One Ashburton Place
Boston, MA 02108
617-963-2427
david.kravitz@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON D. FORD**
   ATTORNEY GENERAL OF NEVADA

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
   *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

KEITH ELLISON
   ATTORNEY GENERAL OF MINNESOTA

By: /s *Liz Kramer*
Liz Kramer*
   *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

MATTHEW J. PLATKIN
   ATTORNEY GENERAL OF NEW JERSEY

By: /s *David Leit*
David Leit
   *Assistant Attorney General*
(609) 414-4301
david.leit@law.njoag.gov

Kashif Chand
   *Chief, Deputy Attorney General*
(609) 696-5160
kashif.chand@law.njoag.gov

124 Halsey Street
Newark, NJ 07101

*Counsel for the State of New Jersey*

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
  CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov


*Counsel for State of North Carolina*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Alex Carnevale*
Alex Carnevale*
  *Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov


*Counsel for the State of Rhode Island*

**JOSH KAUL**
  ATTORNEY GENERAL OF WISCONSIN

By: /s/ Brian P. Keenan
Brian P. Keenan
  State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us


*Counsel for the State of Wisconsin*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: /s/ Elleanor H. Chin
Elleanor H. Chin
  *Senior Assistant Attorney General*
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov


*Counsel for the State of Oregon*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

By: /s/ Jonathan Rose
Jonathan Rose*
  *Solicitor General*
Appellate Unit
Office of the Attorney General
109 State Street, 3rd Floor
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov


*Counsel for the State of Vermont*