# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br>  Plaintiffs, <br><br>  v. <br><br> DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*, <br><br>  Defendants. | C.A. No. 1:25-cv-1144 (JAV) (SDA) |

## PLAINTIFF STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 2

    I.     The States Have Standing to Challenge the Engagement Plan ......................... 2

    II.    The Engagement Plan Is a Final Agency Action ............................................. 5

    III.   The Engagement Plan Violates the APA ......................................................... 7

         A.    The States Can Assert Violations of the Privacy Act and the IRS Code ................... 7

         B.    The DOGE Enforcement Plan Is Contrary to Law .................................... 9

         C.    Implementing The Engagement Plan Was Arbitrary and Capricious ..................... 14

    IV.   The Engagement Plan is *Ultra Vires* ............................................................ 15

    V.    The Engagement Plan Violates the Separation of Powers Doctrine and Take Care Clause .................................................................................... 16

CONCLUSION ............................................................................................................. 17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) ............................................................................ 6-7

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
   397 U.S. 150 (1970) ................................................................................................ 13

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................. 6

*Bohnak v. Marsh & McLennan Co., Inc.*,
   79 F.4th 276 (2023) ............................................................................................... 2-3

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ....................................................................................... 5

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ............................................................................................ 9, 14

*De La Mota v. United States Dep't of Educ.*,
   No. 02-cv-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) ............................ 5

*Doctors for Am. v. Off. of Pers. Mgmt.*,
   No. 25-cv-00322, 2025 WL 452707 (D.D.C.) ......................................................... 7

*Doe v. Herman*,
   No. 97-cv-0043, 1998 WL 34194937 (W.D. Va. Mar. 18, 1998) ............................ 9

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................... 15

*Food & Drug Admin. v. All. For Hippocratic Med.*,
   602 U.S. 367 (2024) .................................................................................................. 5

*Gadelhak v. AT&T Serv., Inc.*,
   950 F.3d 458 (7th Cir. 2020) .................................................................................... 3

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................................... 16

*In re United Mine Workers of Am. Int'l Union,*
    190 F.3d 545 (D.C. Cir. 1999) ...................................................................................16

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
    478 U.S. 221 (1986) .......................................................................................................8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .......................................................................................................5

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) .......................................................................................................8

*Nat. Council of Nonprofits v. Office of Management and Budget,*
    No. 25-cv-00239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) .......................................7

*New York v. HHS,*
    414 F.Supp.3d 475 (S.D.N.Y. 2019) .........................................................................16

*New York v. Scalia,*
    464 F. Supp. 3d 528 (S.D.N.Y. 2020) .......................................................................10

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004) .........................................................................................................9

*San Carlos Apache Tribe v. United States,*
    417 F.3d 1091 (9th Cir. 2005) .....................................................................................8

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................................................................3, 5

*Wescott v. McHugh,*
    39 F.Supp.3d 21 (D.D.C. 2014) ..................................................................................9

**Federal Statutes**

5 U.S.C.
    § 552a ............................................................................................................................11
    § 704 ...........................................................................................................................7-9
    § 706 ..............................................................................................................................9

18 U.S.C.
    § 208 .......................................................................................................................12, 14

E-Government Act
    § 208............................................................................................................................ 11-12

**Federal Regulations**

31 C.F.R.
    § 1.32(d)......................................................................................................................13

85 Fed. Reg. 11776 (Feb. 27, 2020) ..............................................................................11

87 Fed. Reg. 16244, 16245 (Mar. 22, 2022).................................................................10

**Miscellaneous Authorities**

Allyn, Bond, *Member of Elon Musk's DOGE Team Resigns After Racist Posts Resurface*,
    NPR (February 7, 2025)...............................................................................................4

Warzel & Bogost, *The Government's Computing Experts Say They Are Terrified*, The
    Atlantic (February 7, 2025)..........................................................................................4

**INTRODUCTION**

Defendants' opposition elucidates with great clarity the final agency action at the heart of this case. The action described by Defendants is alarming, unlawful, and unconstitutional. At the President's direction, Treasury leadership developed a plan to engage a DOGE team to work at Treasury's BFS on a four-to-six-week project that would assist in effectuating the President's Executive Orders ("EOs") to block federal funding that did not align with the President's priorities, without regard to Congressional appropriation. Under the plan ("Engagement Plan"), the DOGE team will create and Treasury will implement an automated process to pause and flag payment instructions for further review by the submitting agency under an ideological litmus test to determine if the payment aligns with the President's agenda and should be certified or blocked. Treasury applying such a test to block funding is unprecedented and violates the constitutional separation of powers.

The States filed this action and obtained this Court's order temporarily restraining implementation of the Engagement Plan in its third week. As of that date, two DOGE members were already embedded at Treasury and had access to review source code for BFS's payment systems and databases across multiple BFS payment systems as well as the ability to review sensitive payment data. Among this sensitive payment data are the States' confidential financial information and PII of their residents, some of which is contained in payment instructions submitted by the States to obtain Medicaid funds that they then pass along to their residents who are Medicaid beneficiaries.

The details of the Engagement Plan are now before the Court and the Court can refine the necessary injunctive relief to focus on the unlawful conduct as opposed to the category of employee engaging in the conduct, which will avoid the separation of powers argument raised by

Defendants.[1] As described in the accompanying Proposed Preliminary Injunction Order, the Court should continue to preliminarily enjoin Defendants from any plan seeking to flag and pause payment instructions for reasons other than the statutorily-authorized business of Treasury, including the Engagement Plan described by Defendants. The Court should also enjoin any Treasury employee (other than those in Senate-confirmed positions) from accessing BFS payments systems, payment records, source code, or other BFS data without a need for such access to perform their lawful job duties and only after complying with all applicable laws and rules governing such access, and continue to quarantine the devices used by the DOGE team and any records of their activities subject to providing this material in discovery in this or any other related action.

## ARGUMENT

## I.    THE STATES HAVE STANDING TO CHALLENGE THE ENGAGEMENT PLAN

Defendants do not meaningfully dispute that the States have a clear and reasonable interest in protecting their confidential bank account numbers and other sensitive financial information, including details and amounts of payments, from unauthorized disclosure. And under the Engagement Plan, this information was disclosed to two DOGE team members in violation of numerous laws and regulations. *See* Pls MOL 17-20 (ECF No. 4). That is injury sufficient to confer standing. *Bohnak v. Marsh & McLennan Co.*, *Inc.*, 79 F.4th 276 (2023). "'[D]isclosure of private information" to unauthorized individuals is the kind of "intangible harm 'traditionally recognized

---

[1] Defendants' separation of powers argument is predicated entirely on the notion that a court order enjoining only certain categories of employees from engaging in certain conduct improperly infringes on executive authority. Defs MOL 8-9 (ECF No. 35). There is no need for the Court to resolve that issue, because Plaintiffs' proposed preliminary injunction order restrains unlawful conduct by Defendants and their agents regardless of job title.

as providing a basis for lawsuits in American courts'" such that "an injury arising from such disclosure" is "'concrete' for purposes of the Article III analysis." *Id.* at 285 (quoting *TransUnion*, 594 U.S. 413, 425 (2021)); *see also Gadelhak v. AT&T Serv., Inc.*, 950 F.3d 458, 462-63 (7th Cir. 2020).

Defendants' attempt to distinguish *Bohnak* on its facts lacks merit. They claim *Bohnak* is different because that case involved "*public* disclosure," Defs MOL 12 (ECF No. 35), but the material facts are the same; *Bohnak* involved disclosure of confidential information to a single "unauthorized actor," 79 F.4th at 281, and here there was disclosure of the States' confidential financial information to two actors—Marko Elez and Thomas Krause—who are similarly not authorized to view the information under governing law and rules. The fact that the two DOGE team members were Treasury employees does not bring the disclosure outside the scope of *Bohnak's* holding. It would not matter to the reasoning or result in *Bohnak* if the "unauthorized actor" there worked for Marsh & McLennan Agency, plaintiff's employer who made the disclosure. The relevant consideration in *Bohnak* was the fact that the actor receiving the information was unauthorized, and that disclosure gave rise to a concrete injury sufficient to confer on them Article III standing. 79 F.4th at 289 (holding disclosure of "Bohnak's name and SSN to an unauthorized actor are sufficient to suggest a substantial likelihood of future harm, satisfying the 'actual or imminent harm' component of an injury in fact."). *Bohnak*'s holding controls here and compels a finding that the States have suffered a concrete injury.

Additionally, the Engagement Plan also gives rise to a "substantial risk" of future harm. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). There can be no serious dispute that the DOGE team's prior and future access contemplated by the plan carries with it substantial risk

3

that could cause future harm by compromising the States' financial information, including "potential operational disruptions to [the BFS's] payment systems, access to sensitive data elements, insider threat risk, and other risks that are inherent to any user access to sensitive IT systems." [2] Gioeli Aff.-¶11 (ECF No. 34).

Contrary to Defendants' contention (Defs MOL 14), it is of little moment that BFS "developed mitigation strategies that sought to reduce these risks." Gioeli Aff.-¶11. Indeed, the fact that BFS saw the need to develop numerous mitigation efforts to reduce such risks (but notably "not fully eliminate the risks, Gioeli Aff.-¶17) further evidence that the risks were substantial and imminent. And notably, BFS did not conduct a privacy impact assessment as required by law. *See* Pls MOL 18 (discussing the E-Government Act of 2002). Moreover, on at least one occasion, Elez was mistakenly provided with "read/write permissions instead of read-only." Gioeli Aff.-¶¶13, 20. But even with the more restricted "read-only" access, Elez still had "the ability to view and query information and data"; in other words, he had access to the States' sensitive financial information. *Id*. ¶17. Finally, Defendants provide no reassurance that prior to his resignation (for reasons Defendants do not disclose, but press reports indicate was due to his virulently racist social media comments posted last year [3]), Elez did not engage in any improper conduct that compromised the State's information or BFS's payment systems, as BFS's review of the logs of Elez's activity on

---

[2] *See also* Warzel & Bogost, *The Government's Computing Experts Say They Are Terrified*, The Atlantic (February 7, 2025), available at https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/?utm_source=copy-link&utm_medium=social&utm_campaign=share.

[3] *See, e.g.,* Allyn, Bond, *Member of Elon Musk's DOGE Team Resigns After Racist Posts Resurface*, NPR (February 7, 2025), available at https://www.npr.org/2025/02/06/nx-s1-5289337/elon-musk-doge-treasury.

his BFS laptop "remains ongoing." *Id*. 18. On this record, there was a "substantial risk" of future harm to the States. *Driehaus*, 573 U.S. at 157.

The States easily meet the remaining prongs of the Article III standing test. The harms flowing from the disclosure of the States' financial information[4] to the DOGE team members are "fairly traceable" to the Engagement Plan that brought the DOGE team into BFS and granted them access to the BFS payment systems, source code, and data. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Thus, there was a clear "causal nexus between the defendant[s'] conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Because Treasury's implementation of the Engagement Plan inexorably caused the States' injury, enjoining the plan's continued implementation, or the implementation of any similar plan by another name, will redress that injury. *See Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024).

## II.    THE ENGAGEMENT PLAN IS A FINAL AGENCY ACTION

Defendants argue that the Engagement Plan is not a final agency action subject to APA review. Their position is contrary to well-settled law.

Courts take a pragmatic approach to determining whether an agency action is subject to review under the APA. *See De La Mota v. United States Dep't of Educ.*, No. 02-cv-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003). Courts apply a two-pronged test: (i) the agency action must "mark the 'consummation' of the agency's decision-making process—[and is not] of a merely

---

[4] Contrary to Defendants' assertion, Defs MOL 15, the States allege their injury is the unlawful disclosure of their confidential information to the DOGE team, not the blocking of funds.

tentative or interlocutory nature," and (ii) it must determine "'rights or obligations' ... from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & Southern Air Lines*, *Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). The Engagement Plan satisfies both prongs of this test.

The Engagement Plan was developed by Defendants to "help operationalize the President's policy priorities ... by helping identify payments that may be improper under his new Executive Orders" and requiring "pauses to certain types of financial transactions" that do not align with the President's policies. Krause Aff.-¶¶12, 17 (ECF No. 33). The plan called for embedding within BFS a DOGE team to develop an automated process for pausing and flagging payment files while in the BFS "landing zone" before certification by the submitting agency. Robinson Aff.-¶¶5, 11 (ECF No. 32). The objective was to create an automated process that would flag payment files in the "pre-edit phase" for further review based on "certain Treasury Account Symbols" that would signal the payment was suspect, *i.e.*, may not align ideologically with the President's priorities and possibly should be blocked. Krause Aff.-¶20. Treasury leadership had begun "operationalizing" the Engagement Plan as soon as Krause was brought on board at Treasury on January 23, 2025. *Id*. ¶¶1, 12. The plan was already in its "initial stages" of implementation when the Court issued the TRO. *Id*. ¶16. Elez had already been given "access to and was analyzing copies of the source code for certain BFS payment systems" on his Treasury laptop. *Id*.

Accordingly, the Engagement Plan reflected the agency's final decision on how to carry out the President's Executive Orders—a decision that culminated in the operationalization of the plan on January 23, 2025. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021-23 (D.C. Cir. 2000). And the implementation of the plan determined the rights of the States by granting DOGE

team members "the agreed-upon levels of access to BFS databases" containing the States' confidential banking information, Krause Aff.-¶16. *See Appalachian Power*, 208 F.3d 1015 at 1022.

Defendants describe the Engagement Plan as "the type of day-to-day operations of government programs that does not fall into APA review," Defs MOL 19, but the plan was anything but business as usual—it was an unprecedented project that required Treasury leadership to bring in an outside team and grant them substantial system access, requiring numerous risk mitigation efforts, so they could develop a new automated process for flagging payment files that conflicted with the President's agenda. Nothing could be further from a typical day-to-day operation at BFS.

Notably, in the past two weeks, two other federal district courts have found similar actions by federal agencies to comply with the President's EOs to be final agency actions subject to APA review. *See Doctors for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-00322, 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025) (finding decisions by three federal agencies to remove or modify health-related webpages and datasets were final agency actions); *Nat. Council of Nonprofits* v. *Office of Management and Budget*, No. 25-cv-00239, 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (finding that an OMB memo freezing federal funding constituted a final agency action ). The Engagement Plan is no different from these other agency actions taken to implement the President's EOs.

## III.  THE ENGAGEMENT PLAN VIOLATES THE APA

### A.  *The States Can Assert Violations of the Privacy Act and the IRS Code*

A final agency action is reviewable under the APA where "there is no other adequate remedy" available in a court. 5 U.S.C. § 704. Defendants argue that the States cannot assert

violations of the Privacy Act or the IRS Code in an APA challenge because both statutes provide a private right of action and thus afford "[an]other adequate remedy" in court that defeats APA review under § 704. Defs MOL 21-22, 24. But Defendants acknowledge at the same time, indeed affirmatively argue, that the private right of action under these statutes is available only to individuals and cannot be asserted by a sovereign state. *Id*. at 21, 24. Defendants appear to contend that a party may not assert in an APA challenge that final agency action violates a statute under which it has no right of action, so long as *someone else* has a private right of action under the statute. Defendants' position is unsupported by the text of the APA or the decades of caselaw interpreting the statute's basic requirements for judicial review.

As the Supreme Court has long recognized, the APA expressly creates a right of action for the review of final agency action when "there is no other adequate remedy in a court ... at the behest of '[a] person ... adversely affected or aggrieved by agency action.'" *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 229 n. 4 (1986) (quoting 5 U.S.C. §§ 702, 704). Where a statute imposes obligations on a federal agency but the obligations do not "give rise to a 'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005). The aggrieved party must, however, fall within the zone of interests of the relevant statute to bring an APA claim. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (holding the interest asserted "must be 'arguably within the zone of interests to be protected or regulated by the statute' that [plaintiff] says was violated" (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 153(1970))).

The decision in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), is directly on point. In that case, the Supreme Court held that a party may file an action under the APA to enjoin an agency from disclosing its confidential information in violation of the Trade Secrets Act even though the Trade Secrets Act is a criminal statute that does not create a private right of action. *See id*., 441 U.S. at 317–18; *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61–62 (2004).

As these cases hold, and logic dictates, when § 704 refers to "no other adequate remedy" it means no other remedy available *for the party bringing the APA challenge*; otherwise, the express right of action for agency review created under the APA for parties that have no other avenue of redress would be illusory.[5]

### B. *The DOGE Enforcement Plan Is Contrary to Law*

Defendants' attempts to square the DOGE Enforcement Plan with laws and regulations governing the collection, storage, handling, and disclosure of PII and sensitive financial information miss the mark.

***Privacy Act.*** First, Defendants confuse the States' cause of action under the APA for violation of the Privacy Act for a direct cause of action under the Privacy Act. Defs MOL 26-28. Whether the Privacy Act provides a cause of action for "individuals" only is of no moment, because the relief the States seek—an injunction prohibiting data sharing in violation of the Privacy Act— is authorized by 5 U.S.C. § 706. *See Doe v. Herman*, No. 97-cv-0043, 1998 WL 34194937, at *5-

---

[5] The D.C. cases cited by Defendants, Defs MOL 22-23, are distinguishable because they involve individuals who did or could bring a separate Privacy Act claim. *See, e.g.*, *Wescott v. McHugh*, 39 F.Supp.3d 21, 33 (D.D.C. 2014) (dismissing Privacy Act violation under APA as duplicative of separate Privacy Act claims).

6 (W.D. Va. Mar. 18, 1998) (holding that equitable relief for violations of the Privacy Act not found within the Act itself is nevertheless available under the APA).

Having satisfied the required showing for Article III standing, the States need only satisfy the APA's prudential standing requirement under the "zone of interests" test to bring an APA challenge asserting violations of the Privacy Act. "The zone-of-interests test is 'not meant to be especially demanding,'" and the States need not show any "'indication of congressional purpose to benefit the would-be plaintiff.'" *New York v. Scalia*, 464 F.Supp.3d 528, 547 (S.D.N.Y. 2020) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). Here, the States share the interest articulated in the Privacy Act of protecting from improper disclosure of PII entrusted to BFS. Privacy Act of 1974; System of Records, 87 Fed. Reg. 16244, 16245 (Mar. 22, 2022).

Second, Defendants argue that no violation of the Privacy Act occurred because no protected information left Treasury, Defs MOL 12-13, 28, but this contention is belied by Defendants' own affiants. Krause conspicuously does not identify a reporting line for himself within the Department of the Treasury, but instead vaguely mentions his "coordinat[ion]" with and "regular updates" to DOGE. Krause Aff.-¶4. Also absent from Krause's affidavit is any assurance that secure information protected by the Privacy Act did not (and will not) leave Treasury and find its way into the hands of members of the DOGE team who are not Treasury employees. More troublingly, another affiant, Deputy Commissioner Joseph Gioeli III, admits that one DOGE employee, Marko Elez took "screenshots of payment systems data or records," which he may have provided to Krause. Gioeli Aff.-¶4. Krause's affidavit is silent on this issue, and on whether those screenshots made their way into the hands of, for example, the purported head of DOGE, Elon Musk.

10

Gioeli avers that Elez and Krause were "instructed ... that no Treasury information and data could leave the Bureau laptop" provided to Elez, *id.* ¶14, but that a forensic review of Elez's laptop use is "ongoing." *Id.* ¶18. And while that forensic review has apparently so far detected no indication that "Mr. Elez used his BFS laptop to share any BFS payment systems data *outside the U.S. Government*," it is silent as to whether any such information was shared outside of Treasury. *Id.* ¶21 (emphasis added).

More fundamentally, even if the PII data has not yet left the Treasury Department, the fact that the DOGE team members had access to it outside of the strictures of the Privacy Act is sufficient to violate the statute and applicable regulations, including the required "system of records notice." *See* Privacy Act of 1974; System of Records, 85 Fed. Reg. 11776 (Feb. 27, 2020). Indeed, Gioeli admits that the type of access provided to the DOGE team, and specifically Mr. Elez, "presented risks" to BFS and "was broader in scope than what has occurred in the past." *Id.* ¶¶11, 13. This expansion of access to PII and other sensitive information is exactly the kind of action requiring notice under the Privacy Act. Nor did granting the DOGE team access to PII satisfy any of the exceptions to disclosure under the Privacy Act as access to PII, and particularly SSNs, was not necessary for the performance of any lawful duties at Treasury. 5 U.S.C. § 552a(b)(1). And as noted below (*see infra*, at 13-14), there was no reason that SSNs could not have been masked or redacted prior to disclosure to the DOGE team.

**E-Government Act.** First, Defendants' contention there is no review available under the APA for a violation of the E-Government Act "because the creation of a [PIA] does not constitute final agency action" misses the point entirely. Defs MOL 28. The final agency act is the

Engagement Plan and the violation of the E-Government Act is Treasury's *failure* to conduct a PIA before implementing the plan.

Second, Defendants argue the implementation of the plan does not trigger the PIA requirement. Their position conflicts with the plain language of the statute, which mandates that an agency conduct a PIA before "developing or procuring information technology that collects, maintains, or disseminates information that is in an identifiable form." Section 208(b)(1)(A)(i). The work performed by the DOGE team using source code to create an automated process for flagging and pausing payment instructions in the "landing zone" for further review by the submitting agency certainly constitutes "developing ... information technology that collects, maintains, or disseminates information that is in an identifiable form," and thus triggers an obligation to conduct a PIA. *Id*. Indeed, it strains credulity to the suggest implementation of the Engagement Plan did not trigger a PIA when "[t]he purpose of [§ 208] is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government," *id*. § 208(a), and Treasury leadership recognized the need when implementing the plan to develop "mitigation strategies" to reduce the substantial risks arising from the expanded access to the DOGE team granted under the plan. Gioeli Aff.-¶11.

Third, Defendants argue that the States cannot assert a violation of § 208 because the act protects only personal information. Defs MOL 29. But unlike the plaintiff entities in the cases cited by Defendants, the States fall within the "zone of interests" protected by § 208 because, for example, they collect certain funds directly from Treasury on behalf of their residents, such as, for example, Medicaid benefits. Accordingly, the States are required to include the Medicaid beneficiaries' PII, along with confidential medical information, as part of the data uploaded to the

BFS systems. *See*, *e.g.*, Compl. ¶81 (noting New York receives $70 billion from the federal government in Medicaid funds on behalf of approximately 6.8 Medicaid beneficiaries). This is sufficient to satisfy the prudential standing requirement under the APA. *See*, *e.g., Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970) (holding for prudential standing under the APA, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question."); *see supra,* at 10.

***IRS Code Violation**s.* Defendants seek to avail themselves of an exception in the statute for employees requiring disclosure of tax return information "for purposes of tax administration" by shoehorning the work of the DOGE team into the scope of "tax administration." Defs MOL 30. That argument is a non-starter. Nothing about implementing an ideological step in federal funding flow can even remotely be considered to fall under the heading of "tax administration."

***Social Security Regulations.*** relies on the same misguided standing argument for the Privacy Act and the E-Government Act. Contrary to Defendants' contention, Defs MOL 31, because the States provide to BFS data containing PII on behalf of their residents, the States do have interests within the zone protected by the social security regulations. *See supra*, at Part I. Nor is their contention that Treasury officials granting access to the DOGE team complied with the regulations correct. Despite the mandate in the regulations to "mask" social security numbers "[w]henever feasible," 31 C.F.R. § 1.32(d), Treasury officials made no effort to wall off from the DOGE team members the BFS system datasets that contain SSNs, or at least run a script that would partially redact SSNs, nor is there any apparent reason why taking either of those actions would

have impeded Elez's ability to create the automated process he was hired to develop as part of the Engagement Plan.

*Federal Ethics Rules.* Finally, Defendants argue the States cannot assert violations of Title 18 ethics rules because "they do not have personal interests protected by a criminal statute." Defs MOL 32. Their position is directly contrary to *Chrysler*, where the Supreme Court held that a party may file an action under the APA to assert a violation of the Trade Secrets Act even though the act is a criminal statute that does not create a private right of action. *Chrysler,* 441 U.S. at 317-18. Defendants concede that Krause is an SGE and therefore is governed by these ethics rules, including 18 U.S.C. § 208(a). While Krause's role as a consultant has purportedly been approved by the Treasury ethics officer, the delegation to him of the duties of the Fiscal Assistant Secretary have not been. *See* Krause Affidavit, sworn to on February 9, 2025, at ¶1 (ECF. No. 13).

### C.  Implementing The Engagement Plan Was Arbitrary and Capricious

Defendants argue that there was no change in policy reviewable under the "arbitrary and capricious" standard because "Treasury is not aware that a policy limiting BFS payment system access to career employees at Treasury ever existed." Defs MOL 33. Defendants miss the forest for the trees. Prior to the development and implementation of the Engagement Plan, Treasury did not have a procedure to flag and pause payment instructions for further review based on an ideological litmus test to assess whether the payment aligned with the President's agenda. Developing this process for applying such a test for the purpose of potentially blocking funds was most certainly new; otherwise, it would not have required bringing in a DOGE team to create the automated process in a "sandbox" environment using source code.

Defendants cannot provide any justification for implementing this ideological litmus test though a new automated process to flag and pause payment instruction "by *neutral principles and a reasoned explanation.*" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in part and concurring in the judgment) (emphasis added). The only reason provided for flagging and pausing payment instructions is to allow the submitting agency to determine prior to certification whether an otherwise authorized payment should be blocked because it does not align with the President's agenda. That is neither a neutral principle nor reasoned explanation because it directly conflicts with the well accepted understanding that it is not for the Executive Branch to second guess funding decisions made by Congress through appropriations in the exercise of its power of the purse. *See* Pls MOL 22-25.

## IV.    THE ENGAGEMENT PLAN IS *ULTRA VIRES*

For the same reason that Treasury's final agency action violates the APA, its conduct is *ultra vires* and a violation of the separation of powers clause.

Here, the only reason that has been articulated for the Engagement Plan, and now confirmed through Defendants' declarations, is to enable Treasury to selectively review payment instructions through an automated process in order to block payments to States and their residents of federal funds on ideological grounds—who the beneficiary is and what the funds are for—despite Congressional appropriation. Indeed, Krause admits the review process is a partisan second look at agency funding requests in order to facilitate blocking disbursement that do not align with the President's priorities. *See, e.g.*, Krause Aff.-¶¶12, 20. Contrary to the prior practice of Treasury for decades under prior administrations, payment requests have never before been screened, paused, and blocked by Treasury based on ideology and administrative priorities. *See* [Proposed]

15

Brief of *Amici Curiae* Former Treasury Department Officials in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 50-1) at 8.

No statutory authority permits Treasury to implement the Engagement Plan, so the acts taken by Treasury to do so are *ultra vires* and should be enjoined. Pls MOL 22; *Lukong*, 2021 WL 1820265, at *15 ("[T]he government cannot 'suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'") (quoting *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 191 (D.D.C. 2015)).

## V.   THE ENGAGEMENT PLAN VIOLATES THE SEPARATION OF POWERS DOCTRINE AND TAKE CARE CLAUSE

The Executive Branch "does not have unilateral authority to refuse to spend ... funds" already appropriated by Congress. *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). For the reasons stated above, the application under the Engagement Plan of an ideological litmus test to flag and block legislatively appropriated and authorized federal funding is an unlawful usurpation of Congress's power of the purse in violation of the Separation of Powers doctrine and a violation by the President of his constitutional obligation to take care that the laws are faithfully executed. *New York v. HHS*, 414 F.Supp.3d 475, 562 (S.D.N.Y. 2019); *also, Aiken*, 725 F.3d at 261 n.1 (Executive Branch "does not have unilateral authority to refuse to spend" the "full amount [of funding] appropriated by Congress for a particular project or program."); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

**CONCLUSION**

For the foregoing reasons, the States respectfully request that a preliminary injunction be entered in the form accompanying this reply to maintain the status quo pending adjudication of this action.

Dated: February 13, 2025
       New York, NY

Respectfully submitted,

**LETITIA JAMES**
   ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
   *Special Counsel*
Rabia Muqaddam
   *Special Counsel for Federal Initiatives*
Colleen K. Faherty
   *Special Trial Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*

**ROB BONTA**
   ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Michael S. Cohen*
Michael S. Cohen*
   *Deputy Attorney General*
Thomas S. Patterson*
   *Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
   *Supervising Deputy Attorneys General*
Nicholas Green*
Jay Russell*
   *Deputy Attorneys General*
California Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6090
Michael.Cohen@doj.ca.gov

*Counsel for the State of California*

**KRISTEN K. MAYES**
   ATTORNEY GENERAL OF ARIZONA

By: */s Joshua D. Bendor**
Joshua D. Bendor*
Joshua A. Katz*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**PHIL WEISER**
   ATTORNEY GENERAL OF COLORADO

By: */s Shannon Stevenson*
Shannon Stevenson
   *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

By: */s Matthew Fitzsimmons*\*
Matthew Fitzsimmons\*
  *Chief Counsel*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Matthew.fitzsimmons@ct.gov


*Counsel for the State of Connecticut*



**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

By: /s/ *Vanessa L. Kassab*
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


*Counsel for the State of Delaware*



**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

By: /s *Kalikoʻonālani D. Fernandes*
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes\*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


*Counsel for the State of Hawaiʻi*



**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead
  *Public Interest Counsel*
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


*Counsel for the State of Illinois*



**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

By: /s/ *Jason Anton*
Jason Anton
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
jason.anton@maine.gov


*Counsel for the State of Maine*



**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

By: /s *Adam D. Kirschner*\*
Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
akirschner@oag.state.md.us


*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL
  COMMONWEALTH OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz
  *State Solicitor*
One Ashburton Place
Boston, MA 02108
617-963-2427
david.kravitz@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: /s *Liz Kramer*
Liz Kramer
  *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

By: /s *David Leit*
David Leit
  *Assistant Attorney General*
(609) 414-4301
david.leit@law.njoag.gov

Kashif Chand
  *Chief, Deputy Attorney General*
(609) 696-5160
kashif.chand@law.njoag.gov

124 Halsey Street
Newark, NJ 07101

*Counsel for the State of New Jersey*

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
  CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
   *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Alex Carnevale*
Alex Carnevale*
   *Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSH KAUL**
  ATTORNEY GENERAL OF WISCONSIN

By: /s/ Brian P. Keenan
Brian P. Keenan
   State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us

*Counsel for the State of Wisconsin*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: /s/ Elleanor H. Chin
Elleanor H. Chin
   *Senior Assistant Attorney General*
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

By: /s/ Jonathan Rose
Jonathan Rose*
   *Solicitor General*
Appellate Unit
Office of the Attorney General
109 State Street, 3rd Floor
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

* - pro hac vice motion pending

## RULE 7.1 CERTIFICATION

By order entered on February 12, 2025, the Court granted Plaintiffs' motion for an

enlargement of the word count by 1,500 words, for a total word count of 5,000 words. I certify

that, excluding the caption, table of contents, table of authorities, signature block, and this

certification, the foregoing Reply Memorandum of Law contains 4,886 words, calculated using

Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District

Courts for the Southern and Eastern Districts of New York, as enlarged by the Court's order.

Dated: New York, New York
      February 13, 2025

                        LETITIA JAMES
                        Attorney General of the State of New York

                        By: /s Andrew Amer
                        Andrew Amer
                          Special Counsel
                        28 Liberty Street
                        New York, NY 10005
                        (212) 416-6127
                        andrew.amer@ag.ny.gov