P2ELNYCC

1   UNITED STATES DISTRICT COURT
    DISTRICT OF NEW YORK
2   ------------------------------x

3   STATE OF NEW YORK, *et al.*,

4                   Plaintiffs,

5           v.                              25 Civ. 1144 (JAV)

6   DONALD J. TRUMP, in his
    official capacity as President
7   of the United States, *et al.*,

8                   Defendants.
                                            Oral Argument
9   ------------------------------x
                                            New York, N.Y.
10                                          February 14, 2025
                                            2:00 p.m.
11
    Before:
12
                        HON. JEANNETTE A. VARGAS,
13
                                            District Judge
14

15                        APPEARANCES

16  LETITIA A. JAMES
         Attorney General of the State of New York
17       Attorney for Plaintiff New York State
    BY:  ANDREW A. AMER
18       RABIA C. MUQADDAM
         COLLEEN K. FAHERTY
19       Assistant Attorneys General

20  MATTHEW D. PODOLSKY
         Acting United States Attorney for the
21       Southern District of New York
         Attorney for Defendants
22  BY:  JEFFREY S. OESTERICHER
         REBECCA S. TINIO
23       CHRISTOPHER HEALY
         Assistant United States Attorneys

24

25

P2ELNYCC

| 1 | (Case called) |
| 2 | MR. AMER:  Good afternoon, your Honor.  Andrew Amer |

1      (Case called)

2      MR. AMER:  Good afternoon, your Honor.  Andrew Amer

3 with the New York Attorney General's Office for the State of

4 New York, and I will be presenting argument on behalf of all

5 the plaintiff states.

6      THE COURT:  Good afternoon, Mr. Amer.

7      MS. FAHERTY:  Good morning, your Honor.  Colleen Kelly

8 Faherty, special trial counsel, on behalf of the State of

9 New York.

10      THE COURT:  Good afternoon.

11      MS. MUQADDAM:  Good afternoon.  Rabia Muqaddam for the

12 State of New York.

13      THE COURT:  Good afternoon.

14      MR. OESTERICHER:  Good afternoon, your Honor.  Jeff

15 Oestericher, Assistant United States Attorney for the

16 defendant.

17      MR. HEALY:  Good afternoon.  Christopher Healy, senior

18 advisory general counsel at the Treasury Department.

19      MS. TINIO:  Good afternoon.  Rebecca Tinio from the

20 U.S. Attorney's Office for the defendants.

21      THE COURT:  Good afternoon, counsel.

22      We are here today on Plaintiffs' motion for a

23 preliminary injunction in the matter of *New York v. Trump*.  I

24 have reviewed the filings in this matter.  Those filings

25 include the complaint filed by the plaintiffs on February 7,

P2ELNYCC

1   2025 and the materials cited therein.   The complaint also

2   served as a request for an emergency temporary retraining order

3   under Federal Rule of Civil Procedure 65(b).   I have the

4   affirmation of Colleen Faherty dated February 7, 2025, the

5   affirmation of Thomas Krause dated February 9, 2025.

6   Mr. Krause is the senior advisor for Technology and

7   Modernization at the Department of Treasury and is the

8   Department of Government Efficiency team lead at the Treasury

9   Department.

10          I also have an additional affirmation from Mr. Krause

11   dated February 11, 2025.   I have the declaration of Vona

12   Robinson dated February 11, 2025.   Ms. Robinson is the deputy

13   assistant commissioner for Federal Disbursement Services at the

14   Bureau of the Fiscal Service, known as BFS.   I have the second

15   declaration of Vona Robinson dated February 12, 2025, which

16   provides corrections to her February 11 declaration.   I have

17   the declaration of Joseph Gioeli, III dated February 11, 2025.

18   And Mr. Gioeli is the deputy commissioner for Transformation

19   and Modernization at the BFS.

20          I have the declaration of Michael J. Wenzler dated

21   February 11, 2025.   Mr. Wenzler is the associate chief human

22   capital officer for Executive and Human Capital Services of the

23   Department of the Treasury.   I have as well the briefs

24   submitted in connection with the plaintiffs' emergency TRO

25   application and preliminary injunction motion, the briefs

P2ELNYCC

submitted in connection with the government's emergency motion

to dissolve, modify, or stay the TRO.  I have Plaintiffs'

submission of supplemental authority received this morning.  I

also have Plaintiffs' proposed order for preliminary injunction

received February 13.

          I have also granted three motions, all on consent of

the parties, for leave to file amicus briefs.  I have accepted

an amicus brief from the American Center for Law and Justice in

support of the defendants, the amicus brief of former Treasury

Department officials in support of the plaintiffs, an amicus

brief of the State of Iowa and 19 other states in support of

Defendants.

          Those are the materials that I have before me on

Plaintiffs' motion for preliminary injunction.  Are there any

other additional materials on this matter that I did not

mention?

          MR. AMER:  Just a letter with supplemental authority

that we submitted -- I'm sorry, you said that.

          THE COURT:  Yes, I believe I did mention that.  I

received that supplemental authority letter this morning.

          Counsel for the government.

          MR. OESTERICHER:  Yes, your Honor.  I believe we

submitted a further declaration from Mr. Krause yesterday.

          THE COURT:  I thought I mentioned it, but if I did

not, then I will add that to the list of records.  So the

P2ELNYCC

1    Krause declaration dated February 13 as well.

2            So there are three Krause declarations in the record;

3    is that correct?

4            MR. OESTERICHER:  Exactly, your Honor.

5            THE COURT:  Thank you.  Thank you for that correction.

6            Are there any evidentiary objections that we need to

7    address at the outset of this proceeding?

8            MR. AMER:  Nothing from Plaintiffs, your Honor.

9            MR. OESTERICHER:  Nothing from the government, your

10   Honor.

11           THE DEPUTY CLERK:  Counsel for Defense, please speak

12   into the microphones.  Thank you.

13           THE COURT:  I have also reviewed the joint letter

14   submitted by the parties in response to the Court's February 11

15   order, and that is ECF No. 49 on the docket.  In that order I

16   asked the parties to provide their positions regarding a number

17   of largely procedural questions.  As set forth in the joint

18   letter, neither party is seeking any discovery prior to the

19   Court's ruling on the preliminary injunction motion.

20           Additionally, the parties agree that they are not

21   requesting an evidentiary hearing in connection with the PI

22   motion and are instead relying on the parties' submissions and

23   today's argument.  And finally, the parties agree that they

24   were not seeking a consolidation of the hearing on the

25   preliminary injunction motion with a trial on the merits.

P2ELNYCC

1          Counsel, have I accurately set forth your respective

2     positions on these procedural questions?

3          MR. AMER:  You have, your Honor.

4          MR. OESTERICHER:  Yes, your Honor.

5          THE COURT:  Thank you.

6          All right.  Before we proceed with argument on the

7     motion for a preliminary injunction, does anyone have any

8     housekeeping issues they would like to raise with the Court?

9          MR. AMER:  We did post the bond that was required.

10     That's the only other housekeeping matter I would mention, your

11     Honor.

12          THE COURT:  Thank you.  Anything from --

13          MR. OESTERICHER:  Nothing from the government, your

14     Honor.

15          THE COURT:  All right.  With respect to how we are

16     going to proceed this afternoon, I would first like to hear

17     from the parties with respect to the threshold issue of

18     standing.  And after we have had argument on the standing

19     issue, we will turn to the merits of the PI motion.  And I

20     would appreciate if counsel could focus on the likelihood of

21     success on the merits prong.  Counsel will then be given the

22     opportunity to make closing remarks.  This is Plaintiffs'

23     motion, so let's start with the plaintiffs.

24          I would ask that, given the size of the courtroom and

25     the acoustics, if counsel could speak from the podium when

P2ELNYCC

1    addressing the Court.  Thank you.

2                MR. AMER:  Thank you, your Honor.

3                Your Honor, I will begin where you asked me to begin,

4    with the standing question under Article III.  We believe that

5    the states have, indeed, incurred concrete and particularized

6    injury.  Disclosing the states' confidential financial

7    information in order for Treasury to build the automated

8    process that would then block funding on nothing more than

9    ideological grounds constitutes the type of concrete and

10   particularized injury that is sufficient under the cases to

11   confer Article III standing.  That conclusion is supported by

12   the Supreme Court's decision in the *TransUnion* case and by the

13   Second Circuit's recent decision in the *Bohnak* case, both of

14   those involving the disclosure of personal identifying

15   information, or PII, to an unauthorized actor.

16               THE COURT:  Mr. Amer, there does seem to be a little

17   bit of a disjunct between the harm in those cases, as you just

18   referred to.  The harm you articulated was a potential cease in

19   funding, but as I understand *TransUnion* and *Bohnak* to be more

20   focused on potential disclosure of information.  Obviously,

21   there are several claims in the complaint.  Some seem to be

22   focused more on potential interruption of payment streams, and

23   some seem to be focused more on the disclosure of information

24   point.  You obviously have to show standing for each of those

25   claims if they are to proceed.

P2ELNYCC

1          MR. AMER:  Well, your Honor, the end game here is to

2     be able to screen and block funding, but as part of that end

3     game, it's obvious from the declarations that it's a necessary

4     step in that plan to come up with this automated process that

5     they need to build, and it's that automated process that was

6     tasked to the DOGE, Department of Government Efficiency, team

7     and that's where the disclosure was occurring.

8          So it's all part of a single plan, if you will, that

9     includes at the front end having the DOGE team come into

10     Treasury and granting the DOGE team access to the databases,

11     the payment systems, the source code, which then exposed the

12     states' confidential bank information as well as the PII of the

13     states' residents.  So it's all related to the same type of

14     disclosure of confidential information that was involved in the

15     *Bohnak* case, for example, where the PII of the plaintiff was

16     disclosed to an unauthorized actor.  So we don't see any

17     distinction between the disclosure in those cases and the

18     disclosure here.  It's disclosure to an unauthorized actor.

19          THE COURT:  Well, has there been disclosure to an

20     unauthorized actor?

21          The disclosures, as I understand the record before me,

22     was to Mr. Krause, who is a Treasury employee, and temporarily

23     to Mr. -- I hope I have his name -- Elez, who is also a

24     Treasury employee, and not even an SG employee but, apparently,

25     a Schedule C temporary transition employee.

P2ELNYCC

1          So the disclosures were within the Treasury Department

2     as far as the record now reflects.  If that turns out to be the

3     case, has there been an unauthorized disclosure of state

4     information at this point in time?

5          MR. AMER:  There absolutely has, your Honor.  It's an

6     unauthorized actor.  And these individuals are unauthorized

7     because the law and the regulations surrounding how this

8     sensitive, confidential information needs to be handled have

9     been violated, and they have no lawful job duty to access this

10    information.

11         I should mention that in the *Bohnak* case, it wouldn't

12    have made any difference if the disclosure had been to somebody

13    who worked within *Marsh & McLennan.*  The issue was not whether

14    the disclosure was to somebody who was a co-employee, but it

15    was the nature of the information being disclosed and what the

16    laws and the regulations say about who can access that

17    information.  And we have indicated -- and we will get to it

18    later in the argument under likelihood of success -- all of the

19    five various sources of laws and regulations which we say

20    tightly control and tightly restrict who has access to this

21    information.  And it's our position that neither of these two

22    gentlemen were authorized actors for purposes of accessing this

23    information.  They didn't need it to perform any lawful

24    function within the Treasury Department.

25         I should mention that it's been recently reported that

P2ELNYCC

| 1 | the Inspector General for the Treasury Department has launched |
| 2 | an audit into the security issues surrounding the access that |
| 3 | was provided to these DOGE team members.  So we absolutely |
| 4 | believe that there was unauthorized actors who were given |
| 5 | access to confidential bank account numbers and other PII for |
| 6 | the states' residents, and that it falls squarely within the |
| 7 | holding of *Bonhak*. |
| 8 | And there is a second piece of our injury in fact |
| 9 | argument, which is very specific to this type of data breach |
| 10 | case and was also discussed by the Second Circuit in *Bohnak*. |
| 11 | It has to do with injury in fact based on the substantial risk |
| 12 | of future harm.  And here, that risk certainly exists. |
| 13 | I will just mention what we know from the |
| 14 | declarations.  We know that despite the various mitigation |
| 15 | efforts that were undertaken, that the DOGE engineer, Mr. Elez, |
| 16 | was given both read and write access for a period of time by |
| 17 | mistake.  We know that the same engineer took screen shots of |
| 18 | the data in the data system, and that he may have given those |
| 19 | screen shots to his supervisor.  That's in Mr. Gioeli's |
| 20 | affidavit. |
| 21 | We also know that there was no privacy information |
| 22 | assessment study done here, even though it's required to be |
| 23 | done under the E-Government Act.  We also know at this |
| 24 | particular moment in time that no one can tell us what Mr. Elez |
| 25 | did that might have further compromised the states' financial |

P2ELNYCC

1  information because the Bureau's review of his activity logs is

2  still ongoing.

3      So for all those reasons, we think this fits within

4  the second type of harm that one can have in a data breach

5  case, harm that's future, that's substantially likely to occur.

6  And based on everything I have just mentioned, including the

7  Inspector General's audit -- need to conduct an audit, we think

8  we have proven injury in fact on both of these counts.  The

9  states have had their bank account information accessed by

10  people who have no lawful reason to do it and are certainly not

11  in the conduct of the performance of their ordinary jobs.

12      And I would comment, your Honor, looking at the amicus

13  brief from the former Treasury officials, they make that point

14  absolutely clear, that it has been the long-standing practice

15  that this highly confidential information contained on this

16  very critical payment system only be accessed by a handful of

17  career civil servants who are highly trained about how to

18  handle this information and who understand the laws and rules

19  that govern how the information is handled.  I think it's

20  evident from this record that neither Mr. Elez or Mr. Krause

21  are the type of employees within the Treasury Department who

22  historically have been allowed to access this information.

23      I also want to mention one other point about

24  Mr. Krause.  It's also clear from his declaration, the first

25  one he submitted, on the emergency motion, that the Treasury

P2ELNYCC

1    ethics officer has not approved the delegation of duties to him

2    of the fiscal assistant secretary.  So we have a person who has

3    delegated job duties of the Bureau, and it hasn't been cleared

4    through the ethics officer, and that's no small matter because

5    Mr. Krause is simultaneously the chief executive officer of

6    several software companies, including Citrix.  So it's not hard

7    to imagine that there is an ethical issue and a conflicts issue

8    with respect to putting him in the role that he's been placed

9    in.

10             THE COURT:  How do you address the government's

11    argument that it is currently speculative, at best, that there

12    will be an interruption to funding to the states based on the

13    activities of the DOGE team?

14             MR. AMER:  It's not part of our case, so it's really

15    not relevant.  Our case is not brought based on the states'

16    funding having been blocked.  That's not the basis for our

17    injury in fact under Article III, and it's not the basis for

18    why we are here.  We are here because the states' bank

19    information has been accessed.  That has happened.  We know

20    it's happened.  And we know that the people who accessed it

21    have been somewhat careless in the way they have handled it.

22    So that is, I think, the response to the government's position.

23    There are other cases in other courts that are centered on

24    funding being blocked.  That's not this case.

25             I don't know if the Court wants to hear from me next

P2ELNYCC

```
 1   on likelihood of success.

 2            THE COURT:  I am going to turn to the government first

 3   on the standing issue, and then hear argument on the likelihood

 4   of success on the merits.

 5            MR. AMER:  I assume your Honor has no more questions

 6   for me then on the standing issue.

 7            THE COURT:  If you are concluded on standing, I have

 8   no further questions.

 9            MR. AMER:  I am.  Thank you, your Honor.

10            THE COURT:  Mr. Oestericher, if you don't mind taking

11   a moment.  We are having an AV issue that we are going to

12   resolve.

13            (Pause)

14            THE COURT:  Mr. Oestericher, you may proceed.

15            MR. OESTERICHER:  Thank you, your Honor.

16            I just want to start with one clarification before I

17   launch into what I want to say.  There was a point made about

18   whether the ethics officer had cleared Mr. Krause from serving

19   as the fiscal assistant.  That has happened, for the record to

20   be clear.

21            I would start by saying that, from the argument, it's

22   clear that the states' concern is that payments to the state

23   are going to be flagged and ultimately blocked.  But what they

24   are trying to do here is bootstrap what they view as an access

25   violation into somehow bringing a challenge to the flagging of
```

P2ELNYCC

1    these payments, and that can't be done, in part, because they

2    don't have standing.

3        And to address the standing -- the injury in fact,

4    there is none.  And if you look at *TransUnion*, the first part

5    is whether they have a concrete injury, and you need a common

6    law analog.  And in *Bohnak*, the common law analog was there

7    because it was a disclosure, a public disclosure, so it was an

8    individual where the employee was an employee, and someone had

9    hacked into the system, and there was a public disclosure of

10   the information.  And they found a common law analog there, but

11   here, it's totally different.  What you have here are Treasury

12   Department employees accessing Treasury Department information.

13   There is no common law analog for that because there is no

14   public disclosure that would provide for that.

15       THE COURT:  What about their claims that there is an

16   increased risk of hacking and public access to their

17   information, and that risk of future harm under *Bohnak* and

18   *TransUnion* is concrete enough to give them standing?

19       MR. OESTERICHER:  Sure.  I think there are two

20   problems with that.  One is a legal problem and one is a

21   factual one.  So on the legal problem, under the Second

22   Circuit's case law in *Bohnak*, but they are citing *McMorris*,

23   there is sort of -- you need an actual or imminent injury.  And

24   when they were talking about a data breach, they set out three

25   factors in *McMorris* that one is supposed to look at.  One is

P2ELNYCC

1    whether the data was exposed.  So in *Bohnak*, the data was

2    exposed because a malevolent actor had obtained it, which is

3    not the case here.

4          Second was, Was the data misused?  And that was a fear

5    in *Bohnak*, but here, of course, it's Treasury Department

6    employees doing Treasury functions.

7          And the third is whether the plaintiffs are subjected

8    to a perpetual ongoing risk.  And in *Bohnak*, again, there was a

9    data breach, and the information had gone out.  It had been

10   released.  Here, that is not so.  So the factors from *McMorris*

11   definitely cut the other way.

12         THE COURT:  One question I had is that the

13   declarations do say that the information has not been shared

14   outside the U.S. Government.

15         Has it been shared outside the U.S. Treasury, for

16   example, to DOGE within the Executive Office -- has there been

17   interagency sharing of this information?

18         MR. OESTERICHER:  The short answer on that is, we

19   don't presently know.  They are performing a forensic analysis.

20   From what we can tell from the forensic analysis thus far is

21   that there were e-mails sent outside Treasury, but we do not

22   know the content as to whether any PII or bank information was

23   somehow attached or included.  That's what we know.

24         THE COURT:  Is that not problematic from a Privacy Act

25   standpoint, where there is an exception for intra-agency

P2ELNYCC

1    need-to-know access by Treasury employees under (b)(1), but

2    that exception does not apply to sharing outside of the

3    Department of Treasury?  And if there has been such sharing,

4    has there not been a disclosure that then would give the state

5    standing to pursue?

6           MR. OESTERICHER:  I would say a few things about that.

7    First, the state doesn't have any right under the Privacy Act.

8    That's for individuals and individual information, and it's

9    perfectly clear that the state does not have a Privacy Act

10   cause of action.  And so the short answer is no.

11          But the second part is, we just don't know, and it is

12   the plaintiffs' burden for preliminary injunction, and they

13   can't meet that burden.

14          The third thing I would say is, with regard to the

15   broader point about future -- substantial future injury, they

16   didn't provide any evidence on that.  They didn't put in any

17   factual evidence, and the defendants did.  And the record is

18   clear that during the time that the DOGE team members had

19   access to this information, there were extensive mitigation

20   measures that were in place to try and reduce this precise harm

21   that they are concerned about.

22          And so it was a reasoned procedure in the sense that

23   Treasury was very cognizant of this harm and was taking

24   measures to mitigate that harm, including very extensive focus

25   on Mr. Elez in what environment he would use, and being

P2ELNYCC

1    monitored at all times to make sure, as much as possible, that

2    we were not subject to some kind of breach.

3            So for those reasons, they can't show an injury in

4    fact.  They don't have a concrete injury, and it's not actual

5    or imminent either under *TransUnion* or *Bohnak* or *McMorris*.

6            THE COURT:  Does the government's own declarations not

7    establish, though, that the way that this proceeded

8    unnecessarily and, perhaps, arbitrarily and capriciously,

9    increased the risk of hacking and data access by allowing

10    individuals to have access to source codes, full access in a

11    way that apparently had never been granted to a single

12    individual in the past, and unclear from the declarations

13    whether this individual had been provided any training with

14    respect to what government regulations require from a security

15    perspective in maintaining this information?

16            So at what level does an increase in hacking rise to

17    a -- a risk of hacking based upon the agency's actions amount

18    to a concrete harm that allow the states to pursue this claim?

19            MR. OESTERICHER:  I would both push back on the

20    premise, but as a legal matter, I would point the Court to the

21    *McMorris* factors, which are the three factors set out by the

22    Second Circuit, which they cannot meet.

23            But as a factual matter, there was greater access

24    given, greater than had been before, but this was a thought-out

25    procedure.  And it's set forth in the Gioeli declaration.  I

P2ELNYCC

1    think paragraphs 11 to 16 go through in fairly significant

2    detail what those mitigation measures were, and that Mr. Elez

3    was working in a sandbox environment where he could not alter

4    the code.  It was different from even the normal testing

5    environment, to make sure that he could not create disruptions

6    or hacking issues, as much as possible.  We, candidly, admit

7    that there was some measure of increased risk, but we took all

8    appropriate or potential mitigation measures to mitigate that

9    risk as much as possible.  And they simply can't show that

10   there is a substantial risk of future injury.

11         THE COURT:  You described the process as a thoughtful

12   one, but the time frame seems very abbreviated.  We are talking

13   about a matter of days.  So I query as to how thoughtful a

14   process could have been established when we are talking, as it

15   seems to me, based on the chronology established by the

16   declarations, less than a one-week time span between the

17   proposed access, the onboarding of these individuals, the

18   coming up with the engagement plan, putting the mitigation

19   measures into place.  Why the rush?

20         MR. OESTERICHER:  The short answer to why the rush, I

21   think, is because there were executive orders that the Treasury

22   Department was seeking, as set forth in the declaration, to

23   provide both -- there was two purposes for the engagement plan,

24   which was a four- to six-week plan.  One was to overall

25   increase efficiency and the workings -- improving the workings

P2ELNYCC

1    of the agency, but also, the second objective was to be able to

2    better identify payment requests that were in violation of

3    executive orders so that they could be flagged back to the

4    certifying agency.

5         So the BFS, the Bureau of the Fiscal Service, if the

6    payment is certified, they pay it.  And there was a common

7    process for flagging payments that were not potentially

8    appropriate, like if they are on a "Do Not Pay" list.  So this

9    was a version of that, but to comply with the executive orders.

10        Why so fast?  I think because the executive orders

11   were in place, and so there was a desire to move to be able to

12   more quickly identify rather than doing it manually, but to try

13   some automated system that would be able to identify them as

14   set out in the declaration based on particular codes.

15        THE COURT:  I certainly understand the desire by the

16   executive branch to implement an executive order that was

17   issued by the President, but I again question whether the

18   manner in which it could have been implemented could have

19   been -- could have slowed down the process, provided training

20   to the individuals.

21        Was there training provided to these two individuals

22   before they were granted access?

23        MR. OESTERICHER:  I would say two things.  I want to

24   address this directly.  We are talking about two individuals.

25   Mr. Krause had only a read-only, sort of, over-the-shoulder

P2ELNYCC

1    access, and it was Mr. Elez who was granted the greater access.

2    And to be clear, again, with respect to the source code, it was

3    in a sandbox environment, which was different from the testing

4    environment where he could not actually alter the source code.

5        I actually don't know the answer to the amount of

6    training.  I don't know if --

7        MR. HEALY:  Your Honor, as stated in the Gioeli

8    declaration, Mr. Elez was provided training in the PAM system

9    and the SPS system on February 3 and February 5.  If you give

10   me a moment, I can find the paragraph.

11       THE COURT:  That's fine.  I can refer to it later.

12   Thank you very much.

13       MR. HEALY:  Thank you.

14       THE COURT:  Was there training provided, for example,

15   though, on the array of federal regulations that govern

16   handling of information of a sensitive nature such as, for

17   example, Internal Revenue Code regulations governing the

18   handling of return information, regulations governing the

19   handling of Social Security numbers?  Was that training

20   provided?

21       MR. OESTERICHER:  Again, I don't know.  I would say,

22   your Honor, that the engagement plan was not designed for the

23   DOGE, Treasury DOGE team employees to really analyze PII.  This

24   was a method of identifying particular payment requests for

25   further review.  So it wasn't as if they were going to

P2ELNYCC

1    distribute people's Social Security numbers.  At least it did

2    not appear that that was the purpose of the project.  And there

3    is no evidence, by the way, in the record where they bear the

4    burden to show that any of that happened here, that there was

5    any disclosure.

6            THE COURT:  Thank you very much.

7            Do you have anything else to say on the standing

8    issue?

9            MR. OESTERICHER:  I do not.  Thank you.

10           THE COURT:  Let's then turn to the merits argument.

11   Mr. Amer.

12           MR. AMER:  Your Honor, would it be OK if I just

13   quickly responded to a couple of points from my friend on the

14   standing issue?  I will be very brief.

15           THE COURT:  Absolutely.

16           MR. AMER:  I want to first mention this idea that this

17   was kept within Treasury; these were Treasury employees.  We

18   just don't think that matters because of the highly restricted

19   nature of the laws and regulations that apply to this type of

20   information.  And one only has to wonder if one of these

21   handful of civil servants who have historically had access to

22   this information took a screen shot of that information and

23   e-mailed it to everybody in the entire Treasury Department.  It

24   would be no different.  I mean, clearly the fact that this was

25   just within the Treasury Department just doesn't matter.

P2ELNYCC

1              I also want to push back on the notion that this was

2      employees carrying out a Treasury function.  This was not a

3      Treasury function.  This was building a new automated process

4      to apply an ideological litmus test to --

5              THE COURT:  Let's pause for a second.

6              (Pause)

7              MR. AMER:  -- to apply an ideological litmus test to

8      funding requests.  There is nothing typical or normal in terms

9      of Treasury functions about that.  This was --

10             THE COURT:  Certainly the Treasury Department is

11     entitled to put into place the policy priorities of the

12     President, as set forth in executive orders.  If an executive

13     order issues directing the Treasury to put into place certain

14     processes, doesn't that then become a Treasury function?  Just

15     because it was not a function under the prior administration

16     does not mean that it is now *Ultra Vires* just because a new

17     administration has changed the policy.

18             MR. AMER:  It has to be lawful, though, your Honor.

19             THE COURT:  Certainly.

20             MR. AMER:  We will get to that.  And this is not, as

21     my friend suggests, a version --

22             THE COURT:  We are going to pause then and see if we

23     can take care of these AV issues.  I apologize, Mr. Amer.

24             (Pause)

25             MR. AMER:  I was just going to say, this is not, as my

P2ELNYCC

1    friend suggests, just a version of the type of review under the

2    "Do Not Pay" list.  This is a very different type of review

3    that they were trying to put in place.

4            And the final thing is that I think the fact that the

5    government cannot advise the Court if there was any disclosure

6    that went beyond Treasury just adds to the heightened level of

7    risk here that we are talking about, since the government can't

8    make that representation.

9            So with that, I am prepared to turn to the likelihood

10   of success, your Honor.

11           I wanted to address as a threshold --

12           THE COURT:  Mr. Amer, I apologize for interrupting you

13   again.  We are going to take a two-minute pause, if you would

14   like to sit down.  They are going to try to fix the AV issues

15   for good, hopefully.  But if you want to remain standing at the

16   podium while we are paused, that's also fine.

17           MR. AMER:  If it's just going to be a minute or two, I

18   am fine to stay here.

19           THE COURT:  That's what has been represented to me.  I

20   apologize to everyone.

21           (Pause)

22           THE COURT:  So everyone understands what's happening

23   right now, apparently the phone line in which co-counsel for

24   the plaintiffs had called in remotely is not functioning and

25   they are unable to hear the proceeding.  So the AV staff is

1    attempting to give the remainder of plaintiffs' counsel access

2    to their call-in phone line.

3        MS. FAHERTY:  Your Honor, if it's helpful, at some

4    point they did start to hear.  I think at the tail end of

5    what -- when Mr. Amer was arguing.  So it could be that we are

6    getting closer to resolving the sound issues.  I will keep you

7    posted if I hear.

8        THE COURT:  I appreciate that update.  Thank you.

9        If we can't resolve it in a few minutes, I think we

10   are going to proceed without the phone line.  So apologies to

11   counsels on the phone.

12       MR. AMER:  We will fill them in later.

13       THE COURT:  Thank you.

14       (Pause)

15       THE COURT:  We are operational.  Apologies, Mr. Amer,

16   for interrupting.

17       MR. AMER:  Thank you, your Honor, very much.

18       So I will turn to the likelihood of success on the

19   merits.  And let me first focus on the APA argument.  And that

20   raises, as a threshold matter, the question of whether what we

21   have here is a final agency action that's subject to review

22   under the APA.

23       I think when you review all of the declarations the

24   defendants have submitted, it basically concedes the point,

25   quite frankly, because what's disclosed in those declarations

P2ELNYCC

1  is a very detailed plan.  It's a four- to six-week project.  It

2  involves bringing in the DOGE team members to create an

3  automated process that would enable the Bureau to screen, flag,

4  pause, and ultimately block those payment requests that do not

5  align with the President's agenda from an ideological

6  standpoint.

7        THE COURT:  Let me interrupt you, Mr. Amer.  I did not

8  read the declarations to state that the engagement plan was

9  designed to block payments; certainly that there was a review

10  of systems that was designed for a few different purposes,

11  although, albeit vaguely defined, that had to do with the

12  integrity and hardening of the systems.  But I did not see the

13  government to aver that one of the purposes of the engagement

14  plan was to block payments.

15        MR. AMER:  I think what's clear is that the process,

16  the automated process would effectively pull funding requests

17  out of the queue while they were still in the landing zone, as

18  described by Ms. Robinson, and that the basis upon which these

19  funding requests would be flagged while in the landing zone was

20  based on this effort to come up with an ideological litmus

21  test.  The request would then go back to the submitting

22  agencies for determination as to whether they should be blocked

23  or not.

24        So I think the end game was to try and identify those

25  funding requests that required a second look by the sending

P2ELNYCC

1    agencies.  But I think --

2                THE COURT:  Let me interrupt again.

3                MR. AMER:  Sure.

4                THE COURT:  As I read the declarations, that there was

5    this one project that was limited to USAID payments, that there

6    was an attempt over the course of, perhaps, a day to automate,

7    but then was abandoned because the payments were going to be

8    stopped at the agency side and not at the Treasury side.  But

9    it was not a, as I read the record -- and if you want to point

10   me to other parts of the record that state differently -- that

11   it was limited to that one project regarding USAID and it was

12   not an agency-wide automated program.

13               MR. AMER:  I don't think that's correct, your Honor.

14   I think that was, sort of, part of the way they tested the

15   system.  And bear in mind, they were only a few days into

16   Mr. Elez's work on his BFS laptop that was the sandbox

17   environment.  And I think they were using certain test -- data

18   came over to, sort of, test in the sandbox, but I think the

19   ultimate goal was to create an automated process system that

20   would be applied writ large.

21               But I think to some extent that's all just background

22   to the point that this was a definitive plan.  It was called

23   "The Engagement Plan" by the declarants.  It was clearly the

24   culmination of a decision-making process, which is the first

25   requirement for determining whether something is final agency

P2ELNYCC

1   action.  So we don't think there could really be any dispute

2   that this was something tentative.  It was clearly something

3   that was not only consummated, but it was put into action.

4   They brought the DOGE team over.  Mr. Elez was busy working

5   away to create this software automated process.

6         We also think, as to the second prong of the test for

7   whether something is final agency action subject to APA review,

8   there was clearly here a determination of rights.  There was a

9   determination that the DOGE team would be granted access that

10  clearly affects the states' rights to the privacy of their

11  private banking information.  And we think it's also clear that

12  consequences flowed from that determination of rights.  The

13  consequence was that access was granted to the states' bank

14  information as well as to the PII of their residents.

15        And as we pointed out, three courts in the District of

16  Columbia within the past two weeks have found that

17  post-inauguration actions by agencies, not unlike what happened

18  here, were indeed final actions subject to APA review; the two

19  cases cited at page 7 of our reply and the decision we

20  submitted this morning by letter.  So we think there was

21  clearly final agency action here that is appropriate for review

22  by this Court under the APA.

23        We have raised a number of APA arguments.  The first

24  is that this engagement plan is contrary to law.  We have cited

25  to five different laws and regulations that I will just review

P2ELNYCC

 1    quickly, and I am happy to address any questions that your

 2    Honor has specifically to any of them.

 3            First of all, the Privacy Act, we think it's clear

 4    that that was violated.  There is --

 5            THE COURT:  I would like you to pause on the Privacy

 6    Act because --

 7            MR. AMER:  Sure.

 8            THE COURT:  -- I take the government's point that the

 9    Privacy Act does not apply to state information.  It applies to

10    information pertaining to an individual contained in a system

11    of records, and the state is not an individual.

12            Further, the Privacy Act does not permit for

13    injunctive relief for violations of its disclosure provisions.

14    So it seems to me you have two Privacy Act fundamental problems

15    if you are going to proceed on a "contrary to law" basis under

16    that statute.  Can you address those?

17            MR. AMER:  Sure.  First of all, I think it's important

18    to distinguish between Article III standing and prudential

19    standing under the APA.  For prudential standing under the APA,

20    which really addresses the question of whether we can rely on a

21    violation of the Privacy Act for APA, it's a Zone of Interests

22    Test.  It's very different from the Injury In Fact Test that

23    one applies to a standing under Article III.  And under The

24    Zone of Interests Test, we can, indeed, rely on the PII of

25    individual residents who reside within these states and whose

P2ELNYCC

1    information the states provide through portals to the Treasury

2    in order to obtain certain types of funding like Medicaid,

3    where the states are the conduit through which the funds are

4    disbursed.

5            So our argument is that we have prudential standing to

6    raise a Privacy Act claim because we do, indeed, forward on, as

7    the stewards and trustees of our residents, private

8    information, including Social Security numbers and all sorts of

9    other forms of PII that we then upload through these secure

10   portals in order to obtain those types of fundings where the

11   states are the conduit.  So we do think that we satisfy that

12   requirement and can, unlike for Article III standing, we can

13   rely on the fact that access was granted to the PII of our

14   residents.

15           And in terms of -- the fact that the Privacy Act

16   doesn't provide for injunctive relief for this type of

17   disclosure, we are not relying on the Privacy Act for the

18   injunction.  We are relying on the APA, which allows for an

19   injunction of a final agency act that is contrary to law.  So

20   the source for getting the injunction is the APA.

21           I think the argument that the other side makes, that

22   the Privacy Act wouldn't grant a private right of action to

23   states also misses the point.  Under Section 704 of the APA,

24   it's a prerequisite to an APA review that the party seeking to

25   challenge the final agency action has no other available remedy

P2ELNYCC

to them.  And so that's the case with the Privacy Act because

states are not permitted to bring a private right of action

under the Privacy Act.

          This is no different from the Supreme Court decision

in *Chrysler v. Brown* that we cite in our brief where the

challenge was that the administrative -- the final agency

action was in violation of a criminal statute.  And the Court

there recognized that, of course, the individual bringing the

APA challenge has no private right of action under a criminal

statute.  But the Court, nevertheless, allowed the violation to

be part of the analysis.  And that's the whole point of the

APA.  It's to provide a right of action for administrative

final agency actions that would otherwise go unreviewed.  So we

think we fall within the comfortable rubric of what a party can

challenge as contrary to law under the APA.

          THE COURT:  Let me ask you, though, under the *Bowen*

test adequate remedy of law seems to suggest that if a statute

has a set-forth scheme for vindicating those rights, then one

can't add to the scheme set by Congress an, essentially,

back-door remedy that Congress did not provide by proceeding

through the APA.

          So if Congress made a deliberate decision to exclude

injunctive relief from these provisions of the Privacy Act,

that attempting to bring the claim as an injunctive relief

claim under the APA is essentially sidestepping deliberate

P2ELNYCC

1    choices made by Congress, and in some ways akin to the Thunder

2    Basin argument that if Congress speaks to a set of review

3    procedures, you know, impliedly, then other review procedures

4    can't be found by district courts.

5         I hear your argument about *Chrysler Corp.*, but don't

6    you have to confront the fact that there were deliberate

7    choices made in the text of the Privacy Act to not include

8    injunctive relief as a remedy?

9         MR. AMER:  I think there is a distinction here, your

10   Honor.  The distinction is that the states have no ability to

11   bring any sort of Privacy Act case.  The cases that the

12   defendants rely on are all cases where the Privacy Act claim

13   under the APA was duplicative of a separate Privacy Act claim

14   that the plaintiff was bringing or could have brought.  We,

15   obviously, did not bring a Privacy Act claim in this complaint,

16   and it's because we couldn't.  So I think under those

17   circumstances, it's sort of the *Chrysler* holding that applies

18   and not the holding in these other cases.

19        To your Honor's point, if we were in a position where

20   we were able to bring a Privacy Act claim as a separate

21   stand-alone claim, then I think that analysis applies.  Then

22   you would be able to bootstrap your APA claim in order to get

23   some relief that isn't available to you under your private

24   right of action under the statute, but that's just not the case

25   with our Privacy Act claim here.  We are bringing it solely

P2ELNYCC

1    through the APA because that's the only way we can bring it.

2            So we say under the Privacy Act that clearly this plan

3    does not comport with the Privacy Act.  The Privacy Act

4    generally requires prior consent and following a notice

5    protocol.  And while there are exceptions in the Privacy Act,

6    it doesn't apply to the DOGE employees because, as a principal

7    matter, they don't need to access the information to perform

8    any lawful Treasury duty.  So since it's not someone's job duty

9    within the Treasury Department to be creating some sort of

10   automated litmus test based on ideology, they can't fall within

11   the Privacy Act exception.

12           The E-Government Act, I think, is an even clearer

13   application here.  The E-Government Act, no question about it,

14   requires for this type of project that a privacy impact

15   assessment be conducted.  They didn't do that, so they violated

16   the E-Government Act.

17           THE COURT:  How does this engagement fall within the

18   definition of developing or procuring information technology?

19   What is your argument as to how this falls within the 208

20   definition?

21           MR. AMER:  The creation in the sandbox of the

22   automated process falls squarely within the description of

23   developing information technology.  That's essentially what

24   Mr. Elez was doing.  And I think if you just consider for a

25   moment that the department itself, the Bureau, understood the

P2ELNYCC

 1   need for all of these risk mitigation strategies to be

 2   employed, I think it's clear to see that a privacy impact

 3   assessment needed to be done because that's the whole reason

 4   for doing that kind of assessment.

 5         So they basically acknowledge that all of these risks

 6   attain to what Mr. Elez was doing in his sandbox environment

 7   and, yet, they sidestepped this E-Government Act requirement of

 8   doing a more formal assessment.  And I think, to your Honor's

 9   point, it would have slowed things down for sure.  This was a

10   rushed project, and the law doesn't permit this to be rushed.

11         The IRS Code allows tax return information to be

12   accessed, but only for tax administration purposes.  The

13   defendants in their brief tried to suggest that this plan was

14   somehow for tax administration purposes.  I don't think that

15   passes the Red Face Test, your Honor.  There is nothing about

16   what was going on with this engagement plan that could

17   reasonably be characterized as tax administration.

18         We know this involved access to Social Security

19   numbers.  There are very strict rules, as one could certainly

20   understand, about how disclosure of Social Security numbers has

21   to be handled.  And, obviously, the big concern there is

22   identity theft and other mischief that can be done if this

23   information is further disclosed or hacked.

24         There was no effort whatsoever to mask or redact

25   Social Security numbers.  And, in fact, Mr. Elez was, you know,

P2ELNYCC

1    free to take a screen shot of whatever he was looking at,

2    apparently.  So, clearly, there was no compliance with the

3    rules for handling Social Security numbers.

4         And finally, there are ethics rules that apply.  We

5    have just heard Mr. Krause, apparently, received approval from

6    the ethics officer, but Mr. Elez did not.  And at no point

7    prior to his resignation is there any indication in the record

8    that there was any attempt to review the ethical issues

9    surrounding his access.  And the fact that we don't know if any

10   of this information went beyond Treasury is another red flag

11   that, you know, causes concern about the ethics issue.  And

12   this is especially important since we do have people,

13   especially Mr. Krause, who is simultaneously employed

14   elsewhere, outside Treasury, as the CEO of multiple companies,

15   including Citrix.  So you have somebody who is being given

16   access to source code within the Bureau whose other job is as

17   CEO of one of the world's largest software companies, Citrix.

18        We have also, under the APA review, our arbitrary and

19   capricious argument.  Under that, the standard is whether there

20   was any neutral principle or reasoned explanation given for

21   implementing the final agency action.  Here, we don't think

22   there was.  We now know there's zero in terms of an

23   administrative record here.  It was, as your Honor noted, a

24   very rushed project that was put together.  We know the purpose

25   that this project was intended to serve because the declarants

P2ELNYCC

1    told us, saying what I think is the quiet part out loud.  The

2    whole point was to operationalize the President's policy

3    priorities.  That's Mr. Krause's declaration at paragraph 12.

4    He also said in that same paragraph that it was to determine

5    whether payments may be proper under the executive orders.  And

6    he also said that it was to pause certain types of financial

7    transactions that don't align with the President's executive

8    orders.

9            So looking at that in totality, we don't think that

10   there are any neutral principles being espoused or any reasoned

11   explanation.  This was purely an effort to find an automated

12   process that would, unlike the "Do Not Pay" list, that would

13   apply some sort of ideological test to funding, which has been

14   appropriated by Congress.

15           THE COURT:  Did the Supreme Court not, in the *Census*

16   case, suggest that there is no APA violation simply by an

17   agency putting into place policy preferences of a current

18   administration?

19           Simply the fact that there is a presidential policy

20   that is being implemented by an agency does not itself create

21   an APA violation.  In fact, that is the ordinary course, that

22   an administration comes in, they set forth policy preferences,

23   policy priorities.  Agencies implement those priorities.  I

24   assume what you are suggesting goes beyond that --

25           MR. AMER:  It does.

P2ELNYCC

| | |
|---|---|
| 1 | THE COURT:  -- and it is simply not putting into place |
| 2 | a certain policy perspective or preference of the current |
| 3 | administration.  There has to be an unlawfulness to that. |
| 4 | MR. AMER:  Exactly so, your Honor.  And here, you |
| 5 | know, they are not pretending as though this plan was designed |
| 6 | to come up with additional indicators of fraud, for example. |
| 7 | This was unlawful from day one.  It was an attempt to |
| 8 | operationalize the administration's priorities in a way that |
| 9 | simply is not permitted by law and runs counter to |
| 10 | congressional appropriation through legislation. |
| 11 | So if that's their only reason for doing this -- and |
| 12 | it appears from the record that it is the only reason for doing |
| 13 | this -- then it's not a principled and reasonable explanation |
| 14 | that passes muster under the arbitrary and capricious test |
| 15 | under the APA. |
| 16 | We have a couple of other arguments we have raised |
| 17 | that I just want to quickly go through.  We have our *Ultra* |
| 18 | *Vires* claim, which is basically a very similar argument to the |
| 19 | argument about "contrary to law" under the APA; the point being |
| 20 | that the executive branch can only exercise, and agencies |
| 21 | within the executive branch can only exercise that authority |
| 22 | that is granted to them by Congress exercising its Article One |
| 23 | legislative powers.  Where an agency seeks to exercise powers |
| 24 | that have not been granted to it, then it is acting in a way |
| 25 | that is *Ultra Vires*.  That is clearly what is happening here |

P2ELNYCC

1    with respect to the engagement plan.  There is no statute that

2    authorizes the Treasury Department to pause, flag, and subject

3    to a second review for purposes of blocking funding that

4    Congress has appropriated on grounds that are purely political

5    and ideological.

6           THE COURT:  But I understood you to say earlier,

7    Mr. Amer, that you are not relying on the pausing of funds as

8    the injury in this case.  I thought that was what you said

9    during the standing argument when I questioned you on it.  So

10   that seems somewhat -- if that is the harm that you are

11   claiming under the *Ultra Vires* test, then wouldn't the standing

12   argument play out differently?  Or are you now saying that you

13   are relying upon a potential risk of pausing of funds?

14          MR. AMER:  No.  Under the *Ultra Vires* test it's not

15   about what harm you suffer; it's about what authority is being

16   exercised that's not authorized by law.  And so because

17   ultimately the access to the states' bank information is in

18   service of this plan, the Court has to take a broader view of

19   whether the plan in its totality is something that the

20   department, the agency, has the authority under existing law to

21   do.

22          And so I stand by my point that for Article III

23   standing and injury in fact, we are looking -- we are not

24   raising any point about our funding being blocked.  That's not

25   this case.  But the whole plan that was designed is -- and that

P2ELNYCC

1   requires access to our bank information is in service of an

2   objective that simply is not lawful and exceeds any statutory

3   authority.

4           THE COURT:  Let me question you about your proposed PI

5   order in this case.  It does seem as if your proposal is that

6   the PI that would issue would be to order that the defendants

7   are restrained from taking any action to develop, facilitate,

8   or implement any process, whether automated or manual, for

9   Treasury Department payment systems to flag and pause payment

10  instructions.

11          So the remedy you are seeking is to prevent the pause

12  of payments.  The legal violation that you are claiming is the

13  potential to pause payments, but then the injury that you are

14  claiming under standing is not the harm that would result from

15  pause of payments.  And so there does, again, seem to be a bit

16  of a disjunct.

17          And I hear what you are saying, that the Article III

18  standing issue is separate, and the concrete harm that you

19  articulated is the disclosure of information, but there does

20  have to be a link between the harm and the remedy.

21          MR. AMER:  I think your Honor is reading more into

22  paragraph 1 of the proposed injunctive relief than is there.

23          We are not seeking to restrain them from blocking

24  funding.  We are seeking to restrain them from taking any

25  action to develop, facilitate, or implement a process, and we

P2ELNYCC

1    are doing that because we understand that in order for them to

2    create that process, they need to access our private banking

3    information.  So this injunction would not prevent them from

4    blocking funding that they decide to implement through some

5    other means.  So I think it's a narrower injunctive relief than

6    the Court presumes.

7        And again, there are other cases in other courts that

8    are dealing with agency action that blocks funding.  What we

9    are talking about is this need to create an automated process

10    that requires DOGE to come in and rifle through all of the

11    payment systems and records and source code.

12        Then the final two arguments, which I think can be

13    discussed sort of together, the last two claims in our

14    complaint, which we also think we have a likelihood of success

15    on, are the separation of powers claim and the Take Care

16    Clause.  And again, this goes back to the fundamental point

17    that the whole purpose of this engagement plan is to come up

18    with this automated process.  And the objective of the

19    automated process is, plain and simple, unlawful.  It's an

20    attempt to usurp the legislative power of the purse to

21    appropriate funds and have those funds be disbursed.  And by

22    trying to create a process whose sole purpose is to identify

23    and subject to further review for, you know, second-guessing

24    Congress's appropriation, that's a separation of powers

25    violation.  It's not for the executive branch and it's not for

P2ELNYCC

1       the Treasury Department to come up with any process that would

2       second-guess and contravene the express congressional

3       appropriation of funds to particular organizations.

4               It's not for the Treasury Department to say, "We don't

5       like the idea of sending health aid abroad, especially if the

6       clinic is going to serve patients whose ideology is problematic

7       for us.  We don't like funding this particular organization."

8       That is usurping Congress's role and it's, therefore, a

9       separation of powers problem.  And, by the same token, under

10      the Take Care Clause, the President is charged with taking care

11      that he, you know, he executes the law.  And by implementing

12      this type of litmus test based on ideology, he is not taking

13      care to faithfully execute the law.  He is subverting the law.

14      The administration is subverting the law, and the agency is

15      subverting the law by trying to create an automated process

16      that would ignore Congress's appropriation of funding.

17              So the only other -- last point I would mention, in

18      case I don't have an opportunity to address the Court again, is

19      that we would ask that our preliminary injunction, if the Court

20      is going to issue one, require that notice of the preliminary

21      injunction be sent to all staff members within the Treasury so

22      that we ensure that everybody working within Treasury has

23      notice of any order that enjoins certain acts, and we do so

24      because we are troubled by the fact that in other circumstances

25      there seems to be a compliance issue that courts are dealing

P2ELNYCC

1    with, most particularly in Rhode Island.  So we want to make

2    sure that the order requires dissemination to everybody in the

3    department.  So if the Court doesn't have any further

4    questions.

5         THE COURT:  No further questions.  You will be given

6    an opportunity to make closing remarks, however.

7         MR. AMER:  Thank you very much.

8         MR. OESTERICHER:  May I proceed, your Honor?

9         THE COURT:  Yes.

10        MR. OESTERICHER:  I have two housekeeping things

11   before I address the likelihood of success, and one is,

12   frankly, an apology.  But the first one, I wanted to address

13   whether instructions had been given to Mr. Elez and Mr. Krause

14   with regard to the handling of information, and I told you I

15   did not know, but my colleague did, and he pointed me to

16   Gioeli's declaration, paragraph 14.  And it does demonstrate

17   that they were instructed about safeguarding and handling

18   instructions, that all the information had to stay within the

19   Treasury laptop, the BFS laptop that Mr. Elez had been given.

20   But it's set forth in paragraph 14.

21        THE COURT:  Thank you for that.

22        MR. OESTERICHER:  The other one is the apology.  So

23   your Honor was correct.  I said there were three Krause

24   declarations, and there are, but I must not have hit send on

25   the ECF last night.  So there is a third one.  I have it.  I

P2ELNYCC

1    will file it.  It simply says that he has assumed his position

2    as the fiscal agent.  But I can hand it up, if your Honor

3    wishes, or I will just file it.

4         THE COURT:  If you could file it and share it with

5    counsel for the plaintiffs as well.

6         MR. OESTERICHER:  Should I share it now?

7         THE COURT:  If you could share it now so if they have

8    anything they would like to address, I think that would be the

9    wisest course.  And if they would like a few minutes to just

10   review it, we can just take a pause.

11        MR. HEALY:  Your Honor, just to be clear, for the

12   Court's awareness, he was transitioned to a temporary

13   Schedule C appointment, and that allowed him to assume the

14   duties of the fiscal assistant secretary.

15        THE COURT:  Thank you for that clarification.

16        MR. AMER:  I appreciate that, you Honor.  We were

17   wondering if we had missed the bounce on ECF.  I am glad to

18   hear it wasn't us.

19        THE COURT:  I am also glad that my list was complete

20   as I had it.

21        Why don't we give you a minute to review the

22   declaration to see if there is anything you would like to do as

23   a result of receiving this declaration.

24        (Pause)

25        MR. AMER:  We are still proceeding with our case.

P2ELNYCC

| | |
|---|---|
| 1 | THE COURT:  Thank you for that. |
| 2 | MR. OESTERICHER:  So with regard to the likelihood of |
| 3 | success on the merits, starting with the APA, there are |
| 4 | threshold deficiencies with their complaint.  We set them out |
| 5 | in our brief.  But the first one is, there is no final agency |
| 6 | action.  They seem to make clear now that the final agency |
| 7 | action that they are focusing on is the engagement plan, but an |
| 8 | engagement plan is an operational plan.  It is not a final |
| 9 | agency action under the law.  It doesn't determine rights or |
| 10 | obligations, and no legal consequences flow.  It's a plan to |
| 11 | get these folks, the Treasury team DOGE officials, up to speed |
| 12 | about how the systems work so they can test out how they might |
| 13 | be able to improve them.  It does not fit within any of the |
| 14 | definitions.  If you look -- it's more akin to the broad |
| 15 | programmatic attack in *Lujan*, but it just doesn't fit within |
| 16 | the definition of a final agency action. |
| 17 | THE COURT:  Don't consequences flow -- let me pose a |
| 18 | hypothetical to you. |
| 19 | If the engagement plan, for example, called for broad |
| 20 | publication of the states' financial information, let's say |
| 21 | throughout the Treasury Department, but as an engagement plan, |
| 22 | would that not have consequences that flow in that their |
| 23 | information is exposed?  What would their legal remedy be in |
| 24 | that case? |
| 25 | MR. OESTERICHER:  I think that's right, your Honor. |

P2ELNYCC

1   If part of the plan -- if it wasn't just a plan to get people

2   up to speed, but it was an actual plan that said, "At the end

3   of the plan, we are going to publish your PII," I think that

4   would be a much closer case because legal consequences could

5   flow and rights were being determined, but we don't have that

6   here.

7           THE COURT:  Well, I think we are -- we can scale down

8   the hypothetical.  So first it's disclosure to all of Treasury,

9   then it's disclosure to a larger team at Treasury, and now, if

10  you take the plaintiffs' allegations at face value, it's

11  disclosure to unauthorized individuals within Treasury.  But in

12  each of those steps, isn't it an unauthorized disclosure of

13  their information that's causing them a legal harm,

14  potentially, that, therefore, a remedy should be recognized

15  for?

16          If the unauthorized disclosure is the issue, then

17  isn't that the final agency action, is the unauthorized

18  disclosure of information, whether it's pursuant to an

19  engagement plan or otherwise?

20          MR. OESTERICHER:  If the unauthorized disclosure is

21  disclosure by Treasury to Treasury employees of the banks'

22  information which does not violate any statute, I am still not

23  sure --

24          THE COURT:  I think we are just talking about final

25  agency action, leaving aside the merits of the claim.  Let's

P2ELNYCC

1   presume that the unauthorized disclosure violates a statute by

2   virtue of being unauthorized.  So final agency action -- isn't

3   the final agency action the disclosure?  Isn't that the action

4   from which consequences flow?  And then the merits question is

5   whether or not that violated the law.  But the final agency

6   action is the disclosure.

7           MR. OESTERICHER:  I hear you.  I think we still resist

8   that consequences flow from a plan when we do not even know

9   which information is being exposed.  But I hear the point.  I

10  think that is a broader definition of final agency action than

11  is ordinarily endorsed by the courts, but I hear that.

12          THE COURT:  The Supreme Court has instructed that

13  final agency action is a pragmatic test, and certainly informal

14  agency actions have been found to be final agency actions

15  within the meaning of the APA.

16          MR. OESTERICHER:  Yes, but the Supreme Court has also

17  said that programmatic attacks are not final agency action.

18  And basically, what I heard today is that they are saying, this

19  is step one to a step two that they really do object to, which

20  I understand, but that doesn't make it final agency action.

21          THE COURT:  That's why I think I am trying to narrow

22  it down.  If the final agency action is simply the disclosure

23  as opposed to the engagement plan writ large, but the

24  disclosure of state information to, potentially, individuals

25  who otherwise would be unauthorized to access it, is that not a

P2ELNYCC

final agency action from which consequences could flow?

And it's not -- that would not be a programmatic
issue; it would be a simple action taken by the state and,
therefore, wouldn't fall within the *Lujan* rubric that you were
just referring to.

MR. OESTERICHER: Right. So I would say two things.
One is, I think they have abandoned that in their reply brief.
They clearly stated that the final agency action is the
engagement plan, and they have embraced that. It did look like
earlier on, they were saying the access was the final agency
action, but now they have definitely, at least my reading of
it, embraced it.

And whether -- I guess we don't concede the point
because -- primarily because the unauthorized, right. We still
don't see anything unauthorized about it.

THE COURT: I take that as a merits point.

MR. OESTERICHER: Yes, but I hear you. The
consequences flow from access is access, and if that is the
consequence, then yes, we are granting access as part of this.

Two other threshold APA deficiencies. When you talk
about an engagement plan, which is discretionary to the agency,
I don't see a standard by which the Court can decide whether
the engagement plan is good or not or lawful or unlawful.
Plaintiffs haven't identified any statute that limits the
discretion or any law to apply in determining whether an

P2ELNYCC

1    engagement plan to get people up to speed who are trying to

2    make a more efficient system and to identify payments that may

3    need to be flagged.  There is just no standard by which to

4    judge that, and that is a deficiency in the *Lund* case from the

5    Second Circuit and others that we cite.

6            And the third threshold deficiency is whether there is

7    an adequate remedy in court.  The language of 704 is whether

8    there is an adequate remedy in a court.  Here, there is an

9    adequate remedy.  There are all the statutes -- the Privacy Act

10   in particular.  It's just that the Privacy Act, as Congress has

11   defined it, does not include the states, but there is an

12   adequate remedy in court for these violations.

13           THE COURT:  How do you respond to Mr. Amer's point

14   that there is no adequate remedy at law for the states for

15   their information because the Privacy Act doesn't allow them to

16   bring a cause of action under the Privacy Act?

17           MR. OESTERICHER:  Right.  And, unfortunately, that is

18   our point, and it's a bit of a whipsaw, but that's the point.

19   Congress has decided that.  And 704 only says "an adequate

20   remedy in the court."  It doesn't say you must have an adequate

21   remedy.  It just says, "Has an adequate remedy been provided?"

22   And there is a whole detailed -- the Privacy Act has a whole

23   detailed system for what remedies are available or not.

24   Congress has thought about this.  And 704 just says, "Has a

25   remedy been provided?"  And the answer to that is yes.

P2ELNYCC

1  Congress so excluded states from it, and we admit that, and

2  that is a bit of a whipsaw, but that is what the law provides.

3  704, there is an adequate remedy.  It is a threshold defect in

4  their APA claims.

5        We don't think you have to turn to the merits of the

6  others, but I will run through them, as counsel did.  The

7  Privacy Act, as we said, it only applies to information

8  provided by individuals.  It does not apply to the states'

9  data.  And also, there is no violation of the Privacy Act here

10  because the DOGE team members have a need to review the records

11  in the performance of their duties, so it fits within one of

12  the authorized exceptions under the Privacy Act.

13        THE COURT:  Let me probe the employment issue for a

14  minute.

15        Granted, that I think all sides -- well, certainly the

16  Privacy Act says that under (b)(1), employees who have a need

17  to know can have access to information otherwise protected by

18  the Privacy Act.  I am a little unclear as to some of the

19  employment status of Mr. Krause and formerly Mr. Elez,

20  particularly as DOGE team members.

21        Are they selected by Treasury and hired solely by

22  Treasury, or are they selected by the USDS, DOGE, within EOP?

23  And what is their chain of reporting?  Who are they reporting

24  to?  Are they reporting to the agency head within Treasury or

25  are they having a reporting line outside of Treasury to the

P2ELNYCC

1    Executive Office of the President?

2              MR. OESTERICHER:  So I am going to defer to my

3    colleague, your Honor.

4              MR. HEALY:  They report to the Chief of Staff, your

5    Honor.

6              THE COURT:  So they are not reporting to the

7    administrator of DOGE?

8              MR. HEALY:  No.  They collaborate closely with the

9    administrator of DOGE.

10             THE COURT:  What does that mean in this context; they

11   collaborate, but they don't report to?

12             MR. HEALY:  As I understand it, your Honor, the

13   DOGE -- folks at USDS, DOGE, set the top level policy

14   priorities, communicate with Treasury DOGE staff, but the chain

15   of reporting is through the Treasury Department, and they were

16   hired by the Treasury Department.

17             THE COURT:  That is a little bit more complex than the

18   normal employment status that we would have under the Privacy

19   Act in that they are employees of the Treasury Department

20   nominally, but it does seem as if they have this relationship

21   to this other organization.  They are considered part of the

22   team.  They have this coordination aspect.  Does that

23   complicate the Privacy Act inquiry?

24             MR. OESTERICHER:  I don't think so, your Honor.  I

25   think they are clearly, and no one can dispute, they are

P2ELNYCC

1    Treasury Department employees, civil servants, and that's

2    what's required under the Privacy Act.

3        THE COURT:  Mr. Krause's declarations, I believe,

4    states that he was employed under 5 U.S.C. 3109 originally, and

5    before he became a Schedule C employee he was a consultant

6    under that authority.  And 3109 requires an appropriation or

7    statute that permits that consultancy.

8        What is the underlying statute or appropriation that

9    authorized his appointment under 3109?

10        MR. OESTERICHER:  I am going to try and defer to my

11    colleague.

12        MR. HEALY:  The statute under which he was -- OK.

13        I can actually refer your Honor to paragraph 3 of the

14    Wenzler declaration.  Consultants appointed under 5 U.S.C. 3109

15    are federal civil service employees under 5 U.S.C. 2105.

16        THE COURT:  Yes, I see that, but 3109 states that for

17    an individual to be appointed under that authority, there has

18    to be another appropriation or statute that permits it.

19        And so my question is, what is the statute or

20    appropriation that permitted his appointment under 3109?

21        MR. HEALY:  I don't know the answer to that question,

22    your Honor.

23        MR. OESTERICHER:  We will have to get you that answer.

24        THE COURT:  Thank you.

25        Following somewhat this chain of questioning, 5 CFR

P2ELNYCC

304.103 prohibits a consultant who is employed under the 3109

authority from being in a managerial or supervisory position or

from making policy decisions or operating in the chain of

command.

It does seem, however, as if Mr. Krause was operating

within a Treasury chain of command and that he was leading this

DOGE team that had some authority to operate within BFS.  How

does that square with the regulation?

MR. OESTERICHER:  My understanding, your Honor, is

that they were aware of this.  That's why he was converted to a

Schedule C, and that during this time period -- there was only

one other employee there who was only there for part of the

time, and that he was not serving in a managerial role until he

was converted, and that's the purpose of the declaration that

we will be submitting.

THE COURT:  OK.  You can continue.

MR. OESTERICHER:  Thank you, your Honor.

So continuing with the statutes, Section 208 of the

E-Government Act also doesn't apply because they are not

developing or procuring information technology here.  They are

using existing technology.  The sandbox environment, which was

an environment where he could test things, he was just taking

source code and testing it.  There was no new information

technology being applied.  They were using existing technology.

THE COURT:  Isn't a developing technology -- if you

P2ELNYCC

1    were changing the source codes to potentially perform new

2    functions, you are not procuring information technology, but

3    you are certainly developing the technology you have.  Is that

4    not -- is your position that that's not the case?

5                 MR. OESTERICHER:  I don't think so, your Honor.  They

6    are simply using a source code that exists.  They are not

7    changing the source code.  They are using the source code to be

8    able to identify things that can be tagged in the system and

9    sorted out.  They are not creating new technology or new source

10   code.

11                And to be honest, if that provision were read that

12   broadly, there would be all kinds of notices that would have to

13   go out every time you bring in anything to the government.

14   That's not what is being targeted there.  But also, the

15   E-Government Act applies to individual privacy.  The state is

16   not covered by the E-Government Act and they don't have a right

17   to bring a cause of action based on that.

18                THE COURT:  Let's divorce this a bit from the

19   E-Government Act and, perhaps, talk about the arbitrary and

20   capricious standard that would apply.

21                Wouldn't it have been a wiser course for the Treasury

22   Department, in light of the acknowledged risks to data that

23   came about through this unusually broad scope of access that

24   was granted to these two individuals, to conduct that kind of

25   privacy impact analysis and assessment, and to further take

P2ELNYCC

1    some time to discuss mitigation measures?

2              I understand, you know, the Gioeli declaration

3    discusses what mitigation measures were put in place, but it

4    does seem as if those mitigation measures, which included

5    unmonitored logging of Elez's laptop, even now, you don't

6    actually know what was accessed or not accessed because those

7    logs haven't been reviewed.  So how are those mitigation

8    efforts that were put into place sufficient to guard against

9    the acknowledged risk here?

10             MR. OESTERICHER:  I would say a few things, your

11   Honor.  First, time was of the essence because the executive

12   order is made time of the essence and compliance with them made

13   time of the essence.  But the record -- and the plaintiffs bear

14   the burden, but the record here shows that there was thought

15   given to it.  One could second-guess and provide other

16   mechanisms that could have been used, but as far as reasoned

17   decision-making, you can see from the Gioeli declaration that

18   they took serious steps.

19             And to be clear, it's not two people because

20   Mr. Krause had only over-the-shoulder access.  And for

21   Mr. Elez, who had the broad access, they put him in a sandbox

22   environment, right, a separate testing environment, separate

23   from the normal testing environment so that he could not

24   compromise the code, and they made him -- there were other

25   measures to ensure he didn't disrupt the system and other

P2ELNYCC

 1    measures to ensure there weren't more cyber exposure.  So there

 2    was a lot of thought in a very short period of time given to

 3    this project.  And although one could second-guess it, that

 4    certainly does not make it arbitrary and capricious.

 5         THE COURT:  Perhaps you could provide me with a little

 6    bit more information about what this sandbox source code

 7    project was designed to do.  I think I am left a little --

 8    there is some vagueness in the declarations as to what this

 9    project was and how it relates to the stated objective, as put

10    forth in Mr. Krause's declaration, of combating fraud and

11    protecting the integrity of the payment system.  But my limited

12    understanding is that source code review would not tell you

13    anything about fraud necessarily in a particular payment file

14    or payment system.  It would just show you the source code of

15    the BFS system writ large.

16         How does that project of looking at code correlate

17    with the stated objective of combating fraud, if at all?

18         MR. OESTERICHER:  My understanding, your Honor, is

19    that the engagement plan had several purposes, but for purposes

20    of the sandbox and the source code, they were trying to

21    identify payments for flagging that might have been in

22    violation of the executive order so that they could be batched.

23         THE COURT:  The source code wouldn't have payment

24    files.  The source code is the source code for how the system

25    operates, but it's not going to have individual data in there.

P2ELNYCC

1    So I don't know how one would flag potentially fraudulent

2    payments by looking at source code.

3            MR. OESTERICHER:  I am going to pass it.

4            MR. HEALY:  Your Honor, as the declarations note,

5    there are multiple different systems within BFS, and many of

6    them don't talk to each other particularly efficiently.  And

7    so, as noted in the Krause declaration, there are a number of

8    different GAO reports that have identified problems with BFS

9    systems that have resulted in fraud, waste, and abuse, and

10   improper payments.  And the purpose of creating the sandbox,

11   that would allow Mr. Elez to understand how those underlying

12   systems talk to each other and how those underlying systems

13   work.  So my best understanding is that that was what he was

14   doing in the sandbox.  And that is separate and apart from any

15   discussion of "read only" access to the data itself.  So what

16   he was doing in the sandbox with respect to code did not have

17   any PII or data.  It was literally just source code.

18           THE COURT:  That was my understanding.  It was source

19   code.  That's why I was a little confused as to how one could

20   be reviewing payment files for fraud.  But I understand more

21   from your explanation.

22           MR. HEALY:  Two aspects of the same project, but

23   different aspects.

24           THE COURT:  Thank you.  You may continue.

25           MR. OESTERICHER:  I stand corrected.

P2ELNYCC

1          So the Internal Revenue Code, again, it permits

2     disclosure to employees whose official duties require such

3     inspection or disclosure, which is the case here.  That's

4     6103(h)(1).  They are improving the record systems as the GAO

5     concerns regarding earned income tax credit, refunds, but it's

6     also -- there is nothing in the record about what tax

7     information belongs to the states and whether they are claiming

8     a violation of their own information.  If they are claiming

9     violations, again, on behalf of individuals, they don't have

10    the ability to do so.  And there is nothing in there about

11    what -- the states' tax information we are talking about.

12          THE COURT:  Let me just probe the tax administration

13    purpose for which this information was accessed, however.  So

14    under 6103, the information has to be accessed for tax

15    administration purpose.  I don't read Mr. Krause's declaration

16    or anything that we have -- that's in the record about Mr. Elez

17    that they had any expertise or even past experience in tax

18    administration.  It's unclear that they had any training in the

19    Internal Revenue Code or -- even when they started in these

20    positions.

21          So how can we categorize the work that they were doing

22    as being for tax administration purposes?

23          MR. OESTERICHER:  Because I think it was for the

24    overall purpose with regard, in particular, to items flagged by

25    the GAO for the earned income -- improper earned income tax

P2ELNYCC

1    credits was one of the objectives.  But just improving the

2    efficiency of the system, even with regard to processing,

3    whatever it is, tax refunds, etc., is part of tax

4    administration.  They are trying to improve the systems and,

5    therefore, it fits within 6103(h)(1).

6          THE COURT:  You can continue.

7          MR. OESTERICHER:  The next is the Social Security regs

8    which, again, apply only to individuals.  They don't apply to

9    the states.  There is no cause of action there.  It's also --

10    "whenever feasible" is the language of the Social Security

11    regs, but this just doesn't apply to the states.

12          They cite the ethics rules.  There is no evidence of

13    any ethics violation, and the state has no personal interest

14    protected by the criminal statute.  There is no private right

15    of action.

16          And then they have constitutional claims.  They have a

17    separation of powers.  You can't repackage statutory claims as

18    constitutional violations, so it should -- it fails on that

19    basis, but it's also -- there is just no separation -- the

20    underlying -- it's based on the underlying theories which are

21    not correct.  There are no such violations, so there is no

22    separation of powers violation.  And for the same reason, the

23    Take Care Clause is based on the same arguments that they make,

24    and because there are no underlying violations, there is no

25    constitutional violation.

P2ELNYCC

1                    THE COURT:  Thank you, Mr. Oestericher.

2                    MR. OESTERICHER:  Thank you, your Honor.

3                    THE COURT:  Concluding remarks from Mr. Amer first.

4                    MR. AMER:  I will be brief in my concluding remarks,

5        your Honor, but I would like an opportunity to just quickly

6        touch on a couple of points in response to what my friend

7        mentioned.

8                    I think the affiliation with DOGE of Mr. Krause and

9        Mr. Elez was actually pretty critical to all of this.  And I

10       would point your Honor to the beginning of Mr. Krause's

11       declaration.  He says in his declaration that the executive

12       order being followed was an executive order that required -- I

13       will read it to you, your Honor.  It's paragraph 2 of

14       Mr. Krause's declaration, document 33.

15                   "Under the President's January 20, 2025 executive

16       order establishing the U.S. DOGE service, a temporary

17       organization within the Executive Office of the President that

18       seeks to maximize government efficiency and productivity, the

19       President directed each agency head to establish a DOGE team of

20       at least four employees, which may include special government

21       employees, within 30 days."

22                   So it was critical, to implement the executive order,

23       that this be a DOGE team embedded within each agency.  This

24       wasn't even specific to Treasury.  This was a broad directive

25       for all agency heads.  So the fact that they have manipulated

P2ELNYCC

1    the employment status shouldn't matter here.  These were

2    clearly DOGE employees who were being embedded within Treasury.

3    So I think that's an important point.

4           In terms of the training, I think if you look at

5    paragraph 14 of Mr. Gioeli's affidavit, it describes training.

6    It says the Bureau would provide safeguarding and handling

7    instructions for Treasury data for the duration of the project,

8    but we don't know what actually was done and how much of that

9    training had been completed.

10          And then Mr. Elez and Mr. Krause were instructed on

11    how to handle the Bureau laptop.  I think if you compare what's

12    described in paragraph 14, it falls short of the type of

13    training that a career civil servant would be given before they

14    would be allowed to have access.

15          My friend suggested that we have somehow abandoned our

16    contention that the final agency action here was the granting

17    of access.  We have not abandoned that.  I think when we

18    drafted the complaint, your Honor, we understood that access

19    was being granted, but we didn't understand the larger picture.

20    I think with the declarations, we now understand that that

21    granting of access was part of a much larger project.  And so

22    the fact that we are describing it in broader strokes just

23    means we know more about what was going on, and it's still

24    focusing on the act of granting access.

25          I think the point that my friend mentioned about being

P2ELNYCC

1    whipsawed with the Privacy Act and Section 704, he seemed to be

2    suggesting that under Section 704, if there is an available

3    remedy for somebody, then that's good enough, and I don't think

4    704 can be reasonably read that way.  704 requires that there

5    be no available remedy to the party bringing the APA challenge.

6    Otherwise, it just makes no sense.

7        I think in terms of my friend's point about they were

8    only using existing technology, I don't think that squares with

9    the record.  You don't create a sandbox environment and provide

10   source code if you are not developing technology.  That's

11   precisely what they were doing here.

12       And the last point I wanted to mention was about the

13   discussion that we had about whether this is confined to some

14   automated process that was just to look at funding for USAID or

15   whether this was to look more broadly.  And I can point you to

16   two different paragraphs in the declarations on that point.

17       Ms. Robinson's declaration, paragraph 8, says

18   specifically the Bureau was directed to develop a process to

19   identify all USAID payment files within the PAM file system's

20   landing zone.  So she is very specific about USAID and PAM.

21       But then if you look at Mr. Gioeli's declaration,

22   paragraph 16, he says, on January 28, 2025, the Bureau provided

23   Mr. Elez with the Bureau laptop and with copies of the source

24   code for PAM, SPS, and ASAP in a separate secure coding

25   environment known as the secure coding repository or sandbox.

P2ELNYCC

1  So that just underscores the point that it wasn't just PAM and

2  it wasn't just USAID; it was all three of these payment

3  systems.  And I think that shows that the project was much

4  larger than just funding requests for USAID.  Why else would

5  they have provided Mr. Elez with source code that was only --

6  that spanned multiple payment systems?

7          So those are just the points I wanted to make in

8  response.  And in closing, I just want to quickly mention where

9  we have been and what we are asking the Court to do.

10          Less than three weeks ago, the Treasury Department

11  began implementing the engagement plan to develop and use an

12  automated process at the Bureau to flag and pause funding

13  requests that are authorized by congressional appropriation

14  simply because of some ideological litmus test indicating that

15  they don't align with the administration's priorities.  And

16  critical to execute the plan, Treasury brought in the DOGE team

17  and granted them broad access to the Bureau's payment systems,

18  payment records, and source code, thereby disclosing to the

19  DOGE team the states' bank account numbers and other

20  confidential financial information, as well as PII of the

21  states' residents, all of which reside within these Bureau

22  systems.

23          So we are coming to this Court now to ask for

24  preliminary injunction to maintain the status quo that existed

25  three weeks ago, before Treasury put their plan in motion.  And

1    we are asking that the Court do this to prevent further

2    unauthorized disclosure of the states' confidential financial

3    information and personal identifying information of their

4    residents.

5            We have indicated in our proposed injunctive language

6    that we think the way to do this is to approach it on two

7    fronts:  First, restrain them from developing this automated

8    process, because it's clear that a necessary predicate to

9    developing that automated process is to grant access to the

10   states' bank information.  So if we restrain them from

11   developing this automated process, that gives us some assurance

12   that they won't be bringing in more DOGE team engineers or

13   other engineers, or anybody who doesn't have the requisite

14   training to access this information.

15           And the second piece is to focus on assuring that

16   anybody who does have access to this information -- because,

17   obviously, there is a small group of people who do, and that's

18   necessary to perform their jobs at Treasury.  And it's just to

19   reiterate that anyone who is given access to this information

20   only be those Treasury employees.  And again, it's not

21   necessary to distinguish between Schedule C or a special

22   government employee, but any Treasury employee has to have the

23   requisite training, ethics clearances, and so forth that the

24   law requires before they can access this data.

25           And finally, the third piece is just to direct that

P2ELNYCC

```
1    the laptop and logs and other information that would shed light

2    on the activity of the DOGE team prior to when the TRO was

3    issued remain in quarantine.  And Mr. Krause's declaration at

4    paragraph 11 describes how that material is currently being

5    quarantined.  We have an agreement from the government's

6    counsel that that quarantine was being maintained through

7    today, and I would expect that we can have that same

8    understanding through your Honor's order -- until your Honor

9    issues your order.  And we would ask, as we did in our answers

10   to your Honor's questions, that the TRO be extended for as long

11   as necessary for the Court to issue its decision on the PI

12   application.

13               THE COURT:  Thank you very much.

14               MR. AMER:  Thank you.

15               MR. OESTERICHER:  Thank you, your Honor.  I will be

16   brief.

17               I think what today crystalizes is that there is a

18   policy disagreement.  The states are in disagreement with the

19   executive orders and how they could be carried out with regard

20   to blocking payments, but this is not that case.  And what they

21   are doing, what they are attempting to do through their

22   complaint is to use the Privacy Act or some kind of access

23   violation to get at the other concern, and they can't.  They

24   just don't have standing.  They don't have plausible causes of

25   action.  They don't have an injury in fact.  They have all the
```

P2ELNYCC

1    threshold APA problems as well as the merits problems that stop

2    them from being able to pursue what may be a suit down the road

3    but can't be pursued in this manner at this time.

4            I would like to briefly, I guess, make two other small

5    points.  There is nothing unlawful about Treasury carrying out

6    the priorities of the new administration using Treasury

7    employees.  There is nothing impermissible or unlawful about

8    that, nor unusual.

9            And with regard to the order they submitted, there are

10   just a number of issues.  I will just point them out briefly.

11   The first paragraph, where they are trying to restrain the

12   engagement plan, or anything similar, it's not just automated.

13   To show what the state's purpose is, they don't just say

14   automated; they also say manual processes.  So they just don't

15   want it to happen at all.  It's not necessarily just about the

16   DOGE initiative.  But also, the language they use is, they want

17   it paused for reasons other than statutorily authorized

18   business, which is a very amorphous term.

19           The Treasury Department believes that what it was

20   doing and what it is doing is statutorily authorized business,

21   and they think this order would not stop them from doing

22   statutorily authorized business, including what was occurring,

23   but I would note that that term is not well-defined.

24           And secondly, the second paragraph, which talks about

25   access and which employees can access, talks about allowing

P2ELNYCC

1   access only to perform their lawful job duties.  And again,

2   that gets at the same issue.  We believe, Treasury believes

3   that they were performing their lawful job duties pursuant to

4   the executive order.  And I understand the states resist those

5   executive orders, but we don't believe that this order would

6   stop Treasury from doing what it was doing before.  So I wanted

7   to make that clear.

8          But in conclusion, we believe, as stated in our

9   motion, that they lack standing, and they have not met their

10  burden under the preliminary injunction standard, so the PI

11  should be denied.

12         THE COURT:  Thank you.

13         I am going to reserve decision on the preliminary

14  injunction motion.  I am going to be issuing an opinion

15  shortly, but it will not be today.

16         In the meantime, I do find good cause to extend the

17  TRO as modified until such time as my decision issues, to leave

18  in place the status quo, to give the Court time to consider the

19  arguments that have been presented here today and to reach a

20  final decision on the PI motion presented by the plaintiffs.

21         In conclusion, though, I do want to commend all the

22  parties and their advocacy.  These were tremendous briefs and

23  incredible arguments that were presented here today under

24  extreme time pressure, including briefs received on Super Bowl

25  Sunday, which the Court appreciates.  So I know that everyone

P2ELNYCC

1    here has been working very hard and very late nights for the

2    past few days, and the briefs that I got did not reflect those

3    time pressures, but were very polished and very helpful to the

4    Court.  So thank you for all of that.

5            And we are concluded for today.  Good afternoon,

6    everyone.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25