# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al*.,

        Plaintiffs,

    v.

DONALD J. TRUMP, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED
STATES, *et al.*,

        Defendants.

C.A. No. 1:25-cv-1144 (JAV)

**PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO PARTIALLY DISSOLVE
THE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.    DEFENDANTS HAVE NOT ADEQUATELY ADDRESSED THE COURT'S
CONCERNS IN ONBOARDING RYAN WUNDERLY ................................................ 2

    A.    Insufficient Vetting........................................................................................ 4

    B.    Unclear Job Descriptions, Supervision, And Reporting Lines .................................. 6

    C.    Insufficient Training........................................................................................ 10

    D.    Insufficient Mitigation Measures ............................................................................. 12

    E.    Artificial Sense Of Urgency........................................................................................ 13

II.    IN ANY EVENT, DEFENDANTS FAIL TO PROVIDE AN ADEQUATE
EXPLANATION FOR THE STARK CHANGE IN LONGSTANDING TREASURY
POLICY........................................................................................................................ 15

    A.    Defendants Have Not Provided An Adequate Explanation To Depart From The
Treasury's Longstanding Policy Of Leaving The Propriety Of Payment Requests
To The Submitting Agency ..................................................................................... 16

    B.    Defendants' Further Stated Desire To Reduce Fraud And Waste Is Pretextual ....... 18

CONCLUSION..................................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
No. 25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) .................................................18

*American Fed'n of Gov't Emps. v. U.S. Office of Pers. Mgmt*,
No. 25-cv-01780 (N.D. Cal. Mar. 13, 2025).........................................................................21

*Citizens for Respons. and Ethics in Washington v. United States DOGE Service*,
No. 25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ....................................................10

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..........................................................................................................16, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)............................................................................................................. 15-16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).........................................................................................................16, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................................................16

*New York v. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)......................................................................................................15

*New York v. Trump*,
No. 25-cv-00039, 2025 WL 715621 (D.R.I. Mar. 6, 2025)....................................................18

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................................................15

*Storch v. Hegseth*,
No. 1:25-cv-00415 (D.D.C. 2025) ..........................................................................................19

## Federal Statutes

31 U.S.C. § 3351.......................................................................................................................19

**Miscellaneous Authorities**

Emily Peck, *Federal judge orders agencies to rehire workers, calls process a "sham"*, Axios (Mar. 13, 2025)................................................................................................21

GAO, *Bureau of the Fiscal Service's FY 2022 Schedules of the General Fund* (March 2023) ..................................................................................................................20

GAO, *Financial Audit: FY 2024 and FY 2023 Consolidated Financial Statements of the U.S. Government* (Jan. 16, 2025), available at https://www.gao.gov/assets/gao-25-107421.pdf ........................................................................................................19

Letter from Treasury Department to Congress dated February 4, 2025 ........................................17

OMB Memorandum, Temporary Transition Schedule C and Schedule C Authorities and Noncareer Senior Executive Service Appointing Authorities (2025).....................................15

Zeke Miller et al., *Trump uses mass firing to remove independent inspectors general at a series of agencies*, AP (Jan. 25, 2025) ....................................................................20

## INTRODUCTION

Defendants move for an order partially dissolving the preliminary injunction ("PI") to permit Ryan Wunderly, the DOGE engineer brought in to replace Marko Elez, to immediately begin his work on the Engagement Plan. The Court should deny the motion because Defendants fail to adequately address the concerns articulated by the Court in holding that "the inexplicable urgency and time constraints under which they operated all but ensured that the launch of the Treasury DOGE Team was chaotic and haphazard." February 21, 2025 Opinion and Order (ECF No. 76) ("Opinion" or "Op."), at 50.[1]

First, as before, the record is silent on the specifics of the vetting process; neither BFS nor Treasury's Office of Security Programs conducted its own background investigation of Wunderly, relying entirely on a prior background check conducted by a different, unnamed, agency about which Defendants provide no information. Second, despite the Court's concern that at times no one was aware of what Elez was doing (*id*. at 51), Defendants provide no specific description of what Wunderly's job duties will be or who will provide day-to-day supervision over Wunderly and the other Treasury DOGE Team members, nor do Defendants clarify the reporting lines for the Treasury DOGE Team members, which the Court found creates uncertainty over their employment status and authority to access Treasury systems (*id*.). Third, training remains inadequate, with no clarity regarding whether Wunderly's role will or should require additional training beyond the training modules the Treasury Chief of Staff has assigned. More specifically, Wunderly has had no hands-on training with experienced system users, as is often required for particular roles within certain payment systems. Fourth, notwithstanding the inadequate time BFS staff had to develop

---

[1] This brief uses the same defined terms as the Court's Opinion.

mitigation measures and the errors previously made with those measures in place (including granting Elez read/write access for a period of time), Defendants bank exclusively on the same mitigation procedures that failed to prevent past mistakes encountered with Elez. Finally, despite the Court's repeated concern over the rushed nature of the onboarding process for Treasury DOGE Team members, Defendants continue to offer the same "artificial sense of urgency" the Court previously held does "not justify the flawed process that occurred here." *Id*. at 52. Because Defendants have not adequately addressed the Court's many concerns, their motion should be denied.

Moreover, even if Defendants had meaningfully addressed the Court's concerns over the "chaotic and haphazard" launch of the Treasury DOGE Team (which they have not done), the Court should still deny their motion because they fail to provide an adequate explanation for the drastic change to longstanding Treasury policy brought about by the implementation of the Engagement Plan. Defendants' stated objective for implementing the Engagement Plan—to create an automated process that will pause payment requests on ideological or other inappropriate grounds despite congressional appropriation—is not sufficient justification for changing Treasury's longstanding policy of leaving the propriety of payment requests to the submitting agency. And Defendants' unsupported justification of achieving efficiency and combating fraud are obviously pretextual as Defendants utterly fail to explain how the Engagement Plan will serve either of those goals.

## ARGUMENT

## I.    DEFENDANTS HAVE NOT ADEQUATELY ADDRESSED THE COURT'S CONCERNS IN ONBOARDING RYAN WUNDERLY

In its Opinion granting the PI, the Court held that the States "will more likely than not succeed in establishing that the agency's processes for permitting the Treasury DOGE Team access

to critical BFS payment systems, with full knowledge of the serious risks that access entailed, was arbitrary and capricious." Op. at 50. In support of this holding, the Court raised the following specific concerns:

(1) the record contains no evidence of the vetting or security clearance process followed prior to appointing the Treasury DOGE Team members, *id*. at 50;

(2) the Treasury DOGE Team started its work without adequate supervision, having no HR specialist or attorney on the team as mandated by the President's executive order and, during at least some points in time, apparently having "no one from BFS … contemporaneously aware of what" the team's engineer was doing, with confusion over the reporting lines for the Treasury DOGE Team members "call[ing] into question their authority to access Treasury record systems," *id.* at 50-51;

(3) the team's engineer "was given full access to system source codes" "apparently after receiving minimal, if any, training regarding the handling of sensitive government information," *id*. at 51;

(4) due to the rush to implement the Engagement Plan, BFS staff had "almost no time to develop their mitigation measures," leading to "troubling" consequences like mistakenly giving the DOGE engineer read/write access, *id*.; and

(5) the Engagement Plan was implemented with "inexplicable urgency and time constraints," "speak[ing] to the hurried nature" of the process by which team members were granted access to BFS's systems, *id*. at 50-51.

For the reasons discussed below, Defendants have not adequately addressed these concerns nor the requirements of the Court's order with respect to onboarding Wunderly, and accordingly, their motion to partially dissolve the preliminary injunction should be denied.[2]

---

[2] At the eleventh hour, Defendants filed a letter seeking to supplement the record with two new declarations from Treasury officials: David Ambrose, Chief Security Officer/Chief Privacy Officer/Acting Chief Information Officer for BFS (ECF No. 116-1) ("Ambrose Aff."); and Nathaniel Reboja, Assistant Commissioner for Information and Security Services and Chief Information Officer for BFS (ECF No. 116-2). Despite the prejudicial nature of this late filing, Plaintiffs have quickly reviewed the contents of these declarations and they do nothing to allay any of the concerns expressed by the Court in its Opinion about the rushed and chaotic nature of the Treasury DOGE Team onboarding process. Rather, these new declarations confirm that the Court's concerns were well founded.

## A. *Insufficient Vetting*

The Court previously expressed concern that "[t]he record is silent as to what vetting or security clearance process" the Treasury DOGE Team members went through prior to their appointment. Op. at 50. The record is no clearer now with respect to Wunderly. Defendants have disclosed only in the vaguest of terms that Treasury staff conducted no independent background investigation because "[i]t was determined" that some other unnamed federal agency had done so, without further elaboration. Mencl Aff. ¶ 13 (Mar. 5, 2025) (ECF No. 98-4) ("Mencl Aff."). That is patently insufficient to address the Court's concern.

As Defendants acknowledge, vetting potential Treasury employees prior to granting them access to BFS's data and systems is a critically important step "[t]o ensure that [BFS] manages its personnel consistent with national-security and public-trust interests." Gioeli Aff. ¶ 3 (Mar. 5, 2025) (ECF No. 98-2) ("Gioeli Aff. II"). Vetting "for security clearances" and "to determine the suitability and fitness of applicants seeking to become a Treasury employee" confirms "whether they can be trusted to protect the United States government personnel, property, information (including information about others collected by the government), and missions" and is coordinated through the Treasury's Office of Security Programs ("OSP"). Mencl Aff. ¶ 5; *see also* Gioeli Aff. II ¶ 3.

Nevertheless, BFS will forgo vetting a potential employee "prior to granting that person access to [BFS] data or systems" if the "individual is employed by another agency or organization—including the Treasury Departmental Offices" and BFS personnel "obtain[s] assurance from that agency or organization that appropriate vetting and background investigation of the individual has occurred there"; in that circumstance, BFS "typically will rely on that assurance, and will not undertake any additional vetting or background investigation" on its own. Gioeli Aff. II ¶ 4.

OSP will similarly rely on vetting done by others "if an applicant has already undergone a background investigation that has been favorably adjudicated by a federal government agency and it is in-scope per the federal investigative standards, and if there are no facts indicating that the individual does not continue to meet eligibility standards." Mencl Aff. ¶ 7. In that instance, OSP "revalidates the prior background investigation, confirms that it meets the scope required for the new position at Treasury and that it was favorably adjudicated" before OSP "reciprocally accepts the other federal agency's determination." *Id*.

Here, both BFS and OSP failed to conduct a background investigation of Wunderly and instead relied entirely on assurances from undisclosed third parties. As attested by Joseph Gioeli, BFS security staff "obtained assurance" from OSP that it "had vetted Ryan Wunderly for onboarding as a Treasury employee," Gioeli Aff. II ¶ 6, but OSP's "vetting" of Wunderly did not include a background investigation because "[i]t was determined that ... a qualifying background check had already been completed." Mencl Aff. ¶ 13. As the Court previously noted with one of Defendants' other supporting declarations, this "careful wording … was no accident." Op. at 46. Using the passive voice, Mencl avoids identifying who at OSP made the determination to skip Wunderly's background investigation, and she provides no information to assist the Court in understanding why that determination was made—notably, she fails to identify which other federal government agency, if any, completed the "qualifying background check" resulting in a favorable adjudication or when that prior check occurred, or who at OSP "revalidate[d] the prior background investigation" and determined it was "in-scope per the federal investigative standards" with "no facts indicating that [Wunderly] does not continue to meet eligibility standards." Mencl Aff. ¶¶ 7, 13.

While Mencl professes that she has been involved in "ensuring the proper vetting of individuals of the" Treasury DOGE Team through "appropriate background investigations … adjudicated in accordance with the national adjudicative guidelines," she offers no sworn testimony from which the Court could reasonably find that Wunderly was, in fact, properly vetted through an appropriate background investigation meeting the national adjudicative guidelines. *Id.* ¶ 3. The vague statements from her and Gioeli fail to address in any meaningful way the Court's concern about the absence of any information about "what vetting or security clearance process" was followed. Op. at 50.

### B.  Unclear Job Descriptions, Supervision, And Reporting Lines

Despite numerous sworn statements filed with this Court, in the multiple facets of the motions for a TRO/PI and now for partially dissolving the PI, Defendants have still failed to answer a basic question: what are the Treasury DOGE Team members, including its new engineer Wunderly, going to do with the BFS systems and data in support of their work on the Engagement Plan? In this regard, Defendants have done nothing to address the Court's concern over the prior inadequate day-to-day supervision of Elez and "the uncertainty" a lack of "clear reporting lines" for the Treasury DOGE Team creates around "their authority to access Treasury record systems." Op. at 51.

The record reflects that immediately after the President signed the executive order "Establishing and Implementing the President's 'Department of Government Efficiency,'" two individuals were installed as part of the Treasury DOGE Team: Marko Elez and Thomas Krause. Krause Aff. ¶¶ 2-3 (Feb. 11, 2025) (ECF No. 33) ("Krause Aff."). From January 21, 2025, until February 6, 2025, Elez served as the DOGE technical team member, but the record offers little information about his anticipated assignments beyond vague assertions regarding the goals of the Treasury DOGE Team. *Id.* ¶¶ 3, 16. His specific appointment was as the "Special Advisor for

Information Technology and Modernization," a Schedule C appointment made under the Treasury's authority. Wenzler Aff. ¶ 9 (Mar. 5, 2025) (ECF No. 98-3) ("Wenzler Aff.").[3] Until his resignation, Elez was purportedly supervised by Krause, a Special Government Employee, initially designated as a "Consultant for Treasury" but now currently serving as the "Senior Advisor for Technology and Modernization" as a temporary transition appointment under Schedule C, for a term that is set to expire on March 24, 2025, that may or may not be extended. *Id.* ¶ 8.[4] While Defendants have referenced the onboarding of additional Treasury DOGE Team members, *id.* ¶¶ 13-15, they request on this motion to dissolve the Court's PI only as to Wunderly. But they provide no additional detail about Wunderly's anticipated work or assignments beyond a vague statement that Wunderly will take Elez's place on the Treasury DOGE Team. *Id.* ¶ 12.

Based on Defendants' submissions, there is no reason to believe that Wunderly will be treated any differently than Elez, in terms of work and supervision. Under Krause's supervision,[5] Elez had extraordinary "direct" access to Treasury's payment systems, including on at least one occasion read/write access, with hardly any training. Gioeli Aff. ¶¶ 4, 20 (Feb. 11, 2025) (ECF No.

---

[3] It is unclear from Defendants' submission what Elez's background was or why he was qualified to serve in the role he came to fill on the Treasury DOGE Team as a Schedule C appointment.

[4] Defendants do not address whether his term will be extended beyond March 24, and if it is not, how the Treasury DOGE Team's structure will change following Krause's departure.

[5] As the Court noted, Krause was previously employed as an unpaid consultant, and as such was not authorized to act as a supervisor. Op. at 8. Treasury then changed Krause's status to that of a Temporary Transitional Schedule C appointee, apparently to fix this problem. *Id*. But it seems that Krause's status has continued to evolve and he is now a paid employee. Wenzler Aff. ¶ 8. Given that Krause is now serving as a paid Special Government Employee, Defendants should disclose what, if any, changes have been made to address his conflicts of interest based on his concurrent role as CEO of Cloud Software. Op. at 9. They have not done so.

34) ("Gioeli Aff. I").[6] Because of the failure to properly maintain adequate security protocols and oversight during Elez's tenure, however, Treasury employees have been unable to identify for the Court the full scope of Elez's access to the Treasury systems. *Id.* ¶ 18; *see also* Gioeli Aff. II ¶ 17. Nor have they been able to determine whether his access may have resulted in harmful data breaches to its sensitive systems. While Defendants aver that Elez worked under Krause's "supervision," that oversight by Krause appears to have been perfunctory at best and uninformed by proper training; even as of March 5, 2025, Krause had completed only one of the nine required trainings mandated for the Treasury DOGE Team. Wenzler Aff. ¶¶ 18, 20. And Defendants have provided no detail about who Krause was collaborating with at DOGE about Elez's work. *See* Gioeli Aff. I ¶ 4 (describing that "Elez had provided Krause with updates about his work, which may have occasionally included screenshots of payment systems data or records"); *cf.,* Katz Aff. ¶ 3 (Mar. 5, 2025) (ECF No. 98-1) ("Katz Aff.") (stating without explanation or details that Krause, along with unspecified other Treasury DOGE Team members "collaborate closely with staff at the U.S. DOGE Service (USDS) consistent with direction from the [Treasury] Secretary" and Katz). Defendants' submission fails to show that any safeguards have been implemented to avoid the same concerns that previously arose with Elez.

And now, the asserted hierarchy of supervision appears to have shifted. In his affirmation, Chief of Staff Katz testifies that he is "the primary official responsible for assisting the Secretary in overseeing the work of the Treasury DOGE Team," and that Krause is the "DOGE Team Lead" who reports to him in that capacity. Katz Aff. ¶ 3. Krause's status as "Team Lead" is apparently in name only, since Katz also testifies that most of the other Treasury DOGE Team members—

---

[6] Defendants' submission on this motion confirms that Elez did not complete any of the "New Employee Trainings" prior to his resignation. Wenzler Aff. ¶ 21.

including Wunderly—report directly to him. *Id*. ¶ 7. At the same time, all members of the Treasury DOGE Team "collaborate closely with staff at" DOGE in the Executive Office of the President. *Id*. ¶ 3. At least one Treasury DOGE Team member, Gavin Kliger, reports to Treasury's Assistant Secretary for Management rather than to either Krause or Katz. Wenzler Aff. ¶ 13; Katz Aff. ¶ 7. And yet, Defendants' declarations provide no explanation as to how Katz's supervision (apparently without the day-to-day team leadership of Krause come March 24) will suffice to provide the appropriate safeguards to prevent the access issues encountered with Elez. Katz's leadership focuses on "high-level policy direction and priorities," Katz Aff. ¶ 6, but his declaration lacks any explanation about the type of access Katz has to the BFS systems, and is utterly silent as to what training, if any, Katz has received to be able to adequately supervise Wunderly, Elez's replacement, in accessing Treasury's data and systems. Indeed, it appears even more unclear now what role, if any, Katz will play to oversee DOGE work—when Krause's day-to-day "oversight" of Elez (with over-the-shoulder access) already proved insufficient to prevent the access issues previously noted by the Court.

Moreover, the reporting structure and relationship between the Treasury DOGE Team and USDS/DOGE remains opaque. For example, Defendants report that there is no Memorandum of Understanding ("MOU") between Treasury and DOGE, and that DOGE employees will report up through the chain of command within Treasury. Katz Aff. ¶ 6. Defendants only vaguely describe that "the Treasury DOGE Team collaborate closely with staff at USDS consistent with direction from Secretary Bessent and Katz, but they do not report to anyone outside the Treasury Department." Defs. Memorandum of Law (ECF No. 112) ("Defs. MOL") at 10. These assertions, however, stand in stark contrast with the Court's observations of the very close working relationship between members of the Treasury DOGE Team and DOGE itself. For instance, the

Court specifically noted the record reflects how closely tied Krause's work is to DOGE, highlighting that he coordinates closely with officials at DOGE, provides DOGE officials regular updates on his work, and "receive[s] high level policy direction" from DOGE. Op. at 9 (citing Krause Aff. ¶ 4). The Court's skepticism is warranted, given that Krause appears to be a DOGE employee in all but name.

Questions about the reporting structure and operation of DOGE have been raised in numerous other cases, including recently in a memorandum opinion from the United States District Court for the District of Columbia. *See Citizens for Respons. and Ethics in Washington v. United States DOGE Service*, No. 25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ("*CREW*"). There, the court noted "USDS's operations thus far have been marked by *unusual secrecy*." *Id.* at *4 (emphasis added). Despite operating in "unusual secrecy," the *CREW* Court also noted "the structure and influence of USDS appear to [be] unprecedented," USDS exerts "outsized influence on the federal government," and "USDS has obtained unprecedented access to sensitive personal and classified data and payment systems across federal agencies." *Id.* at **3, *8. For these and other reasons, the court found that "USDS is likely covered by FOIA [Freedom of Information Act] and that the public would be irreparably harmed by an indefinite delay in unearthing the records CREW seeks," regarding the operation of the U.S. DOGE service. *Id*. at *1. Defendants' vague representations regarding the reporting chains that govern the relationship between Treasury DOGE Team members, USDS/DOGE, and Treasury leadership continue DOGE/USDS's pattern of secrecy and do not satisfy the Court's concerns. Rather, they beg even more questions regarding the Treasury DOGE Team members' reporting requirements and obligations to DOGE itself.

### C. *Insufficient Training*

In describing Elez's work in the Treasury systems, Defendants identified that, despite a lack of formal training along the lines of those relied upon here (Wenzler Aff. ¶ 18), Elez had

individual and supervised walk-throughs with Treasury employees for access to the specific systems granted. *See* Gioeli Aff. I ¶¶ 18 (describing Elez's treasury-led walk-through in the PAM database and system), 19 (describing a virtual walk-through in the SPS system). In arguments, the Government described these "walk-throughs" as "training" in the system commensurate with Elez's ability to access the PAM and SPS systems. *See* Hr'g Tr. (Feb. 14, 2025) at 20:7-9 (citing the February 11, 2025 Gioeli affirmation).

As the Government acknowledges, however, Wunderly has not completed any "walk-through" trainings on BFS payment systems (*e.g.*, PAM, SPS, ITS.gov.)—alternatively described as "hands-on training with a more experienced user," Gioeli Aff. II ¶ 14—but only the trainings assigned by Katz.[7] Gioeli Aff. II ¶ 14; Katz Aff. ¶ 8. Yet the Court's PI directed Treasury to certify that the Treasury DOGE Team members had been provided with all training typically required of individuals granted access to *BFS payment systems*. Op. at 63. Nor is there any confirmation that Wunderly has complied with the additional ethics requirements he must meet as a Schedule C appointee who is not a Special Government Employee. Wenzler Aff. ¶¶ 10, 12. Defendants' confirmation that Wunderly has completed only the trainings assigned by Katz, but no "walk-through" "hands-on" trainings with experienced system users like the training sessions Elez received, and failure to confirm compliance with the applicable ethics requirements, falls short of the Court's directive.

---

[7] The late-filed Ambrose declaration does not alter this fact; Ambrose merely notes that Wunderly was briefed on a handful of topics about cybersecurity and PII, but that is no substitute for a hands-on walk through of BFS systems. Ambrose Aff. at ¶ 6. In fact, Ambrose apparently briefed Elez on all these same topics, *id.* ¶ 10, which speaks volumes about how ineffective his briefings are in guarding against security breaches.

### D. *Insufficient Mitigation Measures*

In granting the States' motion for a PI, the Court expressed concern that Defendants' rush to grant Treasury DOGE Team members access to BFS systems and data "undertaken under political pressure" "left career staff [at BFS] with almost no time to develop their mitigation measures." Op. at 28, 51. The Court also noted that, despite the mitigation efforts, "a real possibility exists that sensitive information has already been shared outside of the Treasury Department, in potential violation of federal law." *Id*. at 46. Nevertheless, Defendants propose granting Wunderly access to BFS systems and data implementing only the same mitigation measures employed for Elez that this Court previously found to be inadequate.

More robust mitigation measures are clearly needed. Defendants have previously acknowledged that giving such broad systems access to a single individual was unprecedented. Gioeli Aff. I ¶ 13 (Elez's access was "broader in scope than what has occurred in the past"). In addition, the record clearly demonstrates that the mitigation measures previously adopted were patently insufficient. Elez was mistakenly granted read/write permissions to SPS, (*id*. ¶ 20), and BFS granted Elez access to CARS unbeknownst to Gioeli. Gioeli Aff. II ¶ 17. A forensic review of Elez's access was still "ongoing" as of the time of Gioeli's first affirmation, Gioeli Aff. I ¶ 21, and there is no further update on the results or progress of that review except for reporting on the previously unknown access that Elez was granted to CARS,  Gioli Aff. II ¶ 17, and a late-breaking revelation that Elez emailed a spreadsheet with PII to two government officials who are not with DOGE, Ambrose Aff. ¶ 12. And, despite the Court's clear concerns about whether Defendants violated federal law governing inter-agency information-sharing, Defendants provide no specifics about where the screenshots of confidential information that Elez took went, or whether his inter-agency emails contained additional confidential information beyond PII. Op. at 14; Gioeli Aff. I ¶ 4. Even as of this date, a month after the TRO was issued, Treasury is *still* unable to confirm what

operations Elez performed with his BFS laptop,[8] Gioeli Aff. II ¶ 17 ("further analysis is underway"), or what use he made of the separate Treasury laptop he was issued when onboarded but could not use to access BFS systems and services. Gioeli Aff. I ¶ 12.

On this record, Defendants' reliance on the same rushed mitigation measures previously put in place is insufficient.

### E. *Artificial Sense Of Urgency*

Defendants' motion does nothing to alleviate the Court's concerns about the "hurried nature" of the Engagement Plan's implementation, Op. at 51, nor does it offer any reasonable justification for the artificial urgency that Defendants impose on themselves.

Defendants double down on their need to rush the implementation of the Engagement Plan, as evidenced just by their perceived need to attempt to dissolve the PI in piecemeal fashion as to Wunderly weeks in advance of the timetable set forth in the Opinion. As confirmed by Treasury Chief of Staff Katz, he and Secretary Bessent believe "it is crucial" that "the work of the Treasury DOGE Team proceeds as quickly as possible" in "an expeditious manner." Katz Aff. ¶¶ 1, 5. Despite the Court's admonition that "the inexplicable urgency and time constraints under which [the Treasury DOGE Team] operated all but ensured that the launch" of the Engagement Plan "was chaotic and haphazard," Op. at 50, Katz continues to insist that time is "of the essence in launching

---

[8] Indeed, the Ambrose declaration makes clear that Treasury is *still* unable to confirm all of the operations Elez performed with his BFS laptop; whether other emails (from different, personal accounts) were circulated outside of Treasury; or the status of screenshots taken by Elez when he accessed the Treasury systems. At best, Ambrose's declaration makes clear that their forensic analysis to date is limited and narrow: while they checked Elez's *Treasury* email account (Ambrose Aff. ¶ 11), it is silent about other means by which Elez communicated information outside of Treasury—including in "instant messages" identified in the policy guidance provided to Wunderly. *Id*. ¶ 6. Moreover, the revelation that Elez sent spreadsheets of data to "two United States General Services Administration Officials" "containing PII," *id*. ¶ 12, is even more troubling because the recipients are apparently not even DOGE employees.

and operationalizing the Treasury DOGE Team," justifying the use of "differing hiring authorities and reporting structures to bring members of the Treasury DOGE Team onboard quickly." Katz Aff. at n.2. Indeed, Defendants' continued attempt to justify the use of "differing hiring authorities and reporting structures" to achieve a speedy onboarding process flies in the face of the Court's pointed observation that "a more considered process for bringing the DOGE Team [members] on board might have helped clarify" their reporting lines and "authority to access Treasury record systems" given their unique "almost hybrid status," Op. at 51-52, and the Court's stated desire for Defendants to onboard the Treasury DOGE Team members "in a measured, reasonable, and thoughtful way," *id*. at 52.

Katz explains that Defendants are in a hurry to put the Treasury DOGE Team to work on the Engagement Plan because DOGE "is a temporary organization with a limited remit and every day that passes is one less day we have in this Administration to achieve [DOGE's] ambitious goals in service of the President's policy priorities." Katz Aff. ¶ 5. This is merely a restatement of the same "artificial sense of urgency engendered by the Government's imposition of time limits on itself" that the Court previously held does "not justify the flawed process that occurred here." Op. at 52. Saying that they have to move fast for the sake of speed (without any explanation or justification as to why urgency is necessary) is not valid justification for disregarding the ordinary processes followed by Treasury prior to January 20, 2025 and the installation of DOGE.

Moreover, Treasury's supposed urgency is not better justified by its reliance on an OMB hiring memo for the purported authority to circumvent federal regulations and longstanding practice. While the government has apparently disavowed its reliance on Special Government Employees to a large extent, the use of Schedule C employees is similarly haphazard; DOGE's Schedule C employees are not traditional political appointees but were hired under the authority

of an OMB memorandum that purports to disregard existing regulations limiting the use of Schedule C employees.[9] And to the extent Schedule C employees are time-limited—a self-imposed injury created by Treasury's reliance on the OMB memorandum—Treasury has failed to explain why DOGE Team members could not be hired under ordinary procedures.

## II.    IN ANY EVENT, DEFENDANTS FAIL TO PROVIDE AN ADEQUATE EXPLANATION FOR THE STARK CHANGE IN LONGSTANDING TREASURY POLICY

Even if Defendants had adequately addressed the Court's concern about the "chaotic and haphazard" launch of the Treasury DOGE Team, Op. at 50, their request to partially dissolve the preliminary injunction would still be without merit because they fail to provide an adequate explanation for the abrupt change in longstanding Treasury policy brought about by their implementation of the Engagement Plan.

As this Court has already acknowledged, the APA directs a court to set aside an agency action that is not the product of "reasoned decisionmaking" and is "arbitrary and capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). Though the scope of the Court's review under this standard is narrow, its inquiry must nevertheless be "searching and careful" to ensure that the agency has provided a genuine justification that supports its actions. *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 81 (2d Cir. 2020). The arbitrary and capricious standard "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct." *Saget v. Trump*, 375 F. Supp. 3d 280, 355 (E.D.N.Y. 2019) (collecting cases).

---

[9] Office of Mgmt. & Budget, Exec. Office of the President, OMB Memorandum, Temporary Transition Schedule C and Schedule C Authorities and Noncareer Senior Executive Service Appointing Authorities (2025), available at https://www.opm.gov/media/okvbe1ii/memo-lifting-caps-on-ttcs-bll-1-20-2025-final.pdf.

When undertaking its "searching and careful" inquiry, a court must determine whether the agency provided a genuine justification for the action that is consistent with the evidence before it. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). In doing so, a court considers only the justifications that an agency provided when it implemented the policy; it does not consider any *post hoc* rationalizations that an agency may rely on to support its decision with the benefit of hindsight. *See Regents of the Univ. of California*, 591 U.S. at 20-21. And the court considers whether the policy is a reasonable response to the agency's stated goals in light of the facts before it and the scope of its statutory authority. *See, e.g., Dep't of Com.*, 588 U.S. at 785; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Where, as here, the policy reflects an agency's departure from its longstanding practice (*see, infra*, at II.A.), the agency cannot "depart from a prior policy sub silentio" or simply disregard its prior practice. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515-16 (2009). Rather, the agency must also "display awareness that it is changing positions" and show that "there are good reasons for the new policy." *Id*. Defendants have failed to do so here.

## A. Defendants Have Not Provided An Adequate Explanation To Depart From The Treasury's Longstanding Policy Of Leaving The Propriety Of Payment Requests To The Submitting Agency

Prior to the adoption and implementation of the Engagement Plan, it was the longstanding policy at Treasury for BFS to process the disbursement of funds in accordance with the coded data in the payment file as received from the submitting agency, with the submitting agency (and not BFS) bearing the responsibility of conducting a review of the propriety of the payment or eligibility of the payee except for screening through the "Do Not Pay working system." Krause Aff. ¶ 19; *see also* Brief of *Amici Curiae* Former Treasury Department Officials in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 57) at 8. In other words, until Treasury began to implement the Engagement Plan, it was the policy that "the agency responsible for making the payment

16

always drives the payment process." *See* Letter from Treasury Department to Congress dated February 4, 2025, available at https://home.treasury.gov/news/press-releases/sb0009.

As the record reflects, in a stark departure from this longstanding policy, the purpose of Defendants' Engagement Plan—which requires providing the Treasury DOGE Team with broad and unprecedented access to BFS's systems and data—is to create an automated system by which *Treasury* would flag and pause payment requests *on ideological or other inappropriate grounds* for the purpose of facilitating the President's policy agenda on funding, which includes "requiring that certain types of foreign aid-related payments be paused." Robinson Aff. ¶ 7 (Feb. 11, 2025) (ECF No. 32) ("Robinson Aff."); *see also* Krause Aff. ¶ 12 (testifying that DOGE's "early work included … ensuring that the Treasury DOGE Team was leveraging its unique technological expertise to help operationalize the President's policy priorities for the early days of the Administration, including by helping identify payments that may be improper under his new Executive Orders").

To accomplish this objective, the Engagement Plan calls for embedding within BFS a Treasury DOGE Team to develop this automated process for pausing and flagging payment files while in the BFS "landing zone" before certification by the submitting agency. Robinson Aff. ¶¶ 5, 10. The automated process would flag payment files in the "pre-edit phase" for further review based on "certain Treasury Account Symbols" that would signal the payment was suspect, *i.e.*, may not align ideologically with the President's priorities or was being flagged for other inappropriate grounds and possibly should be blocked. Krause Aff. ¶ 20.

Defendants' stated objective for implementing the Engagement Plan—to create an automated process that will pause payment requests on ideological or other inappropriate grounds despite congressional appropriation—is not a legally sufficient explanation to support changing

Treasury's longstanding policy of leaving the propriety of payment requests to the submitting agency. Indeed, within the last few weeks courts have repeatedly enjoined as unlawful attempts by the Administration to pause or block funds that have already been appropriated by Congress. *See, e.g., Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. 25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) (preliminarily enjoining State Department from giving effect to foreign aid Executive Order for funds already appropriated by Congress); *New York v. Trump*, No. 25-cv-00039, 2025 WL 715621 (D.R.I. Mar. 6, 2025) (preliminarily enjoining "[t]he Executive's categorical freeze of appropriated and obligated funds"). In other words, Defendants' desire to create an automated process that will pause funds already appropriated by Congress based on an ideological litmus test or other inappropriate grounds does not provide the "neutral principle[]" or "reasoned explanation" required to justify the drastic change in Treasury's longstanding policy brought about by implementing the Engagement Plan. *Fox Television Stations*, 556 U.S. at 537 (Kennedy, J., concurring in part and concurring in the judgment).

### B. Defendants' Further Stated Desire To Reduce Fraud And Waste Is Pretextual

In addition to supporting their stated need to implement the Engagement Plan in order to achieve the President's funding priorities based on ideological criteria or other inappropriate grounds, Defendants also purport to justify the Engagement Plan and the Treasury DOGE Team's incursion into BFS's systems and data as needed to "tackl[e] issues identified by the Government Accountability Office [or "GAO"], including on the topic of improper and fraudulent payments." Defs. MOL at 11; *see also* Krause Aff. ¶ 2 (testifying that a primary purpose of DOGE is to "reduc[e] and eliminat[e] improper and fraudulent payments; waste, fraud, and abuse; and improving the accuracy of financial reporting"); Katz Aff. ¶ 4 (same). However, Defendants' affiants are silent as to how the Engagement Plan, or more generally any work of the Treasury DOGE Team, will resolve the issues identified by GAO. Moreover, even a cursory review of the

GAO reports cited by Defendants demonstrates a complete disconnect between the problems identified by GAO in the various reports and the work to be performed by the Treasury DOGE Team as part of the Engagement Plan.

First, Krause cites to a GAO report identifying issues with "improper" (albeit not "fraudulent") payments. Krause Aff. ¶ 8. But GAO notes that this is a problem GAO has been identifying in its audits since 1997, and that Congress has taken action to address this very issue in the form of the Payment Integrity Information Act of 2019, codified at 31 U.S.C. §§ 3351-58. *See* GAO, *Financial Audit: FY 2024 and FY 2023 Consolidated Financial Statements of the U.S. Government* at 233-36 (Jan. 16, 2025), available at https://www.gao.gov/assets/gao-25-107421.pdf. Defendants fail to explain why the four to six-week Engagement Plan, or onboarding at Treasury members of DOGE, is an appropriate, reasoned action necessary to fix a decades-old problem that Congress and federal agencies have already taken action to address. And given Defendants' reliance on a GAO report, it is worth noting GAO's recent financial audit expressly stated its report "would not be possible without the commitment and professionalism of inspectors general throughout the federal government who are responsible for annually auditing the financial statements of individual federal entities." GAO, *Financial Audit: FY 2024 and FY 2023 Consolidated Financial Statements of the U.S. Government* at 11 (Jan. 16, 2025), available at https://www.gao.gov/assets/gao-25-107421.pdf. But despite Defendants' purported need for the Engagement Plan to fight waste and fraud, the Administration has fired over a dozen Inspectors General—independent watchdogs whose primary task is auditing and investigating federal agencies to root out waste, fraud and abuse—providing further evidence that their stated objectives of combating waste and fraud are pretextual. *See Storch v. Hegseth*, No. 1:25-cv-00415 (D.D.C. 2025) (involving suit by eight fired Inspectors General that claim their removal violated the

Inspectors General Act, along with additional claims); *see also* Zeke Miller et al., *Trump uses mass firing to remove independent inspectors general at a series of agencies*, AP (Jan. 25, 2025), available at https://apnews.com/article/trump-inspectors-general-fired-congress-unlawful-4e8bc57e132c3f9a7f1c2a3754359993.

Second, Krause points to issues with BFS's CARS identified by GAO as supporting the need for implementing the Engagement Plan. Krause Aff. ¶ 9. But nowhere in the new round of affirmations is there any indication that Wunderly will be given access to, or trained appropriately on, CARS. Indeed, the only reference to CARS in the affirmations is Gioeli's correction that Elez did in fact access CARS—highlighting once again the error-prone rushed rollout of the Treasury DOGE Team's access to Treasury's most sensitive systems. Gioeli Aff. II ¶¶ 16-17. Furthermore, the GAO report Krause references contains a lengthy list of GAO's recommendations and BFS's responses and action plans, none of which Defendants appear to have taken into consideration, and none of which mentions the need for bringing in employees from outside Treasury to build an automated system to flag and pause payment files at the pre-edit phase. *See* GAO, *Bureau of the Fiscal Service's FY 2022 Schedules of the General Fund* at 41-65 (March 2023), available at https://www.gao.gov/assets/d23104786.pdf.

Defendants' attempt to justify implementing the Engagement Plan in order to modernize Treasury and make it more "efficient" is likewise pretextual. Defs. MOL at 11. Specifically, Defendants' affiants fail to explain what Wunderly, or for that matter any other Treasury DOGE Team member, will do to support that vague goal, or explain why it requires granting the Treasury DOGE Team unprecedented access to BFS's systems and data.

This Court is "'not required to exhibit a naiveté from which ordinary citizens are free'" in

looking through Defendants' pretext for the implementation of the Engagement Plan, with its unprecedented intrusion by the Treasury DOGE Team into BFS's data and systems. *Dep't of Com.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Since Defendants have not "'disclose[d] the basis' of [their] action" to purportedly make Treasury more modern and efficient through the Engagement Plan, this Court has no way to "meaningful[ly] … review" whether implementing the Engagement Plan will support these goals, and it is therefore reasonable to interpret these stated goals as pretextual. *Dep't of Com.*, 588 U.S. at 780 (quoting *Burlington Truck Lines*, *Inc. v. United States*, 371 U.S. 156, 167-69 (1962)).

Indeed, courts are already seeing through Defendants' pretenses in other cases, with a federal judge recently ruling from the bench that thousands of federal workers fired in conjunction with DOGE's efforts "was a *sham* in order to avoid statutory requirements," explaining "our government would fire some good employee, and say it was based on performance. When they know good and well, that's a *lie*." Emily Peck, *Federal judge orders agencies to rehire workers, calls process a "sham"*, Axios (Mar. 13, 2025), available at https://www.axios.com/2025/03/13/doge-federal-workers-probationary (emphasis added); *see also American Fed'n of Gov't Emps. v. U.S. Office of Pers. Mgmt*, No. 25-cv-01780 (N.D. Cal. Mar. 13, 2025), ECF. No. 115 (granting and extending TRO as stated on the record; the transcript of the proceedings is not yet available). Similarly here, Defendant's stated desire of improving government efficiency and combating fraud is a pretext; the real goal for their Engagement Plan, as they have previously acknowledged, is unilaterally and unlawfully flagging and pausing congressionally-appropriated funds based on ideological or other inappropriate grounds.

**CONCLUSION**

For the foregoing reasons, the States respectfully request that the Court deny Defendants'

motion to partially dissolve the preliminary injunction.

Dated: March 14, 2025
        New York, New York

                            Respectfully submitted,

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Colleen K. Faherty
  *Special Trial Counsel*
Stephen Thompson
  *Assistant Attorney General.*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*


**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Michael S. Cohen*
Michael S. Cohen
  *Deputy Attorney General*
Thomas S. Patterson
  *Senior Assistant Attorney General*
Mark R. Beckington
John D. Echeverria
  *Supervising Deputy Attorneys General*
Nicholas Green
Jay Russell
  *Deputy Attorneys General*
California Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6090
Michael.Cohen@doj.ca.gov


*Counsel for the State of California*


**KRISTEN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA

By: */s Joshua D. Bendor*
Joshua D. Bendor
Joshua A. Katz
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Katz@azag.gov


*Counsel for the State of Arizona*


**PHIL WEISER**
  ATTORNEY GENERAL OF COLORADO

By: */s Shannon Stevenson*
Shannon Stevenson
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

WILLIAM TONG
  ATTORNEY GENERAL OF CONNECTICUT

By: */s Matthew Fitzsimmons*
Matthew Fitzsimmons
  *Chief Counsel*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Matthew.fitzsimmons@ct.gov


*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
ATTORNEY GENERAL OF THE STATE OF
DELAWARE

By: /s/ *Vanessa L. Kassab*
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


*Counsel for the State of Delaware*

ANNE E. LOPEZ
  ATTORNEY GENERAL OF HAWAI'I

By: /s *Kalikoʻonālani D. Fernandes*
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


*Counsel for the State of Hawaiʻi*

KWAME RAOUL
  ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead
  *Public Interest Counsel*
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


*Counsel for the State of Illinois*

AARON M. FREY
  ATTORNEY GENERAL OF MAINE

By: /s/ *Jason Anton*
Jason Anton
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
jason.anton@maine.gov


*Counsel for the State of Maine*

ANTHONY G. BROWN
  ATTORNEY GENERAL OF MARYLAND

By: /s *Adam D. Kirschner*
Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
akirschner@oag.state.md.us


*Counsel for the State of Maryland*

ANDREA JOY CAMPBELL
   ATTORNEY GENERAL
   COMMONWEALTH OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz
  *State Solicitor*
One Ashburton Place
Boston, MA 02108
617-963-2427
david.kravitz@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

KEITH ELLISON
   ATTORNEY GENERAL OF MINNESOTA

By: /s Liz Kramer
Liz Kramer
  *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
   ATTORNEY GENERAL OF NEVADA

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

MATTHEW J. PLATKIN
   ATTORNEY GENERAL OF NEW JERSEY

By: /s David Leit
David Leit
  *Assistant Attorney General*
(609) 414-4301
david.leit@law.njoag.gov

Kashif Chand
  *Chief, Deputy Attorney General*
(609) 696-5160
kashif.chand@law.njoag.gov

124 Halsey Street
Newark, NJ 07101

*Counsel for the State of New Jersey*

**JEFF JACKSON**
   ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
   CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
   *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov


*Counsel for State of North Carolina*


**PETER F. NERONHA**
   ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Alex Carnevale
Alex Carnevale
   *Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov


*Counsel for the State of Rhode Island*

**JOSH KAUL**
   ATTORNEY GENERAL OF WISCONSIN

By: */s/ Brian P. Keenan*
Brian P. Keenan
   State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us


*Counsel for the State of Wisconsin*

**DAN RAYFIELD**
   ATTORNEY GENERAL OF OREGON

By: */s/ Elleanor H. Chin*
Elleanor H. Chin
   *Senior Assistant Attorney General*
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*


**CHARITY R. CLARK**
   ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan Rose*
Jonathan Rose*
   *Solicitor General*
Appellate Unit
Office of the Attorney General
109 State Street, 3rd Floor
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*


* - pro hac vice motion pending

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 7,337 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
      March 14, 2025

LETITIA JAMES
Attorney General of the State of New York
By: /s Colleen K. Faherty
Colleen K. Faherty
    Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov