UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STATE OF NEW YORK, *et al.,*

                    Plaintiffs,

     - against –                              No. 25 Civ. 1144 (JAV)

DONALD J. TRUMP, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE
UNITED STATES, *et al.,*

                    Defendants.

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2695/2774
*Attorney for Defendants*

JEFFREY OESTERICHER
REBECCA S. TINIO
Assistant United States Attorneys
     – Of Counsel –

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .............................................................................................................2

    I.      Procedural Background.........................................................................................2

    II.     Plaintiffs' First Amended Complaint ....................................................................5

ARGUMENT ..................................................................................................................6

    I.      Plaintiffs Lack Article III Standing......................................................................6

         a.      Plaintiffs Have Not Alleged Injury-in-Fact ................................................8

         b.      Plaintiffs Have Not Alleged Causation or Redressability.........................11

    II.     Plaintiffs Fail To State An APA Claim ...............................................................12

         a.      Plaintiffs Do Not Challenge Final Agency Action ...................................12

         b.      Plaintiffs Have Not Alleged Arbitrary or Capricious
                Agency Action .......................................................................................16

         c.      Plaintiffs Have Not Alleged a Violation of any Statue.............................19

            1.     FISMA ........................................................................................20

            2.     Conflict of Interest Statutes and Other Undefined Statutes ..........23

    III.    Plaintiffs Have Not Alleged A Violation Of The Separation of Powers ..............25

    IV.    Plaintiffs Have Not Alleged A Violation Of The Take Care Clause....................26

CONCLUSION...............................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFT v. Bessent*,
   No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ........................................................ 13

*Air Brake Sys., Inc. v. Mineta*,
   357 F.3d 632 (6th Cir. 2004) ........................................................................................... 14, 15

*American Federation of Labor and Congress of Industrial Organizations v. Dep't of Labor*,
   No. 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ................................................. 22

*Aramony v. United Way of Am.*,
   254 F.3d 403 (2d Cir. 2001) .................................................................................................... 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................. 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................... 12, 19

*California Cmtys. Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) ................................................................................................. 15

*California v. Texas*,
   593 U.S. 659 (2021) ................................................................................................................... 7

*Chan Ah Wah v. HSBC North America Holdings, Inc.*,
   No. 15 Civ. 8974 (LGS), 2019 WL 859042 (S.D.N.Y. Feb. 22, 2019) ..................................... 17

*City and County of San Francisco v. U.S.*,
   443 F. Supp. 1116 (N.D. Cal. 1977) .................................................................................. 10, 23

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .......................................................................................................... *passim*

*Clarke v. Securities Industry Assn.*,
   479 U.S. 388 (1987) ........................................................................................................... 19, 20

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ..................................................................................... 20, 21, 22

*Cornish v. Dudas*,
   715 F. Supp. 2d 56 (D.D.C. 2010) ............................................................................................ 11

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................................................... 25, 26

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................................................ 17, 18, 19

*Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp*,
    28 F.3d 1268 (D.C. Cir. 1994) ................................................................................... 9

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ............................................................................................... 6, 7

*FDA v. Wages & White Lion Invs., L.L.C.*,
    —— U.S. ——, 145 S. Ct. 898 (2025) ...................................................................... 18

*Fox v. Bd. of Trustees of the State Univ. of New York*,
    42 F.3d 135 (2d Cir. 1994) ......................................................................................... 9

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ............................................................................... 12, 13

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) ................................................................................... 9

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ............................................................................. 21, 23

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................................. 15

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Lit.*,
    266 F. Supp. 3d 1 (D.D.C. 2017) ......................................................................... 21, 22

*Judicial Watch, Inc. v. Clinton*,
    880 F. Supp. 1 (D.D.C. 1995) ................................................................................... 23

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................................. 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................... 6, 10

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ................................................................................................. 13

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchauk*,
    567 U.S. 209, 132 S. Ct. 2199 (2012) ................................................................... 7, 19

*Moore v. U.S.*,
    No. 4:22-CV-4020, 2023 WL 8832918 (S.D. Tex. Nov. 30, 2023) ......................... 20

*Moya v. United States Dep't of Homeland Sec.,*
  975 F.3d 120 (2d Cir. 2020) ................................................................ 20, 21, 23

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.,*
  522 U.S. 479 (1998) ..................................................................................... 20

*Nat'l Org. for Marriage, Inc. v. Walsh,*
  714 F.3d 682 (2d Cir. 2013) ......................................................................... 25

*New York City Employees' Retirement Sys. v. Dole Food Co.,*
  969 F.2d 1430 (2d Cir. 1992) ......................................................................... 9

*New York v. Trump,*
  767 F. Supp. 3d 44 (S.D.N.Y. 2025) ..................................................... *passim*

*New York v. Trump,*
  No. 25 Civ. 1144 (JAV), 2025 WL 1095147 (S.D.N.Y. April 11, 2025) ........... 17, 18

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ....................................................................................... 12

*Pearl River Union Free Sch. Dist. v. King,*
  214 F. Supp. 3d 241 (S.D.N.Y. 2016) ............................................................ 12

*Powell v. McCormack,*
  395 U.S. 486 (1969) ....................................................................................... 9

*R.J. Reynolds Tobacco Co. v. U.S. FDA,*
  810 F.3d 827 (D.C. Cir. 2016) ....................................................................... 10

*Salazar v. King,*
  822 F.3d 61 (2d Cir. 2016) ..................................................................... 7, 8, 16

*Scherer v. U.S.,*
  241 F. Supp. 2d 1279 (D. Kan. 2003) ............................................................ 23

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ....................................................................................... 11

*Smiley v. Citibank (South Dakota), N. A.,*
  517 U.S. 735 (1996) ..................................................................................... 19

*Social Security Administration v. AFSCME,*
  145 S. Ct. 1626 (2025) ............................................................................. 2, 14

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ....................................................................................... 6

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
   578 U.S. 590 (2016) ............................................................................................ 12

*U.S. v. Condon,*
   170 F.3d 687 (7th Cir. 1999) ............................................................................. 23

*U.S. v. Mississippi Valley Generating Co.,*
   364 U.S. 520 (1961) ............................................................................................ 23

*Washington v. Trump,*
   302 F. Supp. 3d 127 (D.D.C. 2018) .................................................................. 25

*Welborn v. IRS,*
   218 F. Supp. 3d 64 (D.D.C. 2016) ................................................. 9, 20, 21, 22

*Westchester v. U.S. Dep't of Housing and Urban Development,*
   778 F.3d 412 (2d Cir. 2015) .............................................................................. 15

**Statutes**

5 U.S.C. § 701(a) ..................................................................................................... 15, 22

5 U.S.C. § 701(a)(2) ................................................................................................ 15, 22

18 U.S.C. § 207 ............................................................................................................... 3

18 U.S.C. § 208 ..................................................................................................... 3, 23, 24

26 U.S.C. § 6103 ............................................................................................................. 3

31 U.S.C. § 3335(a) ....................................................................................................... 11

44 U.S.C § 3541(1) ........................................................................................................ 20

44 U.S.C § 3543(a)(1) .................................................................................................... 21

44 U.S.C § 3544(a)(1) .................................................................................................... 21

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................................................................... 2

Federal Rule of Civil Procedure 12(b)(6) ....................................................................... 2

Federal Rule of Civil Procedure 65 ................................................................................. 3

**Regulations**

31 C.F.R. § 1.32 .............................................................................................................. 3

**Other Authorities**

Executive Order 14158 ................................................................................................................. 2

## PRELIMINARY STATEMENT

Defendants, by their attorneys, respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint. Plaintiffs' First Amended Complaint is legally deficient for numerous reasons and therefore should be dismissed.

Plaintiffs lack standing to pursue their claims as they have not alleged a concrete injury-in-fact. Plaintiffs' claims rest on moot allegations that granting Treasury DOGE Team members access to Bureau of the Fiscal Service ("BFS") payment systems to perform modernization work was arbitrary and capricious. The First Amended Complaint ignores both the Treasury Department's ("Treasury") submissions regarding vetting, clearance, training, and mitigation procedures for the Treasury DOGE Team and, more importantly, the Court's analysis and determination that such procedures are adequate. The Court has expressly permitted Treasury to grant current and future Treasury DOGE Team members access to BFS payment systems without the need for further court review. Accordingly, the States cannot establish an injury-in-fact going forward.

The States' new allegations regarding a BFS pre-certification payment review process similarly fail: the review process cannot cancel a payment and thus cannot cause an injury-in-fact.

Plaintiffs also fail to state a claim under the Administrative Procedure Act ("APA"). Plaintiffs' APA claims are not reviewable because they are not challenging final agency action. Rather, they are seeking to second guess decisions that fall within the day-to-day operation of the agency. Moreover, Plaintiffs have not alleged arbitrary, capricious, or unlawful agency action. This Court has already reviewed and rejected Plaintiffs' claim that the Engagement Plan is being implemented in an arbitrary or unlawful way. In addition, case law regarding APA claims challenging DOGE access has developed significantly since this Court's preliminary injunction

order.  In a similar case, the Supreme Court recently granted the government's motion to stay a preliminary injunction pending appeal and allowed DOGE Team members at the Social Security Administration access to agency records.  *Social Security Administration v. AFSCME*, 145 S. Ct. 1626 (2025).  Furthermore, Plaintiffs' allegations of statutory violations fail as a matter of law because, among other things, Plaintiffs do not fall within the zone of interests protected by the statutes upon which they rely.

Finally, Plaintiffs' separation of powers and Take Care Clause claims are repackaged versions of their failed statutory claims and should be dismissed.

Accordingly, the Amended Complaint should be dismissed in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## **BACKGROUND**

### I.    **Procedural Background**

Defendants assume the Court's familiarity with the background of this matter as laid out in the parties' prior filings and the Court's rulings, including information regarding the function of BFS within the Treasury", BFS payment systems, the United States DOGE Service ("USDS"), and the DOGE Team within Treasury (the "Treasury DOGE Team"), and recite herein only the facts most pertinent to the present motion.

On February 7, 2025, plaintiff State of New York, together with eighteen additional states, filed a Complaint for Declaratory and Injunctive Relief in this matter against Donald J. Trump, in his official capacity as President of the United States, Treasury, and Scott Bessent, in his official capacity as Secretary of the Treasury (collectively, "Defendants").  ECF No. 7.  The original Complaint and request for injunctive relief challenged the granting of limited access to BFS systems to members of the Treasury DOGE Team pursuant to Executive Order 14158, which

directed changes designed to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems,"  90 Fed. Reg. 8441, § 4, ECF No. 7 ¶¶ 4-5, and BFS's implementation of a 4-6 week payment process engagement plan (the "Engagement Plan") that outlined how BFS would support the Treasury DOGE Team.  *See, e.g.*, ECF No. 76 ("Feb. PI Order") at 10-11.  The States alleged, principally, that Defendants were taking these actions for the improper purpose of blocking federal payments to the States and were also endangering the safety and security of the States' financial information.  *See, e.g.*, ECF No. 7 ¶¶ 9, 13.

The original Complaint asserted six causes of action under the Administrative Procedure Act ("APA") and the Constitution: (1) violation of the APA by exceeding authority under various statutes and regulations that govern the handling of personally identifiable information ("PII"), namely the Privacy Act of 1974, the E-Government Act of 2002, 26 U.S.C. § 6103, 31 C.F.R. § 1.32, and 18 U.S.C. §§ 207, 208; (2) violation of the APA by taking action contrary to law, under the same authorities; (3) violation of the APA by taking action that is "arbitrary, capricious, [or] an abuse of discretion," in implementing the Engagement Plan and granting BFS systems access to some Treasury DOGE Team members; (4) *ultra vires*, in taking the challenged actions "for the purpose of identifying, blocking, and/or impeding the payment of funds appropriated by Congress"; (5) violation of the separation of powers, by blocking federal payments to the States "that have been appropriated by Congress"; and (6) violation of the Take Care Clause of the Constitution, in taking the challenged actions.  ECF No. 7 ¶¶ 154-99.  Contemporaneous with filing the original Complaint, the States obtained an *ex parte* Temporary Restraining Order, ECF No. 6, and moved for a preliminary injunction seeking, among other things, to block Treasury DOGE Team members from accessing BFS systems, *see* ECF No. 51.

On February 21, 2025, the Court issued an Opinion and Order entering a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, restraining the Treasury Department and the Secretary of the Treasury "from granting access to any Treasury Department payment record, payment systems, or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees to any employee, officer or contractor employed or affiliated with the United States [Department of Government Efficiency ("DOGE")] Service, DOGE, or the DOGE Team established at the Treasury Department."  Feb. PI Order at 63.  The Court's entry of the PI rested solely on its determination that Plaintiffs had met the requirements for preliminary relief as to their claim that the "agency's processes for permitting the Treasury DOGE Team access to critical BFS payment systems" was "arbitrary and capricious" under the APA; the Court concluded that Plaintiffs did not have a likelihood of success on the merits of any of the other five claims in the original Complaint. *Id.* at 50.[1]  With respect to the sole count on which the Court granted relief, it noted expressly that "the issues identified by the Court largely have to do with the processes followed by the agency, and not with the substance of its decisions."  *Id.* at 62.

In the February PI Order, the Court directed Defendants to provide a report setting forth several categories of information regarding the vetting, training, hiring authorities, reporting lines, and mitigation measures implemented pertaining to the members of the Treasury DOGE Team, and invited briefing from Defendants in connection with the potential termination or modification of the PI. *Id.* at 63-64.  Over the next three months, Defendants made several fulsome submissions, including twenty agency declarations, providing the specific information requested by the Court

---

[1] Defendants maintain their disagreements with the Court's holdings in the February PI Order with respect to final agency action and Plaintiffs' likelihood of success on their "arbitrary and capricious" claim under the APA.

in the February PI Order and explaining that the Treasury DOGE Team members were subject to the same—and, in certain respects, more stringent—protocols and requirements regarding vetting, training, and clearance as any other individual granted access to BFS systems. *See, e.g.*, ECF Nos. 98, 112, 116, 120-26, 142-47, 150.

In a series of orders and rulings (*see* ECF Nos. 108, 139, 156), the Court clarified and modified the scope of the PI, culminating in its May 27, 2025 Opinion and Order (ECF No. 156, "May PI Order"). In the May PI Order, the Court ruled that "any employee, officer or contractor employed or affiliated with [USDS], DOGE, or the [Treasury DOGE Team]" was permitted to access BFS systems provided that they complied with conditions that tracked the vetting, training, hiring, reporting, and mitigation procedures and protocols that Defendants had described to the Court. May PI Order at 6-7. With regard to any new Treasury DOGE Team members, the Court ruled that they could similarly access BFS systems without the requirement to obtain a further judicial determination. *Id.* at 7.

## II.    Plaintiffs' First Amended Complaint

On May 23, 2025, Plaintiffs filed a First Amended Complaint. ECF No. 155 ("FAC"). The core allegations of the FAC are, again, that Treasury's granting of limited access to BFS systems to Treasury DOGE Team members has "put the States' confidential information at serious risk"; and that "Treasury's stated goal" in granting this access is "pausing and potentially blocking the disbursement of congressionally appropriated funds to the States based on ideological criteria driven by the President's executive orders." FAC ¶ 6. The FAC includes new allegations regarding "a hybrid team of employees, working on behalf of … [DOGE]," and the use (not specifically alleged to be occurring at Treasury) of "an open-source Artificial Intelligence ('AI') system owned and controlled by a private third party, without measures taken to ensure the privacy and security

of the States' data." *Id.* ¶¶ 8, 10. The FAC sets forth four causes of action: (1) arbitrary and capricious action in violation of the APA, with respect to the manner in which Treasury granted BFS systems access to the Treasury DOGE Team and the alleged pausing and potential blocking of federal payments to the States "on ideological grounds"; (2) actions contrary to law in violation of the APA, with reference to the Federal Information Security Modernization Act ("FISMA"), conflicts of interest rules contained in Title 18 of the U.S. Code, and "duly enacted statutes appropriating funds to the States"; (3) violation of separation of powers via the alleged pausing and blocking of federal payments to the States that have been appropriated by Congress; and (4) violation of the Take Care Clause. FAC ¶¶ 138-77.

## **ARGUMENT**

### I.    **Plaintiffs Lack Article III Standing**

As a threshold matter, the Court should dismiss the First Amended Complaint because Plaintiffs lack standing to bring their claims. A mandatory prerequisite to any exercise of judicial power under Article III is the existence of a constitutional "case" or "controversy," without which the Court lacks jurisdiction to proceed. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024); *see also id.* at 381 ("By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action."); *New York v. Trump*, 767 F. Supp. 3d 44, 65 (S.D.N.Y. 2025) (to establish standing, "plaintiffs must be able to sufficiently answer the question: 'What's it to you?'") (internal quotation marks and citation omitted).

Establishing standing requires three showings. *New York*, 767 F. Supp. 3d at 65. A plaintiff must show a "concrete" ("real," not "abstract") injury-in-fact, which is "particularized" to the plaintiff and not a "generalized grievance." *Alliance*, 602 U.S. at 381. If the injury has not yet

actually manifested, it must be "certainly impending," and not speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). And even an alleged actual—*i.e.*, present—injury must be legally cognizable under the American legal tradition. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-26 (2021).

If a plaintiff can show injury-in-fact, then they must also show the second element: a causal link between that injury and the allegedly unlawful conduct of the defendant. *Alliance*, 602 U.S. at 382. In the context of a challenge to governmental action that does not directly impact the challenger, causation will be "'ordinarily substantially more difficult to establish,'" *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)), because the plaintiff "generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts,'" *id.* at 383 (quoting *Clapper*, 568 U.S. at 415 n.5). Finally, the plaintiff must show that any injury caused by the allegedly unlawful behavior of the defendant is likely redressable by judicial relief. *California v. Texas*, 593 U.S. 659, 671-74 (2021).

 "To bring a claim under the APA a plaintiff must satisfy Article III's standing requirements . . . at all times during the litigation (mootness)." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016) (citing, *inter alia, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchauk*, 567 U.S. 209, 132 S. Ct. 2199, 2210 (2012)). Accordingly, "even if a party has constitutional and statutory standing when her complaint is filed, her claim can become moot during the course of the litigation." *Salazar*, 822 F.3d at 73.

Here, the Plaintiff States have not shown the three foundational requirements of standing. Accordingly, the Court should dismiss the First Amended Complaint.

a. **Plaintiffs Have Not Alleged Injury-in-Fact**

The Plaintiff States fail to establish an injury-in fact. The States unsuccessfully assert two forms of injury. First, they allege that they "suffered, and will continue to suffer, harm as a result of Defendants' disclosure of the States' Sensitive Data through expanded access granted to DOGE-Treasury team members, as well as significant cybersecurity lapses." FAC ¶ 111; *see also id.* ¶ 6 (alleging that Defendants put the "States' confidential information at serious risk through shoddy and insufficient training, vetting, oversight, and hiring procedures—in contravention of federal law and regulations governing information security—and even shoddier execution"), ¶ 112 (alleging that Defendants failed to follow established information security requirements and thereby exposed their sensitive data to cybersecurity threats). While this Court found these allegations sufficient to establish standing at the initial preliminary injunction stage, *New York*, 767 F. Supp. 3d at 66-69, that is no longer the case. That is because, as the Court found, Treasury implemented adequate vetting, clearance, training, and mitigation procedures to address these concerns such that the Court permitted Treasury to grant Treasury DOGE Team members access to BFS' highly sensitive payment systems. *See* May PI Order at 4-7.[2] Specifically, the Court found that all of the Treasury DOGE Team members "had been through the same vetting, clearance, and training procedures required of all other Treasury employees provided with access to the BFS payment systems," and "would be subject to the same mitigation procedures." *Id.* at 4. These procedures "largely alleviate[d]" the Court's concerns at the initial preliminary injunction stage. *Id.* The Court therefore modified the preliminary injunction to allow Treasury to grant all current and future members of the Treasury DOGE Team access to BFS payment systems,

---

[2] The issues identified by the Court at the preliminary injunction stage "largely ha[d] to do with the processes followed by the agency, and not with the substance of its decisions." *New York,* 767 F. Supp. 3d at 85.

provided that any future members of the Treasury DOGE Team are subjected to the same training, vetting, and mitigation procedures. *Id.* at 7.

Given the Court's findings, Plaintiffs cannot show a concrete injury-in-fact that is "certainly impending" and not speculative from allowing Treasury DOGE Team members to access BFS payment systems. *Clapper*, 568 U.S. at 409. The Court has approved the granting of access and therefore Plaintiffs lack a basis to complain. *See Salazar*, 822 F.3d at 73 (collecting cases). Indeed, in dissolving the preliminary injunction with respect to current and future Treasury DOGE Team members, the Court rejected Plaintiffs' claims that Treasury's current training, vetting, hiring, and mitigation procedures were insufficient and in violation of federal law and regulations governing information security. *See* ECF No. 139 ("April PI Order") at 18-28; *see also* May PI Order at 4-5. Plaintiffs' allegation that granting Treasury DOGE Team members access to BFS payment systems will harm them by creating a "serious risk that the States' bank accounts and other financial information will be obtained and misused by bad actors," FAC ¶ 111; *see also id.* ¶ 112, therefore is belied by the Court's decisions and insufficient to establish standing.[3]

---

[3] For the same reasons, Plaintiffs' claims in the FAC challenging the way the Engagement Plan was first implemented are moot. A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969) (citation and internal quotations omitted). "When a case becomes moot, the federal courts 'lack[ ] subject matter jurisdiction over the action.'" *Fox v. Bd. of Trustees of the State Univ. of New York*, 42 F.3d 135, 140 (2d Cir. 1994) (quoting *New York City Employees' Retirement Sys. v. Dole Food Co.*, 969 F.2d 1430, 1433 (2d Cir. 1992)). As this Court has recognized on multiple occasions, the concerns that animated its February PI Order regarding the initial rollout of the Engagement Plan have been "largely alleviated" by Defendants' "extensive submissions." May PI Order at 3-4. Moreover, the allegations in the FAC pertaining to former Treasury DOGE Team member Marko Elez are moot because Mr. Elez is no longer a member of that Team. *See, e.g.*, FAC ¶¶ 83-87. And Plaintiffs have pled no continuing harm or other legally cognizable interest stemming from the implementation of the Engagement Plan. Rather, Treasury has described in detail the procedures and protocols that have superseded the factual landscape associated with the initial implementation of the Engagement Plan, and as discussed

Plaintiffs also cannot establish standing based on the Court's initial finding at the preliminary injunction stage of a likely past violation of the APA. "'To pursue an injunction or a declaratory judgment, . . . plaintiffs must allege a likelihood of future *violations* of their rights [by the Defendants], not simply future *effects* from past violations.'" *Welborn v. IRS*, 218 F. Supp. 3d 64, 80 (D.D.C. 2016) (emphasis in original) (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp*, 28 F.3d 1268, 1272 (D.C. Cir. 1994)). Based on the Court's recent findings, Plaintiffs cannot plead a likelihood of future violations. Accordingly, they lack standing to pursue an injunction or a declaratory judgment. *Id.*; *see also Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) (Plaintiffs must plead a "real and immediate" threat of repetition, not merely "a nebulous assertion of the existence of a 'policy'" and a likelihood that they will "be subjected to the policy again.").[4]

Plaintiffs' second alleged injury—the potential for a delay or halt in federal reimbursement to the States, FAC ¶¶ 125-37—fares no better. As Plaintiffs acknowledge, to date, they have not experienced any delay or halt in federal reimbursements from Treasury, *id.* at ¶ 131 ("The States have a strong interest in ensuring they *continue* to receive timely reimbursement . . . ."), even though the Engagement Plan and payment review process was operationalized over six months ago, on January 23, 2025, *id.* ¶ 124. Plaintiffs' speculative concern that through the work of

---

above, the Court has reviewed those procedures and protocols. Thus, any claims for relief in the FAC premised on the rollout of the Engagement Plan and past alleged data security problems associated with it are moot.

[4] Plaintiffs also have not pled that they have been injured by Defendants' alleged violation of the federal criminal conflict of interest statutes. FAC ¶¶ 93-103; *see R.J. Reynolds Tobacco Co. v. U.S. FDA*, 810 F.3d 827, 829 (D.C. Cir. 2016) (dismissing complaint because plaintiffs' allegations that FDA granted access to their confidential information in violation of conflict of interest statutes failed to establish an injury-in-fact); *see also Lujan*, 504 U.S. at 562 (courts are hesitant to find standing when the asserted injury "depends on the unfettered choices made by independent actors not before the courts"); *see also infra* Part II.c.2.

DOGE, reimbursement requests may be denied in the future, *id.* ¶ 131, does not constitute a concrete injury-in-fact that is "certainly impending." *See Clapper* 568 U.S. at 409, 411, 416.

### b. Plaintiffs Have Not Alleged Causation or Redressability

Plaintiffs also cannot establish causation or redressability. As discussed *supra*, the only direct harm that Plaintiffs have alleged is the disclosure of their sensitive data to Treasury DOGE Team members. FAC ¶¶ 6, 111-12. But Plaintiffs cannot establish the necessary causal link to the Engagement Plan because any such disclosure was or is authorized by the Court.[5]

The same is true for Plaintiffs' assertion of harm from the purported increased data security risks arising from the granting of access to Treasury DOGE Team members. FAC ¶¶ 6, 111-12. Again, this theory fails because Defendants have acted with the Court's imprimatur in granting such access. Moreover, causation is also lacking because Plaintiffs' injury "rest[s] on speculation about the decisions of independent actors"—here, malicious actors online who would obtain and exploit Plaintiffs' data. *Clapper*, 568 U.S. at 414; *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (same); *Cornish v. Dudas*, 715 F. Supp. 2d 56, 69-70 (D.D.C. 2010) (dismissing APA complaint based on alleged FISMA violation where plaintiff "has not adequately pled causation between the alleged injury and the defendants' conduct"). And redressability is absent; Plaintiffs cannot show that denying access to a small group of Treasury DOGE Team members would meaningfully affect the likelihood of a future cyber intrusion incident that could lead to the harms Plaintiffs posit. *See Simon*, 426 U.S. at 45-46.

---

[5] Causation and redressability are also lacking for any alleged injuries based on Defendants' purported violations of the federal conflict of interest rules. *See generally City and County of San Francisco v. U.S.*, 443 F. Supp. 1116, 1125 (N.D. Cal. 1977) (finding no standing for APA cause of action based on alleged violation of federal conflict of interest regulations because "[i]t is only speculation" that plaintiff's injury would not have occurred "had the alleged conflict of interest not existed").

Finally, the other injury that Plaintiffs allege—the potential that the States' federal reimbursements will be delayed or halted in the future, *see* FAC ¶¶ 131, 137—is equally causally attenuated and unlikely to be redressed by success in this litigation.  As Plaintiffs recognize, the process at issue "helps identify payments that may be improper under [the President's] Executive Orders," *id.* ¶ 123; it does not stop or cancel them.  By law, Treasury cannot disburse a payment that has not been certified by the payor agency, nor does it have the discretion to refuse to disburse any certified payment.  *See* 31 U.S.C. § 3335(a).  Accordingly, Treasury's review or identification of payments could not cause Plaintiffs' hypothetical harm, and a court order abrogating the process would not redress the alleged harm as the decision whether to certify a payment resides with the payor agency.

## II.     Plaintiffs Fail To State An APA Claim

Plaintiffs' two APA claims, *see* FAC ¶¶ 138-56, fail to satisfy several threshold statutory and pleading prerequisites.  Count One alleges that Defendants acted arbitrarily and capriciously in failing to protect the States' sensitive data and exposing the States to significant cybersecurity risks, and in allegedly expanding BFS' role in identifying (and thus pausing and potentially blocking) certain federal payments to States, purportedly on ideological grounds.  *Id.* ¶¶ 138-47.  Count Two alleges that Defendants implemented the Engagement Plan in violation of (a) FISMA, as amended, (b) federal ethics rules contained in Title 18 of the U.S. Code, and (c) "duly enacted statutes appropriating funds to the States."  *Id.* ¶¶ 148-56.  As demonstrated below, both of these APA claims should be dismissed as a matter of law.

### a.     Plaintiffs Do Not Challenge Final Agency Action

Plaintiffs' two claims under the APA, FAC ¶¶ 138-56, are not reviewable because, first, they fail to challenge final agency action.  The APA does not permit "judicial review over

everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (citation omitted). Rather, APA review is limited to "'final agency action.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704). Agency action is final only when it "'mark[s] the consummation' of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "The second prong will be satisfied where the agency's action 'gives rise to direct and appreciable legal consequences.'" *Pearl River Union Free Sch. Dist. v. King*, 214 F. Supp. 3d 241, 258 (S.D.N.Y. 2016) (quoting *Hawkes*, 578 U.S. at 598) (internal quotation and citation omitted). Day-to-day operations of federal agencies are generally not considered final agency action, and thus not subject to APA review. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 899 (1990) (plaintiffs "cannot demand a general judicial review of the [agency]'s day-to-day operations" under the APA); *Fund for Animals*, 460 F.3d 13 at 20 (APA does not authorize courts to oversee "the common business of managing government programs").

Defendants respectfully disagree with the Court's prior holding that the original Complaint adequately pled a final agency action—namely, "the decision by the Treasury Department to constitute a DOGE Team with individuals from outside the agency, who were employed pursuant to temporary hiring authorities, and provide those individuals with unprecedented access to the BFS payments systems pursuant to a four-to-six week Engagement Plan." Feb. PI Order at 44. In addition to the arguments presented by Defendants in opposition to entry of a preliminary injunction, *see* ECF No. 35, Defendants note that higher courts have, in the intervening time, expressed substantial skepticism regarding the types of claims advanced by Plaintiffs here in

similar cases involving granting agency DOGE team members access to information systems, and have stayed preliminary injunctions restricting that access. *See, e.g.*, *AFT v. Bessent*, No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) (in a case challenging access to agency information and data systems by individuals whose role is to implement "the President's DOGE agenda," order granting government's motion to stay preliminary injunction pending appeal and denying *en banc* review); *see also id.* at *5 (Richardson, C.J. and Agee, C.J., concurring) ("The agency action here—granting IT access to certain employees—does not fit comfortably into either bucket" of recognized final agency actions. . . .  "So I am doubtful the district court could so definitively find final agency action here").[6]

Most significantly, the Supreme Court recently granted the government's motion to stay the preliminary injunction entered by the district court in *Social Security Administration v. AFSCME*, 145 S. Ct. 1626 (2025), holding that pending disposition of the government's appeal on the merits, "SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work." *Id.*  In that case, the government argued, among other things, that the plaintiffs failed to challenge final agency action under the APA, in that their claims addressed "a loosely defined series of personnel decisions related to granting individual employees access to agency systems." *See* *https://www.supremecourt.gov/DocketPDF/24/24A1063/358032/20250502151449738_SSA%20v.%20AFSCME%20stay%20final%20with%20appendix.pd* at 22 (last visited July 23, 2024).  As in this case, the plaintiffs in *AFSCME* argued that the Social Security Administration "granted access to DOGE team members too quickly and without adequately vetting those employees, providing

---

[6] The government's appeal on the merits of the district court's entry of the preliminary injunction was argued in May and is presently *sub judice.*

them with sufficient training, or correctly assessing their need for access to SSA systems." *Id.* The government urged, as Defendants do here, that those types of access decisions fall within the day-to-day management and operation of an agency, and do not constitute discrete agency action susceptible to APA review. *Id.* Moreover, as the government argued in *AFSCME* (*see id.* at 23-24), the fact that such access decisions could potentially lead to indirect, practical consequences (*e.g.*, here, some potential greater risk to the States' financial information) does not make them final agency action, because adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). The data access decisions here, as in *AFSCME*, have no "direct and appreciable legal consequences" for plaintiffs, *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019), and thus do not constitute final agency action reviewable under the APA.[7]

Similarly, the identification of potentially improper payment requests for agency review also does not constitute discrete, final agency action reviewable under the APA. As discussed above, by law, the relevant certifying agency—not BFS—determines whether a payment complies with the law and thus is ultimately made, and BFS has no discretion to either make a payment that has not been certified, or fail to make a payment that has been certified. *See supra* Part I.b. Implementation of a payment process to assist payor agencies in identifying improper payments is not a final agency action. Therefore, Plaintiffs fail to state an APA claim with respect to these allegations.

---

[7] Moreover, as noted *supra*, the factual landscape surrounding the initial 4-6 week Engagement Plan has been superseded by the agency's policies and protocols for granting BFS systems access to members of the Treasury DOGE Team, and the Court's approval of those protocols. Thus, to the extent legal consequences ever flowed to Plaintiffs because of the Engagement Plan, that flow has been interrupted.

Finally, both the granting of BFS systems access to Treasury DOGE Team members and the flagging of potentially improper payments lie within Treasury's discretion. "[A]gency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (quoting 5 U.S.C. § 701(a)(2)); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[B]efore any [judicial] review at all may be had, a party must first clear the hurdle of § 701(a)."). This exception to the availability of judicial review applies where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Westchester v. U.S. Dep't of Housing and Urban Development*, 778 F.3d 412, 419 (2d Cir. 2015) (internal quotation marks and citation omitted); *see Salazar,* 822 F.3d at 76–77 (noting that "courts look at statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action" in considering whether actions are discretionary). Plaintiffs have identified no statutory, regulatory, or other prohibition against the agency's discretion to hire employees to access and improve its data and information systems, or take steps to identify potentially improper payment requests. There is simply no law to apply to second guess these decisions, and they are thus unreviewable as agency action.

### b. Plaintiffs Have Not Alleged Arbitrary or Capricious Agency Action

Even assuming that Plaintiffs have alleged final agency action that lies outside the agency's discretion, which they have not done, Plaintiffs have failed to allege arbitrary or capricious conduct by Defendants. In Count One, Plaintiffs assert two theories of arbitrary and capricious action. First, Plaintiffs allege that by "permitting DOGE-Treasury employees to access the Sensitive Data without adequate vetting or training; by failing to prevent DOGE-Treasury employees from sharing sensitive data outside of Treasury; and by failing to account for insider threats and adequately respond to them," Defendants have "expos[ed] the States to significant cybersecurity

risks" in violation of the APA. FAC ¶ 140. Plaintiffs also allege that "Defendants' implementation of the Engagement Plan is arbitrary and capricious because Defendants have failed to provide a reasoned explanation for the change from longstanding Treasury policy and practice to expand BFS's limited, ministerial role in processing payment requests already approved by the submitting federal agency . . ." *Id.* ¶ 143. Neither of these theories in Count One states a claim.

As discussed *supra*, this Court has already evaluated, and rejected, Plaintiffs' assertion that Treasury acted improperly by granting Treasury DOGE Team members access to BFS payment systems. Plaintiffs' effort to revisit those claims in their First Amended Complaint should be rejected.

In the Court's April PI Order with respect to Ryan Wunderly, the Court reviewed Plaintiffs' claims concerning Treasury's training, vetting, hiring authority, reporting chain, and mitigation procedures. *Id.* at 19-28. As to each, the Court found that Treasury's existing procedures, if properly implemented, are reasonable and adequate to satisfy the Court's initial concerns. *Id.* Six weeks later, in the May PI Order, the Court made the same findings with respect to granting access to four additional Treasury DOGE Team members and ordered that Treasury may grant future Treasury DOGE Team members access to BFS payment systems following the same procedures without the need for court approval. ECF No. 156 at 7. In holding that Defendants could provide such access, the Court necessarily found that Treasury's procedures are not arbitrary and capricious. Those findings and rulings are dispositive of Plaintiffs' allegations. *See, e.g.*, *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) ("Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication."); *Chan Ah Wah v. HSBC North America Holdings, Inc.*, No. 15 Civ.

8974 (LGS), 2019 WL 859042, at \*4 (S.D.N.Y. Feb. 22, 2019) (granting dismissal motion where court's prior decision "necessarily resolved" the question at issue).

Plaintiffs' second theory that Treasury arbitrarily changed its policy with respect to processing payments also fails as a matter of law.  *See* FAC ¶¶ 121-23, 141-45.  "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also New York v. Trump*, No. 25 Civ. 1144 (JAV), 2025 WL 1095147, at \*12 (S.D.N.Y. April 11, 2025).  This so-called change-in-position doctrine ensures that agencies "take into account" the "serious reliance interests" of regulated parties who were guided by an agency's previously stated position.  *Encino*, 579 U.S. at 221-22 (cleaned up); *see also New York*, 2025 WL 1095147, at \*12. The change-in-position doctrine only applies, however, if "an agency changed existing policy."  *FDA v. Wages & White Lion Invs., L.L.C.*, ––– U.S. ––––, 145 S. Ct. 898, 918 (2025); *see also New York*, 2025 WL 1095147, at \*12.  For an agency position to constitute a "policy" within the meaning of the change-in-position doctrine, it must typically have been set forth in some "formal" manner, such as a regulation, a guidance memorandum, or an agency enforcement action.  *White Lion Invs.*, 145 S. Ct. at 918 n.5 ("We have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting."); *see also New York*, 2025 WL 1095147, at \*12.

Here, there is no allegation that Treasury had a pre-existing policy expressed in a guidance document or in some other formal fashion that was altered by the revised process for identifying potentially improper reimbursement requests.  *See* FAC ¶ 114.  Accordingly, the change-in-position doctrine does not apply.  *See White Lion Invs.*, 145 S. Ct. at 918 n.5; *New York*, 2025 WL 1095147, at \*12.

Moreover, Defendants have provided a reasoned explanation for the change. As Plaintiffs allege, the automated process to flag for the certifying agency certain requests was developed to "help[] identify payments that may be improper under [the President's] new Executive Orders." FAC ¶ 123 (internal quotation marks and citation omitted); *see also id.* ("The objective was to create an automated process that would flag payment files in the 'pre-edit phase' for further review based on 'certain Treasury Account Symbols'" that would signal the payment was suspect, *i.e.*, may not align ideologically with the President's priorities and possibly should be blocked."). While Plaintiffs obviously disagree with the President's priorities and new Executive Orders, that does not render Defendants' explanation unreasonable. *See Encino*, 579 U.S. at 221-22. Likewise, Plaintiffs cannot claim that Treasury's revised process upset a "legitimate reliance" interest, as they have no interest in receiving reimbursement for expenses that are not permitted under federal law. *See White Lion Invs.*, 145 S. Ct. at 927; *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996).

### c. Plaintiffs Have Not Alleged a Violation of any Statute

The First Amended Complaint should also be dismissed because Plaintiffs have failed to allege a statutory violation as a predicate for their APA claims. Plaintiffs allege in Count Two that the Court must set aside the Engagement Plan because it was implemented in violation of FISMA, federal ethics rules, and unspecified duly enacted statutes appropriating funds to the States. *See* FAC ¶¶ 148-56. However, Plaintiffs do not plead a statutory violation.

As an initial matter, to bring a statutory or constitutional claim, Plaintiffs must satisfy the zone of interests test. *New York*, 767 F. Supp. 3d at 71. That is, they must demonstrate that the "'interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* (quoting

19

*Bennett*, 520 U.S. at 163) (internal quotation marks and citation omitted).  The zone of interests test "'denies a right of review if [the plaintiff's] interests are so marginally related to or inconsistent with the purposes implicit in [the underlying statute] that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *New York*, 767 F. Supp. 3d at 71 (quoting *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399 (1987)).  In the APA context, "'the interest the party asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated.'"  *New York*, 767 F. Supp. 3d at 71 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 224 (cleaned up)).

"'The relevant zone of interests for an APA claim is defined by 'the statute that the plaintiff says was violated,' rather than by the APA itself.'"  *New York*, 767 F. Supp. 3d at 71 (quoting *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 131 (2d Cir. 2020) (citation omitted)).  "In applying the zone of interests test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff.  Instead, we first discern the interests arguably to be protected by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them."  *New York*, 767 F. Supp. 3d at 71-72 (quoting *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998) (cleaned up)).  Although the zone of interests test "'is not meant to be especially demanding,'" *New York*, 767 F. Supp. 3d at 71 (quoting *Clarke*, 479 U.S. at 399), "'it is not toothless,'" *New York*, 767 F. Supp. 3d at 71 (quoting *Moya*, 975 F.3d at 132).  Applying this standard, it is clear that Plaintiffs' statutory APA claims fail.

### 1.  FISMA

"FISMA is a peculiarly hortatory statute directed to federal executives to protect federal information technology for the benefit of the federal government."  *Welborn,* 218 F. Supp. 3d at

81; *see also Cobell v. Kempthorne*, 455 F.3d 301, 313 (D.C. Cir. 2006) ("FISMA is intended to 'provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets.'") (quoting 44 U.S.C. § 3541(1)).  There is no private right of action under FISMA.  *See id.*; *Moore v. U.S.*, No. 4:22-CV-4020, 2023 WL 8832918, at 83 (S.D. Tex. Nov. 30, 2023); *see also Cobell*, 455 F.3d at 314 ("Notably absent from FISMA is a role for the judicial branch.").

To achieve that goal, FISMA assigns responsibilities to the Director of OMB and to the head of each agency.  *Cobell*, 455 F.3d at 314.  FISMA makes the head of each agency responsible for "providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of" agency information.  44 U.S.C § 3544(a)(1)(A).  The Director of OMB is charged with "developing and overseeing the implementation of policies, principles, standards, and guidelines on information security."  *Id.* § 3543(a)(1).  In complying with their obligations under FISMA, the Director of OMB and agency heads must also ensure compliance with information security standards promulgated by the Department of Commerce, including standards and guidelines developed by the National Institute of Standards and Technology ("NIST").  *Id.* §§ 3543(a)(1)-(2), 3544(a)(1)(B)(i); *see also Cobell*, 455 F.3d at 314 (same).

This regulatory scheme makes clear that the States' interest in the protection of their PII does not fall within the zone of interests that FISMA was designed to protect.  *See Welborn*, 218 F. Supp. 3d at 81 (FISMA is "directed to federal executives to protect federal information technology for the benefit of the federal government"); *Cobell*, 455 F.3d at 314 ("We are far from certain that courts would ever be able to review the choices an agency makes in carrying out its FISMA obligations").  Rather, FISMA "requires federal agencies to comply with information

security standards and conduct annual independent evaluations of their information security." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Lit.*, 266 F. Supp. 3d 1, 44 (D.D.C. 2017) (internal quotation marks and citation omitted), *aff'd in part & rev'd in part on other grounds*, 928 F.3d 42 (D.C. Cir. 2019). Plaintiffs' interests are at least one step removed from the purposes of FISMA and therefore fall outside of its zone of interests. *See, e.g.*, *Moya*, 975 F.3d at 132-33 (dismissing APA claim where plaintiffs' interests were "a crucial step removed from the challenged statute"— "[t]he core concern of the zone-of-interests doctrine is, after all, whether a plaintiff has a cause of action under the law invoked.") (internal quotation marks and citation omitted); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813 (D.C. Cir. 1987) ("If . . . the zone of interests to be protected or regulated by every statute necessarily includes an organization's . . . interest in promoting the rights created by that statute, that . . . would render the entire concept of a zone of interest a nullity.") (emphasis omitted).

      Plaintiffs' FISMA-based APA claim fails for two additional reasons. First, as discussed above, the APA expressly excludes from its review agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under FISMA, "each agency head is delegated full discretion in determining how to achieve its goals, which removes [FISMA] from APA review." *Welborn*, 218 F. Supp. 3d at 81 (citing 5 U.S.C. § 701(a)); *see also Cobell*, 455 F.3d at 314 & n.5 ("We are far from certain that courts would ever be able to review the choices an agency makes in carrying out its FISMA obligations."); *American Federation of Labor and Congress of Industrial Organizations v. Dep't of Labor*, No. 25-339 (JDB), 2025 WL 1129227, at *18 (D.D.C. Apr. 16, 2025) ("the scant case law on whether fulfilling FISMA's requirements is committed to agency discretion weighs in their favor"); *In re U.S. Off. of Pers. Mgmt.*, 266 F. Supp. 3d at 43–

44 ("The Court holds that OPM's actions in carrying out the statute's requirements is committed to the agency's discretion, and not subject to judicial review under the APA.").

Second, even if FISMA compliance decisions were reviewable under the APA (which they are not), the First Amended Complaint does not allege that Treasury has failed to establish an overall information security program in compliance with FISMA.  *See* FAC ¶¶ 46-52, 82-112. Rather, Plaintiffs seek to second-guess the granting of access to Treasury DOGE Team members as part of the Engagement Plan.  *Id.* ¶¶ 82-92.  That is fatal to Plaintiffs' claim.  While "Plaintiffs may disagree with the agency defendants' assessments," that is not sufficient basis to state an APA claim for violation of FISMA.  *American Federation of Labor*, 2025 WL 1129227, at *18 (granting dismissal of APA claims based on alleged violations of FISMA where plaintiffs expressed disagreement with the agency's information security decisions and assessments).

### 2.  Conflict of Interest Statutes and Other Undefined Statutes

Plaintiffs' attempt to bring an APA claim alleging that certain Treasury DOGE Team members were acting in contravention of criminal statutes governing conflicts of interest in federal employment is also unavailing.  *See* FAC ¶¶ 93-103.  18 U.S.C. § 208 establishes civil and criminal penalties for government employees, including Special Government Employees, who participate in an official capacity in transactions in which they or a close relative or associate has a financial interest.  There is no private right of action under this statute; the only right of action is reserved for the Attorney General.  *See Scherer v. U.S.*, 241 F. Supp. 2d 1279, 1285 (D. Kan. 2003); *accord U.S. v. Condon*, 170 F.3d 687, 689 (7th Cir. 1999); *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 5 n.3 (D.D.C. 1995).

Plaintiffs' conflict of interest claim fails at the threshold, as they do not fall within the zone of interests protected by the criminal statute.  *See Moya*, 975 F.3d at 131-32; *City and County of*

*San Francisco v. U.S.*, 443 F. Supp. 1116, 1125 (N.D. Cal. 1977). The purpose of the federal criminal conflict of interest statutes is to "protect the government from corruption and self-interested financial dealing." *City and County of San Francisco*, 443 F. Supp. at 1125; *see also U.S. v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563 (1961) (their function "is to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the government"). The States' general interest in "promoting the rights created by that statute" is not sufficient to fall within the criminal statutes' zone of interests. *Haitian Refugee Ctr.*, 809 F.2d at 813; *see also Moya*, 975 F.3d at 131-32; *City and County of San Francisco*, 443 F. Supp. at 1125 (dismissing APA claim based on violation of criminal conflict of interest statutes finding that City and County did not fall within the zone of interests).

Plaintiffs' allegations of a § 208 violation also fail to state a claim. Plaintiffs assert that "three DOGE-Treasury employees *appear* to have problematic conflicts that *could* impact the objective performance of their duties at Treasury." FAC ¶ 95 (emphasis added). Each of these Treasury employees allegedly owns shares in a company that "has lobbied heavily against IRS Direct File." *Id.* ¶¶ 96, 98. Plaintiffs do not allege how this affects them. *Id.* ¶¶ 96-103. And they admit that they do not know whether these "DOGE-Treasury team members have been required to divest from any of their financial holdings" or what other vetting procedures have been employed by Treasury. *Id.* ¶ 99. Far from stating a claim of a violation of § 208, Plaintiffs have not established that this section is implicated whatsoever by the Engagement Plan they challenge. *See New York*, 767 F. Supp. 3d at 75 (finding that Plaintiffs failed to show that Section 208 is "even implicated by the agency action in this case" and observing that "section 208(a) says nothing about who is or is not authorized to disclose or receive agency information").

Finally, to the extent Plaintiffs seek to assert an APA cause of action based on their conclusory allegation that "the Engagement Plan was put in place by the Agency Defendants in contravention of duly enacted statutes appropriating funds to the States, to be disbursed by Treasury," FAC ¶ 153, it fails.  Notably, Plaintiffs do not even identify the "duly enacted statutes" on which they purport to base this claim.  *Id.*  Nor do Plaintiffs allege that they have failed to receive federal reimbursements because of these supposed statutory violations.  *Id.*  Accordingly, Plaintiffs' claim lacks the requisite degree of specificity for factual pleading.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[8]

### III.    Plaintiffs Have Not Alleged A Violation Of The Separation Of Powers

Plaintiffs' assertion that the Engagement Plan's new automated process is a violation of the Constitution's separation of power principles, FAC ¶¶ 158-70, likewise does not state a claim.  As a threshold matter, Plaintiffs' failed statutory claims cannot be repackaged as constitutional violations.  *Dalton v. Specter*, 511 U.S. 462, 473 (1994) ("[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims[] subject to judicial review.").  Moreover, as noted above, Plaintiffs do not plead that any payments to which they are entitled have been blocked—much less that such payments were blocked because of the actions challenged in this lawsuit.  This claim is therefore unripe.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (citation omitted).

---

[8] To the extent this allegation is an attempt to raise a claim based on separation of powers concerns, that also is unavailing.  *See infra* Part III.

## IV.     Plaintiffs Have Not Alleged A Violation Of The Take Care Clause

Finally, Plaintiffs' claim that the challenged actions violate Article II's Take Care Clause, FAC ¶¶ 172-77, is legally deficient.  "Whether claims brought directly under the Take Care Clause are even justiciable is open to debate." *Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018); *see also New York*, 767 F. Supp. 3d at 81. Moreover, as this Court has recognized, "Plaintiffs' Take Care Clause claim is without merit" because "Plaintiffs do not point to any language in the E.O. that is in contravention of federal law." *New York*, 767 F. Supp. 3d at 81, 82.  And again, Plaintiffs' Take Care Clause claim merely puts constitutional gloss on their APA statutory authority arguments, which fail for the reasons discussed above.  *See Dalton*, 511 U.S. at 473.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the First Amended Complaint in its entirety.

Dated: July 24, 2025
        New York, New York

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
(D.C. Bar No. 988057)
Senior Trial Counsel
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

JAY CLAYTON
United States Attorney

By: */s/ Jeffrey Oestericher*
JEFFREY OESTERICHER
REBECCA S. TINIO
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2695/2774
Email: jeffrey.oestericher@usdoj.gov
        rebecca.tinio@usdoj.gov

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8315 words.