# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al*.,

              Plaintiffs,

     v.

DONALD J. TRUMP, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED
STATES, *et al.*,

              Defendants.

C.A. No. 1:25-cv-1144 (JAV)

**PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

PROCEDURAL HISTORY ............................................................................................. 2

    A.    The Pleadings............................................................................................ 2

    B.    The PI Order ............................................................................................. 4

ARGUMENT .................................................................................................................. 6

I.     THE STATES HAVE STANDING TO BRING THIS ACTION ......................................... 6

    A.    The States Suffer Injury-In-Fact from Defendants' Inadequate Onboarding
         Process ...................................................................................................... 7

    B.    The States Suffer Injury-In-Fact from Implementation of the Engagement Plan.....11

II.    THE STATES ADEQUATELY PLEAD THEIR APA CLAIMS........................................ 13

    A.    The States' APA Claims Challenge Final Agency Action............................. 13

        1.    The Challenged Onboarding Process Constitutes Final Agency Action........... 13

        2.    The Change in Treasury's Role in Processing Payment Requests
             Constitutes Final Agency Action .................................................... 15

    B.    The States Adequately Plead that the Engagement Plan is Arbitrary and
        Capricious ............................................................................................... 16

        1.    The FAC Plausibly Alleges that the Onboarding Process is Arbitrary and
             Capricious ...................................................................................... 16

        2.    The FAC Plausibly Alleges the Change in Treasury's Historic Limited
             Role Reviewing Payment Instructions is Arbitrary and Capricious ................. 17

    C.    The States Adequately Plead that the Engagement Plan is Contrary to Law........... 20

        1.    The Engagement Plan Is Contrary to FISMA................................................ 21

        2.    The Engagement Plan is Contrary to Conflicts of Interest Statutes and
             Regulations .................................................................................... 24

        3.    The Engagement Plan is Contrary to Congressional Appropriations ................ 25

III.   THE STATES ADEQUATELY PLEAD THE ENGAGEMENT PLAN VIOLATES THE
     CONSTITUTION (SEPARATION OF POWERS DOCTRINE AND TAKE CARE
     CLAUSE) ................................................................................................... 26

CONCLUSION............................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Star Grp., Inc. v. Northland Energy Trading, LLC*,
No. 21-797, 2023 WL 8613525 (2d Cir. Dec. 13, 2023)........................................................16

*AFSCME v. SSA*,
778 F. Supp. 3d 685 (D. Md. 2025) ..................................................................................14

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)...........................................................................................................9

*Am. Council of Blind of N.Y., Inc. v. City of New York*,
495 F. Supp. 3d 211 (S.D.N.Y. 2020)................................................................................9

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
777 F. Supp. 3d 253 (S.D.N.Y. 2025)...........................................................................15, 17

*Am. Fed'n of Tchrs. v. Bessent*,
No. 25-1282, __ F.4th __, 2025 WL 2313244 (4th Cir. Aug. 12, 2025) .......................... 13-14

*Bell v. Wolfish*,
441 U.S. 520 (1979)........................................................................................................10

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................................................................................13, 20

*Biden v. Texas*,
597 U.S. 785 (2022).......................................................................................................15

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979).......................................................................................................20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).....................................................................................................7, 12

*Clarke v. Sec. Industry Ass'n*,
479 U.S. 388 (1987).......................................................................................................20

*Clinton v. City of New York*,
524 U.S. 417 (1998).......................................................................................................27

*Cobell v. Kempthorne,*
 455 F.3d 301 (D.C. Cir. 2006) ................................................................22

*Ctr. for Biological Diversity v. Bernhardt,*
 946 F.3d 553 (9th Cir. 2019) ................................................................27

*Dalton v. Specter,*
 511 U.S. 462 (1994) ...............................................................................27

*Dep't of Com. v. New York,*
 588 U.S. 752 (2019) ...........................................................................18, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
 591 U.S. 1 (2020) ...................................................................................18

*E. Bay Sanctuary Covenant v. Garland,*
 994 F.3d 962 (9th Cir. 2020) ................................................................20

*Elias Bochner, 287 7th Ave. Realty LLC v. City of New York,*
 118 F.4th 505 (2d Cir. 2024) ................................................................13

*F.T.C. v. Cuban Exch., Inc.,*
 No. 12-cv-5890, 2014 WL 3756358 (E.D.N.Y. July 30, 2014)................10

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ............................................................................ 18-19

*FCC v. NextWave Personal Commn's Inc.,*
 537 U.S. 293 (2003) ...............................................................................20

*Ferguson v. Ashcroft,*
 248 F. Supp. 2d 547 (M.D. La. 2003) ....................................................20

*Fountain v. Karim,*
 838 F.3d 129 (2d Cir. 2016) ..................................................................25

*Gen. Elec. Co. v. EPA,*
 290 F.3d 377 (D.C. Cir. 2002) ..............................................................15

*In re Aiken Cnty.,*
 725 F.3d 255 (D.C. Cir. 2013) ..............................................................26

*In re U.S. Off. of Personnel Mgmt. Data Sec. Breach Lit.,*
 928 F.3d 42 (D.C. Cir. 2019) ................................................................22

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012)................................................................................ 10-11

*Lamberty v. Conn. State Police Union*,
    No. 21-1275, 2022 WL 319841 (2d Cir. Feb. 3, 2022) ...................................8

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...................................................................................20

*Massachusetts v. EPA*,
    549 U.S. 497 (2007).....................................................................................7

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)......................................................................8-9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................................18

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021)........................................................10

*Nat'l Leased Housing Ass'n v. HUD*,
    No. 03-cv-1509, 2007 WL 148829 (D.D.C. Jan. 16, 2007)..........................26

*New York v. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020).........................................................................18

*New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025).........................................................4-5

*New York v. Trump*,
    769 F. Supp. 3d 119(D.R.I. 2025) ..............................................................19

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)....................................................................................10

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020)....................................................................23

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................18

*Schaghticoke Tribal Nation v. Kempthorne*,
    587 F.3d 132 (2d Cir. 2009)........................................................................20

iv

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ........................................................................27

*Social Security Admin. v. AFSCME*,
    145 S. Ct. 1626 (2025) ............................................................................ 13-14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................6, 12

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................7, 12

*Town of Orangetown v. Ruckelshaus*,
    740 F.2d 185 (2d Cir. 1984) .........................................................................19

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ....................................................................................8

*United States v. Hakim*,
    462 F. Supp. 3d 418 (S.D.N.Y. 2020) ...............................................................9

*United States v. N.Y.C. Transit Auth.*,
    97 F.3d 672 (1996) .....................................................................................9

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ..................................................................................26

*Welborn v. Internal Revenue Service*,
    218 F. Supp. 3d 64 (D.D.C. 2016) .................................................................22

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .............................................................................. 10-11

*Widakuswara v. Lake*,
    773 F. Supp. 3d 46 (S.D.N.Y. 2025) ...............................................................27

*Youngstown Sheet & Tube Co. v. Sawyer*,
    103 F. Supp. 569 (D.D.C. 1952) ...................................................................26

**Constitutions**

U.S. Const.
    art. II, § 3..............................................................................................26

**Federal Statutes**

5 U.S.C.
    § 701.................................................................................................22
    § 706.................................................................................................20

18 U.S.C.
    § 207.................................................................................................24
    § 208.............................................................................................24, 25

26 U.S.C.
    §§ 7213............................................................................................24

44 U.S.C.
    § 3501...............................................................................................22
    § 3551...............................................................................................21
    § 3554...............................................................................................23

## INTRODUCTION

Plaintiffs[1] commenced this action in response to Defendants' unprecedented disclosure of the States' confidential information to a team of Department of Government Efficiency ("DOGE") employees embedded at Treasury to develop an automated process that will flag and block disbursements of appropriated funds based on ideology. The Court previously granted the States' motion for a preliminary injunction ("PI") to enjoin such disclosure because Defendants failed to provide the DOGE team with adequate training, vetting, or supervision, and so held that the States are likely to succeed in proving Defendants' conduct was arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

In moving to dismiss this action, Defendants principally argue that because they have revamped their onboarding process for the DOGE team to comply with the Court's PI order, the States no longer have any injury-in-fact and the case is therefore moot. But it is well settled that a defendant's voluntary cessation of wrongful conduct in response to a lawsuit does not render a case moot where, as here, it is not *absolutely clear* that the wrongful conduct will not recur. The States continue to suffer injury-in-fact because Defendants can easily resume their rushed and chaotic onboarding of DOGE employees at a moment's notice, and they have given no assurances to guard against that outcome if they are not enjoined. Indeed, Defendants continue to defend the legality of their past conduct, both on this motion and through their appeal of the Court's PI order.

In addition to adequately pleading their arbitrary and capricious claim under the APA based on Defendants' slipshod onboarding process, the States' first amended complaint (ECF No. 155)

---

[1] The Plaintiffs are the States of New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, North Carolina, Oregon, Rhode Island, Vermont, and Wisconsin, and the Commonwealth of Massachusetts (collectively "States").

("FAC") plausibly alleges that Defendants' implementation of their plan to develop an automated process to flag and block funding on ideological grounds supports multiple additional legal claims. **First**, the FAC provides additional grounds for finding Defendants' conduct arbitrary and capricious because the plan represents a drastic shift in longstanding Treasury policy for which Defendants provide no reasoned explanation. **Second**, implementation of the plan is contrary to law in violation of the APA because it violates the Federal Information Security Management Act ("FISMA") and ethical rules that apply to all federal employees. **Third**, it undermines Congress's role in appropriating funds in violation of the Separation of Powers Doctrine. And **fourth**, for the same reason, it violates the Take Care Clause.

As the States plausibly allege in the FAC sufficient grounds for sustaining all these claims, Defendants' motion should be denied.

## PROCEDURAL HISTORY

### A. *The Pleadings*

The States commenced this action on February 7, 2025, by filing a complaint for declaratory relief ("Complaint" or "Compl.") (ECF No. 1) and a motion for a temporary restraining order ("TRO") (ECF Nos. 3-5). The States alleged that the Bureau of the Fiscal Service ("BFS") had recently granted DOGE employees onboarded at Treasury (hereafter "Treasury DOGE Team") broad, unfettered access to BFS systems, including systems containing the States' confidential information, without any vetting, training, or security measures, contravening decades of Treasury policy that restricted such access to a limited number of career civil servants. Compl. ¶¶3-10, 134.

The States filed the FAC on May 23, 2025 (ECF No. 155). As alleged in the FAC, Treasury is responsible for maintaining the States' sensitive banking and other confidential financial information, and for using that information to disburse federal funds owed to the States. FAC ¶59. Historically, BFS's role within Treasury was limited to checking payment requests against various

"Do Not Pay" databases maintained by Treasury, but it otherwise had no substantive role in determining whether a payment was proper. *Id.* ¶¶64-65, 113-118.

Immediately after the DOGE Team was embedded at Treasury, there were information security violations that put the States' confidential information at risk; DOGE employee Marko Elez was haphazardly given permission to make edits to a sensitive BFS database, sent confidential Treasury data to federal employees outside of Treasury, and impermissibly took screenshots of Treasury data, all within days of starting his position. *Id.* ¶¶83-85. All of this was done without meaningful (legally required) oversight from Treasury. *Id.* ¶¶89-91. Elez was never sanctioned for his information security violations; rather, he left Treasury only to be rehired to the DOGE team at Health and Human Services ("HHS"). *Id.* ¶85-86. An investigation by the Treasury Inspector General into DOGE's access to Treasury systems is ongoing. *Id.* ¶92. Across the federal government, DOGE employees have engaged in behavior that puts the confidential information of the federal government, the States, and their residents at risk. *Id.* ¶¶104-110.

In addition to lax information security, Defendants have also failed to address vulnerabilities stemming from the Treasury DOGE Team members' ongoing conflicts of interest. In particular, DOGE employee Tom Krause continues to hold shares in companies Treasury regulates, such as Intuit and TurboTax, and also remains employed by Cloud Software Group. *Id.* ¶¶95-97. Two other Treasury DOGE Team members also hold shares in Intuit. *Id.* ¶98.

DOGE's purpose at Treasury is to implement the Engagement Plan, which aims to create an automated process for pausing and blocking payments to the States and others on ideological grounds if those payments do not align with the President's political agenda. *Id.* ¶¶119-124. The Engagement Plan dramatically changes Treasury's historically passive role from "America's checkbook," *id.* ¶114, to an active arbiter of whether payments should be disbursed based on

politics. *Id.* ¶123. The Engagement Plan was already in the early stages of implementation prior to this Court's issuance of the PI order. *Id.* ¶124. Once the Engagement Plan is fully implemented, Treasury will be able to quickly and easily cut off or delay the States' access to funds duly appropriated by Congress merely because the purposes of the funds do not align with the President's political agenda. *Id.* ¶¶123, 125-31.

To address this unlawful conduct, the States assert four causes of action: (i) Defendants have acted arbitrarily and capriciously in violation of the APA by failing to protect the States' sensitive data and by changing Treasury's longstanding policy of leaving substantive review of the propriety of payments to the submitting agency without any reasoned explanation (Count One, *id.* ¶¶138-47); (ii) Defendants have acted contrary to law in violation of the APA by violating laws and regulations governing information security at federal agencies, conflicts of interest, and appropriations laws (Count Two, *id.* ¶¶148-56; and (iii) Defendants have violated the Separation of Powers Doctrine and the Take Care Clause because the Engagement Plan usurps Congress's power of the purse and ignores duly enacted appropriations laws (Count Three, *id.* ¶¶157-70, Count Four, *id.* ¶¶171-77).

### B.  *The PI Order*

On February 21, 2025, the Court granted the States' motion for a PI, "restrain[ing] … access to any Treasury Department payment record, payment systems, or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees," including the States, to any Treasury DOGE Team member pending further order of the Court. *New York v. Trump*, 767 F. Supp. 3d 44, 55, 85 (S.D.N.Y. 2025) ("February Order"), *opinion modified on denial of reconsideration*, 778 F. Supp. 3d 578 (S.D.N.Y. 2025) ("April Order"), *and modified*, No. 25-cv-1144, 2025 WL 1504697 (S.D.N.Y. May 27, 2025) ("May Order").

First addressing the States' Article III standing, the Court held that the States "have adequately alleged both past harm in the unauthorized disclosure of the States' confidential financial information to the [Treasury] DOGE Team, and the risk of future harm, in the risk of exposure of their confidential information to officials of USDS/DOGE and to the public through potential hacking," finding that such "unauthorized disclosure of the States' confidential information is an intangible harm that is 'traditionally recognized as providing a basis for lawsuits in American courts.'" February Order, 767 F. Supp. 3d at 67 (quoting *Bohnak v. Marsh & McLennan Companies*, *Inc.*, 79 F.4th 276, 285 (2d Cir. 2023)). The Court further held, "[m]ore fundamentally, there is a realistic danger that the rushed and ad hoc process that has been employed to date by the Treasury DOGE Team has increased the risk of exposure of the States' information." February Order, 767 F. Supp. 3d at 68.

Turning to the likelihood of success on the States' APA claims, the Court held the challenged agency action—the decision by the Treasury Department to provide DOGE Team members "unprecedented access to the BFS payment systems pursuant to [the] Engagement Plan"—was a "consummated" "concrete action" constituting final agency action subject to review under the APA. *Id*. at 76-78. The Court determined "that Plaintiffs will more likely than not succeed in establishing that the agency's processes for permitting the Treasury DOGE Team access to critical BFS payment systems, with full knowledge of the serious risks that access entailed, was arbitrary and capricious," finding that the agency's conduct "all but ensured that the launch of the Treasury DOGE Team was chaotic and haphazard." *Id*. at 79.

The Court otherwise concluded that the States were unlikely to prevail on their remaining APA claims or their claims that Defendants' conduct was *ultra vires* and violated the Separation of Powers Doctrine and the Take Care Clause. *Id.* at 71-75, 80-82.

5

On Defendants' motion, supported by "12 declarations spanning 54 pages," the Court held the Defendants' "extensive submissions … largely alleviate[d]" its concerns over inadequate training, vetting, hiring authority, and supervision, and therefore modified the PI on April 11, 2025, to permit access to BFS systems and records by Treasury DOGE Team member Ryan Wunderly, provided that he "first completes any hands-on training … typically required of other Treasury employees granted commensurate access" and first submits the required financial disclosure report. April Order, 778 F. Supp. 3d at 591-96.

On May 1, 2025, Defendants filed a motion seeking to dissolve the PI in its entirety, supported by declarations purporting to show that four more Treasury DOGE Team members "had been subjected to the same vetting as other Treasury employees, had received the same training as [Ryan] Wunderly, and would be subject to the same mitigation procedures." May Order, 2025 WL 1504697, at *2. The Court declined to dissolve the PI, holding that "Plaintiffs have established their entitlement to injunctive relief pursuant to Rule 65" and thus need not "simply rely on Defendants' assurances that they will continue to comply with the practices that have been put in place in the absence of a [court] mandate." *Id*. at *3. Instead, the Court modified the PI to require that newly-onboarded Treasury DOGE Team members meet the same requirements and be subject to the same mitigation, hiring, and supervision protocols as required under the Court's April Order, but without requiring Defendants to seek leave of court to add new team members. *Id*.

## ARGUMENT

## I.    THE STATES HAVE STANDING TO BRING THIS ACTION

To have standing under Article III, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). And a state plaintiff is owed "special solicitude" when assessing Article III standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

To establish injury-in-fact, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). A plaintiff may allege a "future injury" if he or she shows that the threatened injury is "certainly impending," or there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quotation omitted).

### A.  *The States Suffer Injury-In-Fact from Defendants' Inadequate Onboarding Process*

In granting the States' PI motion, the Court has already determined that the States' allegations concerning Defendants' onboarding process for the Treasury DOGE Team are likely to satisfy Article III. *See* February Order, 767 F. Supp. 3d at 67 ("Plaintiffs have adequately alleged both past harm in the unauthorized disclosure of the States' confidential financial information to the DOGE Team, and the risk of future harm, in the risk of exposure of their confidential information to officials of USDS/DOGE and to the public through potential hacking.").[2]

The Court further held that the States met the causation and redressability requirements because they "have adequately shown that 'but for' the Engagement Plan allowing undertrained DOGE Team members unusually broad access to sensitive Treasury data, … the States' financial data would not be at a higher risk of being exposed …." *Id*. at 69.

---

[2] Recent reporting also shows that DOGE's security violations continue apace, with the DOGE team implanted in the Social Security Administration (SSA) accused by SSA's chief data officer in a whistleblower report of "copy[ing] … a crucial Social Security database in June to a vulnerable cloud server" and other information security violations. Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk*, *Whistle-Blower Says*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html.

The full whistleblower report is available at
https://static01.nyt.com/newsgraphics/documenttools/a9f2afd18a79e330/b181d62a-full.pdf.

Defendants argue the States "no longer" have standing because Treasury has subsequently "implemented adequate vetting, clearance, training, and mitigation procedures to address" the Court's concerns. Defendants' Memorandum of Law (ECF No. 166) ("Defs. MOL") at 8. The Court effectively rejected this same argument in denying Defendants' motion to dissolve the PI in its entirety, holding that "Plaintiffs are not obligated to simply rely on Defendants' assurances that they will continue to comply with the practices that have been put in place in the absence of a [court] mandate." May Order, 2025 WL 1504697, at *3. In any event, Defendants' argument fails under the well-settled voluntary cessation doctrine.

"[V]oluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia*, *Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (quoting *Friends of the Earth*, *Inc. v. Laidlaw Env't Services (TOC)*, *Inc.*, 528 U.S. 167, 189 (2000)); *see also Lamberty v. Conn. State Police Union*, No. 21-1275, 2022 WL 319841, at *2 (2d Cir. Feb. 3, 2022) (summary order). "This is both a stringent and a formidable burden.". *Mhany Mgmt.*, *Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603-04 (2d Cir. 2016) (citations omitted). Defendants seek to avoid this onerous burden by omitting any mention of "voluntary cessation" and recasting their argument as an inability of the States to "show a concrete injury-in-fact" that is "certainly impending" and "not speculative." Defs. MOL at 9. Their obfuscation is unavailing; the crux of their argument is that they have cured the deficiencies in the onboarding process giving rise to the States' injury-in-fact through the changed practices identified in their declarations—in other words, through the actions taken to comply with the PI upon threat of contempt.

Defendants also have not met their "formidable burden" of showing that it is "absolutely clear" that Treasury will not resume the prior rushed and chaotic onboarding process identified by

the Court. *Mhany Mgmt.*, 819 F.3d at 604 (quoting *Laidlaw*, 528 U.S. at 190). As the Second Circuit has repeatedly held, the suspicious timing of a party's voluntary cessation weighs against finding mootness. *See*, *e.g.*, *id.* (noting suspicious timing because the defendant ceased its unlawful conduct "only on the eve of summary judgment motions"); *United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (1996) ("We also think it is significant that the change of policy was instituted on the eve of the lawsuit."). "That is because such timing suggests a litigation-driven motivation, as opposed to an authentic, durable commitment on the part of the defendant to mend its ways." *Am. Council of Blind of N.Y.*, *Inc. v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020). Here, Defendants' implementation of Treasury's new onboarding process for the Treasury DOGE Team is purely based on a "litigation-driven motivation" to satisfy the Court's concerns in order to pursue the Engagement Plan without delay. *Id.*; *see also United States v. Hakim*, 462 F. Supp. 3d 418, 433-34 (S.D.N.Y. 2020) (noting "[c]ourts should be particularly cautious when faced with corrective measures that appear to take place in anticipation of or *in reaction to legal action*" (emphasis added)) (citing *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952)).

Moreover, Defendants have "not pointed to any safeguards that would prevent the new [onboarding process] from being changed, rescinded, or honored in the breach." *Am. Council of Blind*, 495 F. Supp. 3d at 248. Rather, "[o]n the record before the Court, [Treasury] is at liberty to reverse or revise" the onboarding process "through a superseding memorandum or by other means." *Id.* at 249.[3] Given Defendants' own admissions of rushed and inadequate onboarding procedures, including lack of training regarding the handling of sensitive government information and lapses like inadvertently providing at least one DOGE Team member read/write access to

---

[3] The record here stands in stark contrast to the record in *Already*, *LLC v. Nike*, *Inc.*, 568 U.S. 85, 93 (2013), where the Court found the case moot because there was an "unconditional and irrevocable" covenant that prevented allegedly unlawful activity from recurring.

BFS's systems, February Order, 767 F. Supp. 3d at 79, the "few assurances from Defendants" about maintaining the new onboarding process fall far short of making it "absolutely clear that the alleged conduct would not recur on other occasions." *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516-17 (S.D.N.Y. 2021) (cleaned up); *see also F.T.C. v. Cuban Exch., Inc.*, No. 12-cv-5890, 2014 WL 3756358, at *4 (E.D.N.Y. July 30, 2014) (holding "absent permanent injunctive relief there is nothing to stop defendants from" reverting to their wrongful conduct).

Indeed, Defendants maintain that their pre-litigation conduct was not arbitrary and capricious, *see* Defs. MOL at 4 n.1, and are appealing the PI orders, ECF No. 169. Their continuing efforts to "defend the legality" of their prior conduct demonstrate that, in the absence of a permanent injunction, they "would [not] necessarily refrain" from resuming their prior unlawful conduct. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012); *see also West Virginia v. EPA*, 597 U.S. 697, 720 (2022) ("We do not dismiss a case as moot" where the government "vigorously defends the legality" of its prior conduct) (cleaned up); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (holding case is not moot where the defendant "vigorously defends the constitutionality of its" conduct "and nowhere suggests that if th[e] litigation is resolved in its favor it will not resume" its prior practices); *Bell v. Wolfish*, 441 U.S. 520, 542 n.25 (1979) ("That petitioners were able to comply with the District Court order also does not make this case moot, because petitioners *still dispute the legality of the court's order* …. ") (emphasis added).

Where, as here, Defendants vigorously defend their prior challenged conduct and fail to establish any effective barrier to resuming such conduct, they do not carry their stringent and

formidable burden of demonstrating with absolute clarity that the conduct could not recur. *Knox*, 567 U.S. at 307; *West Virginia*, 597 U.S. at 720.

## B. The States Suffer Injury-In-Fact from Implementation of the Engagement Plan

The stated purpose for providing the Treasury DOGE Team with broad access to BFS systems and data is to implement the Engagement Plan. FAC ¶¶119-124. Under the Engagement Plan, the Treasury DOGE Team will create, and Treasury will implement, an automated process to flag payment instructions for further review by the submitting agency under an ideological litmus test to determine if the payment aligns with the President's agenda and should be certified or blocked. *Id*. ¶¶121-22.

The Engagement Plan marks a drastic change from Treasury's longstanding policy and practice; for decades, it was Treasury's policy for BFS to process the disbursement of funds in accordance with the coded data in the payment file as received from the submitting agency, with the submitting agency (not BFS) responsible for reviewing of the propriety of the payment or eligibility of the payee. *Id*. ¶114. BFS historically conducted a limited, ministerial review of payment files, managed by career civil servants, to ensure that requested payments are successfully and securely processed and to ensure the integrity of BFS's systems, insulated from political pressures or policy interests. *Id*. ¶¶115, 118. Treasury's implementation of the Engagement Plan will create a model to alter the IT systems currently in place at BFS to effectuate the selection of particularly labeled payments files according to ideological criteria. *Id*. ¶¶122-23. Carrying out the Engagement Plan, the Treasury DOGE Team will develop an automated process to flag payment files in the "pre-edit phase" for further review based on "certain Treasury Account Symbols" that would signal the payment was suspect, *i.e.*, may not align ideologically with the President's priorities and possibly should be blocked. *Id*. ¶123.

Treasury's implementation of the Engagement Plan causes the States to suffer injury-in-fact, most particularly for the billions of dollars in federal funds the States receive from Treasury on a reimbursement model—where the States pay out funds for state-administered federal programs from their state treasuries and on the back end seek reimbursement from Treasury through the federal government's funding portal system. *Id.* ¶126. Examples of federal programs that work on a reimbursement model include programs administered by FEMA, the Department of Energy, the EPA, the Federal Highway Administration, and HHS. *Id.* ¶127. Even if funding to the States is merely paused, but not ultimately blocked, there will be concrete injury to the States because under the many federal programs that operate on a reimbursement model, any delay in disbursing payment deprives the States of critical funds required for other budget items. *Id.* ¶131. This harm of "future injury" satisfies the standing requirement because the threatened injury is "certainly impending," or there is a "substantial risk that the harm will occur." *Susan B. Anthony*, 573 U.S. at 158 (quotation omitted); *see also Clapper*, 568 U.S. at 409, 414 n.5 (2013).

Additionally, there can be no serious doubt that this future injury "is fairly traceable" to Defendants' implementation of the Engagement Plan and is "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560-61). The Engagement Plan drastically alters BFS's historically limited role in reviewing payment files and creates the automated process for flagging and potentially blocking the disbursement of funds to the States on purely ideological grounds. As with the States' injury-in-fact arising from "the Engagement Plan allowing undertrained DOGE Team members unusually broad access to sensitive Treasury data," February Order, 767 F. Supp. 3d at 69, the separate harm to the States resulting from the threatened delay of funding disbursements attributable to the automated ideological review process would not arise but for the Engagement Plan, and will be sufficiently redressed if the Court enjoins Treasury

from the Engagement Plan's continued implementation. *See Elias Bochner*, *287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024) (holding the injunction need not "completely redress the asserted injury," but only remediate it to a sufficient degree to eliminate any effects of the challenged conduct).

## II.    THE STATES ADEQUATELY PLEAD THEIR APA CLAIMS

### A.    *The States' APA Claims Challenge Final Agency Action*

Agency conduct is deemed a final agency action subject to review under the APA where it "mark[s] the 'consummation' of the agency's decision-making process—[and is not] of a merely tentative or interlocutory nature," and is a determination "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & S. Air Lines*, *Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Both the Defendants' onboarding procedures for the Treasury DOGE Team and the implementation of the Engagement Plan are discrete final agency actions subject to APA review for the reasons described below.

#### 1.    The Challenged Onboarding Process Constitutes Final Agency Action

The Court has already determined in granting the States' PI motion that the Defendants' adoption of the DOGE onboarding process is a final agency action subject to APA review because Treasury in fact "implemented" the process and the alleged harms to the States—the disclosure of the States' confidential information and risk of future disclosures—are "concrete consequences that flow from the challenged agency action." February Order, 767 F. Supp. 3d at 76-77.

Defendants urge the Court to revisit this prior determination based on two other cases involving agency disclosures to DOGE teams. Defs. MOL at 13-14. Those cases, *Am. Fed. of Tchrs.* ("*AFT*"), *v. Bessent*, No. 25-cv-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025), and *Social*

*Security Admin. v. AFSCME*, 145 S. Ct. 1626 (2025) ("*SSA*"), are inapposite. In *SSA*, a majority of the Supreme Court issued an administrative stay of the district court's injunction without any reasoning at all, so it is impossible to know what the majority thought about the issue of final agency action, if anything. 145 S. Ct. at 1626. There is certainly no basis to conclude from the Court's short order that the majority necessarily disagreed with the district court's determination that the agency's decision to grant the DOGE Team access to personal identifying information of millions of Americans "falls within the ambit of a final agency action." *AFSCME v. SSA*, 778 F. Supp. 3d 685, 757 (D. Md. 2025).

Similarly, the two-judge majority in *AFT v. Bessent*, writing separately in concurring opinions, did not reach any determination on the issue of final agency action. Instead, both judges applied Fourth Circuit precedent (not binding here) to conclude that the government is likely to succeed in showing the non-state plaintiffs lacked standing and, for that reason, voted to grant the government's emergency motion to stay the lower court's injunction pending appeal. 2025 WL 1023638, at *1-3. Indeed, one member of the majority expressly stated he did "not hold firm views on" any other issue aside from standing, including whether there is final agency action. *Id*. at *5.

In the panel's later merits decision issued on August 12, 2025, the same two-judge majority vacated the district court's injunction still based on an analysis of Article III standing under the "likelihood of success" factor applicable on a PI motion. *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, __ F.4th __, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025). With respect to final agency action, the majority in *dicta* stated the answer was "uncertain at best" given the "lack of clear precedent in this area," and therefore concluded the district court could not "definitively find final agency action" sufficient to satisfy the more onerous likelihood of success standard. *Id*. at *7-8.

14

The decision has no bearing on the very different issue presented here—whether the FAC plausibly alleges final agency action under the more lenient Rule 12(b)(6) pleading standard.

### 2. The Change in Treasury's Role in Processing Payment Requests Constitutes Final Agency Action

Under the Engagement Plan, Treasury DOGE Team members are tasked with developing an automated process to flag payment instructions in the "landing zone" based on ideological criteria. FAC ¶123. This is final agency action subject to challenge under the APA.

First, as the Court previously held, the decision to implement the Engagement Plan has been "consummated"—that is, "the agency has reached a decision on the issue" of implementing the plan "and effectuated it in some manner." February Order, 767 F. Supp. 3d at 76. In fact, as Defendants concede in their submitted declarations, the automated process to pause and flag payment requests based on ideological criteria is already in operation; multiple payment instructions were flagged and paused for further review by the submitting agency using the automated process.  ECF No. 32 (Robinson Decl. ¶13-14); FAC ¶124.

Second, it is equally clear that the implementation of the Engagement Plan has legal consequences and determines rights and obligations because at a minimum the result of using this new process is to delay disbursement of appropriated funds to the States. *See supra* at 11-13.

Accordingly, the implementation of the automated process developed by the Treasury DOGE Team pursuant to the Engagement Plan is final agency action. *See Biden v. Texas*, 597 U.S. 785, 807-08 (2022) (holding that program termination decision that "bound DHS staff" was final agency action) (quotation omitted); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding or is applied by the agency in a way that indicates that it is binding.") (citations omitted); *Am. Fed'n of Gov't Emps.*, *AFL-CIO v. U.S. Off. of Pers. Mgmt.*,

777 F. Supp. 3d 253, 279 (S.D.N.Y. 2025) ("The complaint adequately alleges that OPM engaged in a final agency action when it abruptly changed its longstanding practices by giving access to sensitive and legally protected records in violation of those practices, federal statutes, and even the terms of the DOGE Executive Order.").

### B. The States Adequately Plead that the Engagement Plan is Arbitrary and Capricious

The States plausibly allege that by implementing the Engagement Plan, the Defendants have acted in an arbitrary and capricious manner in violation of the APA in two ways. First, as the Court has already held the States are likely to prove, the Defendants' rushed and chaotic process for onboarding the Treasury DOGE Team is arbitrary and capricious. Second, Defendants fail to provide a reasoned explanation for drastically altering Treasury's longstanding policy of conducting only a limited, ministerial review of payment instructions in violation of the change-in-position doctrine.

### 1. The FAC Plausibly Alleges that the Onboarding Process is Arbitrary and Capricious

The Court has already determined, based on facts alleged in the original complaint that are repeated in the FAC, that the States are likely to succeed in proving the Defendants' onboarding process for the Treasury DOGE Team is arbitrary and capricious. *See* February Order, 767 F. Supp. 3d at 79. *A fortiori*, the States have sufficiently pleaded this claim to survive a motion to dismiss, where their burden is merely to allege "sufficient facts to state a plausible claim to relief" rather than show a likelihood of success. *A Star Grp.*, *Inc. v. Northland Energy Trading*, *LLC*, No. 21-797, 2023 WL 8613525, at *1 (2d Cir. Dec. 13, 2023).

Defendants argue that their revamped process for onboarding the Treasury DOGE Team in response to the PI is "dispositive of Plaintiffs' allegations" that the onboarding process is arbitrary and capricious. Defs. MOL at 17. But for the same reason this argument does not defeat

standing based on the application of the voluntary cessation doctrine, it also does not overcome the Court's prior holding that the States are likely to succeed in proving the onboarding process is "arbitrary and capricious" under the APA. *See supra* at Part I.A; *see also Am. Fed. of Gov't Employees*, 777 F. Supp. 3d at 279 (holding allegations that, in granting DOGE employees access to records, the agency "rushed the onboarding process, omitted crucial security practices, and thereby placed the security of" the agency's record "at grave risk" adequately pleaded the agency "violated the APA by acting in an arbitrary and capricious manner").

### 2. The FAC Plausibly Alleges the Change in Treasury's Historic Limited Role Reviewing Payment Instructions is Arbitrary and Capricious

Prior to the implementation of the Engagement Plan, it was the longstanding policy at Treasury for BFS to process the disbursement of funds in accordance with the coded data in the payment file as received from the submitting agency, with the submitting agency (and not BFS) bearing the responsibility of conducting a review of the propriety of the payment except for screening through the "Do Not Pay" working system. FAC ¶114. In other words, until Treasury began to implement the Engagement Plan, it was the policy that "the agency responsible for making the payment always drives the payment process." *Id.* Under this longstanding policy, which ensures insulation from political pressures, BFS staff—comprised of career civil servants— do not independently determine the propriety of a payment instruction because that is the responsibility of the submitting agencies with respect to the specific laws and regulations governing their funding programs. *Id*. ¶¶115, 118.

In a stark departure from this longstanding policy, the purpose of Defendants' Engagement Plan—which requires providing the Treasury DOGE Team with broad and unprecedented access to BFS's systems and data—is to create an automated system by which *Treasury and not the*

*submitting agency* would flag and pause payment requests *on ideological or other inappropriate grounds* for the purpose of facilitating the President's policy agenda on funding. *Id*. ¶¶120-23.

The APA directs a court to set aside an agency action that is not the product of "reasoned decisionmaking" and is "arbitrary and capricious." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation omitted). Though the scope of the Court's review under this standard is narrow, its inquiry must nevertheless be "searching and careful" to ensure that the agency has provided a genuine justification that supports its actions. *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 81 (2d Cir. 2020) (quotation omitted). The arbitrary and capricious standard "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct." *Saget v. Trump*, 375 F. Supp. 3d 280, 355 (E.D.N.Y. 2019) (collecting cases). When undertaking its "searching and careful" inquiry, a court must determine whether the agency provided a genuine justification for the action that is consistent with the evidence before it. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). In doing so, a court considers only the justifications that an agency provided when it implemented the policy; it does not consider any *post hoc* rationalizations that an agency may rely on to support its decision with the benefit of hindsight. *See Regents of the Univ. of California*, 591 U.S. at 20-21. And the court considers whether the policy is a reasonable response to the agency's stated goals in light of the facts before it and the scope of its statutory authority. *See*, *e.g.*, *Dep't of Com.*, 588 U.S. at 785; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where, as here, the policy reflects an agency's departure from its longstanding practice, the agency cannot "depart from a prior policy *sub silentio*" or simply disregard its prior practice. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, the agency must also "display awareness that it

is changing positions" and show that "there are good reasons for the new policy." *Id*. Defendants have failed to do so here.

Defendants' stated objective for implementing the Engagement Plan—to create an automated process that will pause payment requests on ideological or other inappropriate grounds despite congressional appropriation—is not a legally sufficient explanation to support changing Treasury's longstanding policy of leaving the propriety of payment requests to the submitting agency. Indeed, recently courts have repeatedly enjoined as likely unlawful attempts by the Administration to pause or block funds that have already been appropriated by Congress.[4] *See*, *e.g.*, *New York v. Trump*, 769 F. Supp. 3d 119, 127(D.R.I. 2025) (preliminarily enjoining "[t]he Executive's categorical freeze of appropriated and obligated funds").

Defendants' desire to create an automated process that will pause funds already appropriated by Congress based on an ideological litmus test does not provide the "neutral principle[]" or "reasoned explanation" required to justify the drastic change in Treasury's longstanding policy brought about by implementing the Engagement Plan. *Fox Television Stations*, 556 U.S. at 537 (Kennedy, J., concurring in part and concurring in the judgment). Moreover, such political influence itself can be a basis to find agency action arbitrary and capricious, if the "pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute." *Town of Orangetown v. Ruckelshaus*, 740 F.2d

---

[4] The Court previously rejected the States' change-in-policy APA argument under the original complaint, finding that the "grant of access to BFS payment systems by individuals who were ostensibly Treasury employees but associated with the newly-created DOGE" related to "internal personnel actions [that] are not properly characterized as agency 'policy'" falling within the scope of the change-in-policy doctrine. April Order, 778 F. Supp. 3d at 596. But that holding is not applicable to the argument presented here, where the States' new allegations focus on the change in policy with respect to Treasury's role in reviewing payment instructions rather than who should have access to BFS payment systems.

185, 188 (2d Cir. 1984); *see also Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 134 (2d Cir. 2009).

### C. The States Adequately Plead that the Engagement Plan is Contrary to Law

Agency action is "not in accordance with law" for purposes of 5 U.S.C. § 706(2)(A) where it rests on an impermissible and irrational construction of the law that flies in the face of established agency precedent, conflicts with other important statutory and constitutional protections, and would lead to absurd results. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 979 (9th Cir. 2020); *Ferguson v. Ashcroft*, 248 F. Supp. 2d 547, 572 (M.D. La. 2003). And the prohibition in § 706(2)(A) applies to "*any* law, … not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Personal Commn's Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). This includes criminal statutes, which may form the basis of a contrary to law claim under the APA. *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979) (holding that APA provides for judicial review of agency action that is not in accordance with the Trade Secrets Act, 18 U.S.C. § 1905).[5] An agency's decision to act in violation of law is the type of agency action for which the courts can provide redress. *Id.* at 318-19.

In the FAC, Plaintiffs satisfy their "not … especially demanding" burden, *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399 (1987), of demonstrating that the "interest[s] sought to be protected by the complainant [are] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Bennett*, 520 U.S. at 163 (quotation

---

[5] At several points, Defendants intimate that the lack of a private right of action in FISMA or the relevant conflict statutes should have some bearing on the Court's analysis. Defs. MOL at 21, 23. But that is irrelevant, as the APA provides the right of action. *Chrysler Corp.*, 441 U.S. at 316-18 (1979) (holding that APA review is available even though Trade Secrets Act does not contain a private right of action).

omitted). Specifically, Plaintiffs have pleaded facts sufficient for the Court to determine that Plaintiffs' interests in the continued security of their confidential information held by Defendants and in receipt of timely payments of duly appropriated funds are within the zone of interests sought to be protected by FISMA, the relevant conflicts of interest statutes governing the Treasury DOGE Team, and statutes appropriating funds for programs with which the current Administration disagrees.

### 1. The Engagement Plan Is Contrary to FISMA

The States have adequately alleged that, since the early days of the current Administration, the Treasury DOGE Team repeatedly violated federal information security mandates, putting the States' confidential data at significant risk of exposure. FAC ¶¶82-92. Defendants' arguments sidestep the merits of these violations.

**The States are within the zone of interests of FISMA.** Originally passed as part of the E-Government Act of 2002, Pub. L. 107-347 (Dec. 17, 2002), FISMA is intended to "provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets," 44 U.S.C. § 3551(1), and "provide for development and maintenance of minimum controls required to protect Federal information and information systems." *Id.* § 3551(3). Defendants read these purposes to require that the federal government protect its own information for its own sake, and for no other reason. Defs. MOL at 21. In doing so, Defendants ignore both the language of a later amendment to FISMA, Pub. L. 113-283 (Dec. 18, 2014), and the broader context of the federal government's information security protections.

In 2014, Congress amended FISMA to direct OMB to publish policies and guidelines governing breaches of the federal government's information security systems. Pub. L. 113-283, § 3558 (codified at 44 U.S.C. § 3553 Note). Those policies require the federal agency that is affected

by any such breach to, among other things, provide "notice … to affected individuals, … which shall be provided as expeditiously as practicable and without unreasonable delay after the agency discovers the unauthorized acquisition or access." *Id.* § 3553 Note 2(d)(1)(B). Accordingly, FISMA is directly aimed at protecting the confidential information of not only the federal government, but also that of the States. Defendants' heavy reliance on *Welborn v. Internal Revenue Service*, 218 F. Supp. 3d 64, 81 (D.D.C. 2016), is misplaced because the *Welborn* court, just like Defendants, did not grapple with the 2014 amendments to FISMA and its broader role in the federal government's information collection regime.  Defendants also rely on nearly twenty-year-old *dicta* in *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006), which was decided before the D.C. Circuit determined that FISMA violations could form the basis of a complaint alleging violations of the Privacy Act. *See In re U.S. Off. of Personnel Mgmt. Data Sec. Breach Lit.*, 928 F.3d 42, 62, 67-68 (D.C. Cir. 2019) (holding that plaintiffs' allegations of FISMA compliance failures adequately alleged willful violation of the Privacy Act).

Additionally, Congress has made it clear that confidential information like the States' data maintained by the federal government is subject to the information security protections mandated by FISMA. For example, the Paperwork Reduction Act, which broadly governs the procedures for how and under what circumstances the federal government can collect, use, and share information from individuals and states, was specifically designed to ensure that all such information is subject to "laws relating to … security of information." 44 U.S.C. § 3501(8)(B).

**FISMA does not fall within the APA exception for agency action committed to agency discretion**. Defendants' argument that FISMA is committed to agency discretion by law, and thus unreviewable by this Court under the "quite narrow[]" exception provided in 5 U.S.C. § 701(a)(2), fares no better. *Dep't of Com.*, 588 U.S. at 772 (quotation omitted). Section 701(a)(2) applies only

where either (1) the agency action is one that is traditionally regarded as being within an agency's discretion, such as the decision to commence or settle an enforcement action, or (2) "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642-43 (D.C. Cir. 2020) (quoting *Citizens to Pres. Overton Park*, *Inc. v. Volpe*, 401 U.S. 402, 410 (1971) and holding that agency action in contravention of regulations implementing the Federal Advisory Committee Act is amenable to APA review). But the relevant provision of FISMA that the States allege was violated, 44 U.S.C. § 3554(1)(B)(i), is clear in its mandate: Defendants "*shall ... comply[] with …* information security standards promulgated under section 11331 of title 40," *id.* (emphasis added), which includes the relevant National Institute of Standards and Technology (NIST) standards the States cite to in the FAC. *See* FAC ¶52. The NIST standards are exactly the kind of "meaningful standards to cabin [an] agency's otherwise plenary discretion" that subject the agency's action to review under the APA; either Defendants have complied with the NIST standards or they have not, a determination which this Court is well equipped to make. *Wheeler*, 956 F.3d at 643 (quoting *Drake v. F.A.A.*, 291 F.3d 59, 71 (D.C. Cir. 2002)). Courts have "found meaningful standards to apply 'under far more permissive and indeterminate language'" than that in § 3554(1)(B)(i). *Wheeler*, 956 F.3d at 643 (quotation omitted and collecting cases).

**The States have plausibly alleged a violation of FISMA by the Defendants**. Finally, Defendants argue that the States fail to state a claim because the FAC "does not allege that Treasury has failed to establish an overall information security program in compliance with FISMA." Defs. MOL at 23. But that is not what § 3554(1)(B) demands. Instead, the States have alleged that Defendants violated FISMA by ignoring NIST's standards in their entirety, including those governing who gets access to Treasury's systems and data; how information is protected and

exchanged intra-agency; how internal information security threats are alleviated; and what sanctions flow from a violation of information security requirements by federal employees. FAC ¶¶52, 82-92, 150-51.[6]

### 2. The Engagement Plan is Contrary to Conflicts of Interest Statutes and Regulations

Treasury maintains data for some of the most sensitive information systems containing highly sensitive information—from the IRS databases[7] to sensitive bank information and PII. As part of the federal government's statutory framework to ensure trust in its data system integrity, there are numerous provisions in place to prevent bad actors from gaining unlawful access for maleficent purposes. The conflicts of interest regulations are one such set of insurance measures imposed on federal employees handling sensitive data; transparent disclosures are a necessity to assure stakeholders whose sensitive data is accessible to federal employees of the fair and honest dealings of those handling such information.

**The States are within the zone of interests of the conflicts of interest statutes.** Defendants admit that a purpose of the relevant conflicts of interest statutes, 18 U.S.C. §§ 207 and 208, "is to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the government." Defs. MOL at 24 (quoting *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961)). The States fall within the zone of interests protected by these statutes in two ways: first, because Treasury maintains the States' sensitive confidential

---

[6] *AFL-CIO v. Department of Labor*, cited by Defendants, is not to the contrary; there, the plaintiffs relied on a separate provision of FISMA, § 3554(1)(A), and failed to allege, unlike here, that the defendants had ignored the requirements of FISMA. 778 F. Supp. 3d 56, 85 (D.D.C. 2025).

[7] Notably, unlawful access of data in the IRS systems may subject an individual to criminal penalties. *See*, *e.g.*, 26 U.S.C. §§ 7213, 7213A.

information, which "financially interested" Treasury DOGE Team members may abuse. FAC ¶59. Second, Treasury is responsible for the distribution of an extraordinary volume of funds to the States in furtherance of federally funded programs, which the ideologically driven Engagement Plan puts at risk from "corrupting influences" seeking to sway the Administration in one direction or another. *Id.*

**The States adequately plead that Defendants have acted contrary to 18 U.S.C. § 208.**

Section 208(a) prohibits government employees from "participat[ing] personally and substantially … [in a] particular matter in which, to his knowledge, he … has a financial interest." Plaintiffs have alleged that three Treasury DOGE Team members—Tom Krause, Todd Newnam, and Linda Whitridge—appear to have disqualifying interests in private entities that do significant business with Treasury. FAC ¶¶95-102.[8] Insofar as the Engagement Plan grants these employees the power of pausing payments and tagging disbursements with certain designations, the lack of clarity as to improper motives and self-dealing is particularly troubling. Indeed, Defendants do not dispute that the States have adequately alleged that these employees have made decisions motivated by their personal interests or in alignment with the very conflicts pleaded, allegations that must be accepted as true for purposes of this motion. *See Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016).

### 3.  The Engagement Plan is Contrary to Congressional Appropriations

The States have adequately pleaded that the Engagement Plan is contrary to Congress's duly enacted appropriations laws. In particular, the States identified federally funded programs that operate on a reimbursement model, which, if paused or canceled because of the ideological

---

[8] Reporting since the filing of the FAC also shows that Defendant Bessent has failed to fully divest himself of holdings, including large tracts of farmland, that pose conflicts of interest for his position as Secretary of the Department of the Treasury. *See* Alan Rappeport, *Bessent Has Yet to Fully Divest Assets*, *Raising Concern at Ethics Agency*, N.Y. Times (Aug. 13, 2025), https://www.nytimes.com/2025/08/13/us/politics/scott-bessent-conflicts-of-interest.html? .

criteria imposed under the Engagement Plan, will leave the States holding the bag for these programs. FAC ¶¶59, 125-31.

For example, the States discuss the HHS Foster Care Program, which Congress has *required* the federal government to fund on a reimbursement model. *Id.* ¶129 (citing 42 U.S.C. § 674). Efforts to block or pause payments authorized by the Foster Care Program under the Engagement Plan are contrary to the plain language of the authorizing statute, and thus contrary to law for purposes of the APA. *See Nat'l Leased Housing Ass'n v. HUD*, No. 03-cv-1509, 2007 WL 148829, at *19 (D.D.C. Jan. 16, 2007) (holding that Department of Housing and Urban Development acted contrary to law by failing to comply with relevant appropriations act); *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress.").

III.    **THE STATES ADEQUATELY PLEAD THE ENGAGEMENT PLAN VIOLATES THE CONSTITUTION (SEPARATION OF POWERS DOCTRINE AND TAKE CARE CLAUSE)**

Under the Separation of Powers Doctrine, a court is authorized to enjoin an action by the Executive Branch that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Similarly, the Take Care Clause provides that the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quoting *id.*) ("Under our system of government, Congress makes the laws and the President …'faithfully execute[s]' them.").

Plaintiffs have plausibly alleged that Defendants have violated both the Separation of Powers Doctrine and the Take Care Clause by their implementation of the Engagement Plan to pause and block disbursement of appropriated funds. As the States allege, the Engagement Plan is

an attempt to usurp Congress's power of the purse by contravening appropriations laws. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And by directing that the Engagement Plan be adopted and implemented, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause. *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025). ("Withholding congressionally appropriated funds … simply cannot be construed as following through on [the] constitutional mandate" set forth in the Take Care Clause.).

Defendants cite a single case, *Dalton v. Specter*, 511 U.S. 462 (1994), to support their attempt to construe Plaintiffs' constitutional claims as statutory, but *Dalton* does not support that proposition. *Dalton* held only that the federal government does not "necessarily violate[] the Constitution" when it exceeds the bounds of its statutory authority. *Id.* at 473. That does not mean that action outside the scope of statutory authority can *never* give rise to a constitutional violation. *See Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020) ("*Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not"), *vacated and remanded as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).

Defendants' arguments regarding Plaintiffs' Take Care Clause claim are equally unavailing. Courts have recognized that plaintiffs may invoke the Take Care Clause in litigation. *See*, *e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561-62 (9th Cir. 2019) (considering merits of Take Care claim).

## CONCLUSION

For the foregoing reasons, the States respectfully request that the Court deny Defendants' motion to dismiss the FAC in its entirety.

Dated:  New York, New York
        August 28, 2025

Respectfully submitted,

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

By: */s Andrew Amer*
Andrew Amer
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Colleen K. Faherty
  *Special Trial Counsel*
Stephen C. Thompson
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6127
andrew.amer@ag.ny.gov

*Counsel for the State of New York*

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Michael S. Cohen*
Michael S. Cohen
  *Deputy Attorney General*
Thomas S. Patterson
  *Senior Assistant Attorney General*
Mark R. Beckington
John D. Echeverria
  *Supervising Deputy Attorneys General*
Nicholas Green
Jay Russell
  *Deputy Attorneys General*
California Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6090
Michael.Cohen@doj.ca.gov
*Counsel for the State of California*

**KRISTEN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA

By: */s Joshua D. Bendor*
Joshua D. Bendor
Joshua A. Katz
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**PHIL WEISER**
  ATTORNEY GENERAL OF COLORADO

By: */s Shannon Stevenson*
Shannon Stevenson
  *Solicitor General*
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*

28

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s Matthew Fitzsimmons*
Matthew Fitzsimmons
  *Chief Counsel*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5318
Matthew.fitzsimmons@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF THE STATE OF
DELAWARE

By: /s/ *Vanessa L. Kassab*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s Kalikoʻonālani D. Fernandes*
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead
  *Public Interest Counsel*
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 590-6967
Darren.Kinkead@ilag.gov
*Counsel for the State of Illinois*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: /s/ *Jason Anton*
Jason Anton
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
jason.anton@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s Adam D. Kirschner*
Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6424
akirschner@oag.state.md.us

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
   ATTORNEY GENERAL
   COMMONWEALTH OF MASSACHUSETTS

By: /s/ David C. Kravitz
David C. Kravitz
   *State Solicitor*
One Ashburton Place
Boston, MA 02108
617-963-2427
david.kravitz@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

**AARON D. FORD**
   ATTORNEY GENERAL OF NEVADA

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
   *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**KEITH ELLISON**
   ATTORNEY GENERAL OF MINNESOTA

By: /s *Liz Kramer*
Liz Kramer
   *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
   ATTORNEY GENERAL OF NEW JERSEY

By: /s *David Leit*
David Leit
   *Assistant Attorney General*
(609) 414-4301
david.leit@law.njoag.gov

Kashif Chand
   *Chief, Deputy Attorney General*
(609) 696-5160
kashif.chand@law.njoag.gov
124 Halsey Street
Newark, NJ 07101

*Counsel for the State of New Jersey*

**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
  CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
   *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Alex Carnevale
Alex Carnevale
   *Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**JOSH KAUL**
  ATTORNEY GENERAL OF WISCONSIN

By: /s/ Brian P. Keenan
Brian P. Keenan
   State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us

*Counsel for the State of Wisconsin*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: /s/ Elleanor H. Chin
Elleanor H. Chin
   *Senior Assistant Attorney General*
Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

By: /s/ Jonathan Rose
Jonathan Rose
   *Solicitor General*
Appellate Unit
Office of the Attorney General
109 State Street, 3rd Floor
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**CERTIFICATION**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law in Opposition contains 8,750 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: New York, New York
      August 28, 2025

                                                    LETITIA JAMES
                                                    Attorney General of the State of New York
                                                    By: /s Colleen K. Faherty
                                                    Colleen K. Faherty
                                                       Special Trial Counsel
                                                      28 Liberty Street
                                                    New York, NY 10005
                                                    (212) 416-6046
                                                    Colleen.Faherty@ag.ny.gov