UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW YORK, et al., Plaintiffs, | | 25-CV-1144 (JAV) |
| -v- | | <u>OPINION AND ORDER</u> |
| DONALD TRUMP, et al., Defendants. | | |

JEANNETTE A. VARGAS, United States District Judge:

Nineteen states (collectively, the "States" or "Plaintiffs") bring this suit against President Donald J. Trump, the United States Department of the Treasury ("Treasury"), and Secretary of the Treasury Scott Bessent (collectively, the "Defendants"). Plaintiffs' claims arise from the establishment of the Department of Government Efficiency ("DOGE") in January 2025, and the subsequent embedding of a team of DOGE-affiliated employees within Treasury. The First Amended Complaint, ECF No. 155 ("FAC"), asserts claims pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., as well as claims for violations of the Take Care Clause of the U.S. Constitution and the Separation of Powers Doctrine.

Yet the Executive Order that established DOGE has since expired, and the Treasury DOGE team has been disbanded. Accordingly, Plaintiffs' claims related to access by DOGE-affiliated employees to sensitive Treasury information are dismissed as moot. The remaining claims in the First Amended Complaint are

dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### A. The DOGE Executive Order

In January 2025, President Donald Trump issued Executive Order 14,158, Establishing and Implementing the President's "Department of Government Efficiency." Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) (the "E.O." or "Executive Order"). The E.O. established DOGE, with the stated purpose of "implement[ing] the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." E.O. § 1. The E.O. also created the United States DOGE Service ("USDS") within the Executive Office of the President. *Id.* § 3(a). The E.O. calls for the creation of DOGE teams within each executive agency. *Id.* § 3(c). Agency heads are required to consult with the USDS Administrator in selecting the members of the DOGE team. *Id.* Additionally, agency heads are required to coordinate their work with USDS, and DOGE Team Leads are to "advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

The Executive Order contemplates, however, that DOGE would be a creation of finite duration. The Executive Order established DOGE as a "temporary organization," with the goal of advancing the President's "18-month DOGE agenda." *Id.* § 3(b). By operation of the E.O., DOGE was scheduled to automatically terminate on July 4, 2026. *Id.*

## B. The Treasury DOGE Team

The following allegations are taken from the First Amended Complaint, and are accepted as true for purposes of this motion to dismiss.

DOGE employees are generally appointed into a schedule C transition position within the federal agency in which the DOGE team is embedded, based on the recommendation from DOGE that the agency take on the employee appointment. FAC, ¶ 77. While the DOGE employee embedded in an agency works within that agency, the employee also had reporting obligations and responsibilities to serve the mission and goals of DOGE. *Id.*, ¶ 79.

Treasury put into place a hybrid team of employees, working on behalf DOGE (the "Treasury DOGE Team"), to perform functions aimed at achieving the goals outlined in several presidential executive orders. *Id.*, ¶ 8. Treasury and Secretary Bessent granted these hybrid employees expanded access to sensitive information contained within the Bureau of the Fiscal Services ("BFS"). *Id.*, ¶ 8.

The BFS is an operational bureau within Treasury that functions as the central payment clearinghouse for all payments to and from federal agencies. FAC, ¶¶ 57-58. BFS is responsible for providing reimbursement directly to the States for Congressionally mandated programs. *Id.*, ¶ 59. BFS maintains sensitive and confidential financial information, including the States' banking account numbers. *Id.*, ¶ 59.

The FAC alleges the Treasury DOGE team's data access carries with it an ongoing risk of potential operational disruptions to BFS's payment systems, access

to sensitive data elements, insider threat risk, and other risks that are inherent to any user access to sensitive IT systems. *Id.*, ¶ 87. Treasury DOGE employees accessed BFS data belonging to the States without following federally-mandated information security procedures. *Id.*, ¶¶ 8-9. For example, two DOGE employees were permitted to view sensitive information belonging to the States who were not authorized to view the information under governing law and regulation, and who did not have the training or vetting to access the relevant Treasury systems. *Id.*, ¶¶ 83-84. Additionally, the Treasury DOGE team coordinated with DOGE writ large, running the risk that they may be sharing confidential information maintained in the BFS systems with members of the DOGE team who are not Treasury employees. *Id.*, ¶ 88.

Defendants also granted data access to Treasury DOGE employees "in furtherance of the unlawful data pooling that DOGE has undertaken at other federal agencies." *Id.*, ¶ 11. This access created a serious risk that the States' bank accounts and other financial information would be obtained and misused by bad actors. *Id.*, ¶ 111.

The FAC further alleges the Treasury DOGE team was tasked with developing a method to automatically pause and block federal program funding that did not align with the President's priorities (the "Automated Review Process"). *Id.*, ¶¶ 120-21. The objective was to create an automated process that would flag payment files in the pre-edit phase for further review based on certain Treasury Account Symbols that would signal the payment was suspect, i.e., may not align

ideologically with the President's priorities and possibly should be blocked. *Id.*, ¶ 123. Treasury leadership began the work of developing this process in January 2025. *Id.*, ¶¶ 123-24.

### C. Procedural History

When Plaintiffs initiated this suit in February 2025, the original Complaint challenged the access to the BFS payment systems provided to the Treasury DOGE team members. Plaintiffs brought suit pursuant to, *inter alia*, the APA, claiming that this access violated, *inter alia*, the Privacy Act, 5 U.S.C. § 552a, and section 208 of the E-Government Act of 2002, 44 U.S.C. §§ 101 *et seq*. Plaintiffs also contended that Defendants' actions were arbitrary and capricious.

On February 21, 2025, this Court granted Plaintiffs' motion for a preliminary injunction. ECF No. 76. The Court enjoined Defendants from providing members of the Treasury DOGE Team access to the BFS payment systems. In doing so, the Court held that Plaintiffs had established a likelihood of success with respect to their claim that Defendants' actions were arbitrary and capricious. The Court reasoned that Plaintiffs had standing because they had adequately alleged that, by granting the Treasury DOGE Team access to the BFS payment systems, Defendants had created a realistic danger of future unauthorized disclosures of the States' financial information. *Id.* at 27-30.

The Court concluded that Plaintiffs were more likely than not to prevail on their claim that the Treasury Department had "acted arbitrarily and capriciously by failing to adequately consider the numerous privacy and security problems

associated with" providing such access. *Id.* at 33. Noting that the "inexplicable urgency and time constraints under which [BFS staff] operated all but ensured that the launch of the Treasury DOGE Team was chaotic and haphazard," the Court found that the Treasury DOGE Team should have been appointed, onboarded, trained, and provided with access to the BFS payment systems "in a measured, reasonable, and thoughtful way." *Id.* at 50, 52.

The Court further held that Plaintiffs had sufficiently demonstrated a "substantial risk of future harm where the data access protocols in place do not satisfactorily vet the employees with access and rigorously train them in data security measures." *Id.* at 59 (quotation marks omitted). Deciding that the balance of equities and the public interest in preventing the "catastrophic" consequences of a possible cybersecurity breach weighed in favor of a preliminary injunction, the Court granted the motion. *Id.* at 61.

The Court ordered the Treasury Department to certify that the Treasury DOGE Team members had undergone the proper training to receive access to BFS payment systems, provide clarity about the vetting and security clearances process followed for members of the Treasury DOGE Team, explain the mitigation procedures in place to minimize disclosure risks from the expansion of data access to the Treasury DOGE Team, provide the legal authority pursuant to which each DOGE Team member was employed or detailed to the Treasury Department, and provide the reporting chains governing the DOGE Team members, USDS/DOGE, and Treasury Leadership. *Id.* at 63-64. The Court indicated that, upon receipt of

such certifications, the Court would determine whether the Treasury Department had adequately redressed the violations of the APA identified in its opinion, so as to justify the termination or modification of the preliminary injunction.

In a series of subsequent orders, the Court modified the preliminary injunction. *See* ECF Nos. 108, 139, 156. In an order dated May 27, 2025, the Court permitted employees, officers or contractors employed or affiliated with USDS, DOGE, or the Treasury DOGE Team to access BFS systems, provided that they complied with conditions that tracked the vetting, training, hiring, reporting, and mitigation procedures and protocols that Defendants had described to the Court. ECF No. 156 at 6-7. With regard to any new Treasury DOGE Team members, the Court ruled that they could similarly access BFS systems without the requirement to obtain judicial authorization. *Id.* at 7.

On May 23, 2025, Plaintiffs filed the FAC. As with the original Complaint, the FAC primarily alleges that Treasury's granting of access to BFS systems to Treasury DOGE Team members has put the States' confidential information at serious risk (the "Access Claims"). The FAC, however, includes additional claims related to the Treasury DOGE Team's attempt to create an automated program for the blocking of Congressionally-appropriated federal program funding (the "Automated Review Process Claims").

The first cause of action asserts that the Defendants acted in an arbitrary and capricious manner, in violation of the APA, by (i) granting BFS systems access to the Treasury DOGE Team and (ii) creating an automated system for the pausing

and potential blocking of federal payments to the States on ideological grounds. FAC, ¶¶ 138-47. The second count, also brought pursuant to the APA, asserts that both the grant of access and the Automated Review Process were contrary to law. FAC, ¶¶ 148-56. The third and fourth causes of action claim that the Automated Review Process violated the Separation of Powers Doctrine and the Take Care Clause of the United States Constitution. FAC, ¶¶ 157-77.

On July 7, 2026, the Court *sua sponte* raised with the parties whether the dissolution of DOGE on July 4, 2026, and the expiration of the Executive Order rendered this action moot. ECF No. 180. In response to that order, the Government submitted the Declaration of Elaine J. Rigas, the Acting Associate Chief Human Capital Officer for Executive and Human Capital Services at the Departmental offices of Treasury. *See* ECF No. 185 ("Rigas Decl."). Rigas affirmed that there is no current DOGE reporting structure, and that the Treasury DOGE Team no longer exists. *Id.*, ¶ 3. Only two former members of the Treasury DOGE Team remain at Treasury. *Id.* One serves as the Chief Financial Officer at the Internal Revenue Service and the other serves as Treasury's Chief Information Officer. *Id.* Additionally, Rigas confirmed that the Executive Order has expired. ECF No. 188, ¶ 3.

## LEGAL STANDARDS

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true "all factual allegations in the complaint" and "draw[s] all reasonable inferences" in favor of the non-moving party. *Romanova v. Amilus Inc.*,

138 F.4th 104, 108 (2d Cir. 2025) (citation omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . [the standard] requires more than labels[,] [] conclusions, and a formulaic recitation of a cause of action's elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "The Court's charge in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004)).

## DISCUSSION

Defendants argue that the First Amended Complaint fails to state a claim for relief under Rule 12(b)(6) of the Federal Rule of Procedure. Before reaching those issues, however, the Court has an independent obligation to assure itself that it possesses subject matter jurisdiction. *See, e.g.*, *Winston v. City of Syracuse*, 887 F.3d 553, 558 n.3 (2d Cir. 2018). The Court therefore first considers whether the dissolution of DOGE on July 6, 2026, and the expiration of the Executive Order render this action moot.

### A. Mootness

The jurisdiction of the Court is limited to actual cases and controversies; any plaintiff who does not present an actual case or controversy lacks standing. U.S. Const. art. III; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish standing, a plaintiff must demonstrate (1) an injury-in-fact that is (a) concrete, particularized, and (b) actual or imminent; (2) a causal connection between the injury and the conduct at issue; and (3) a likelihood of redressability by a favorable decision from the Court. *Lujan*, 504 U.S. at 560-61.

"Mootness is standing set in a time frame." *Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 67 (2d Cir. 2023) (cleaned up). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* (cleaned up). "The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021).

The Court concludes that the automatic dissolution of DOGE, as contemplated by the Executive Order, renders Plaintiffs' Access Claims moot. The gravamen of these APA claims is that Treasury had failed to protect the States' data by permitting members of the Treasury DOGE team access without adequate vetting and training and failed to prevent members of the Treasury DOGE team from sharing data outside of Treasury. FAC, ¶¶ 67-112, 140, 151-52. A Treasury

official has confirmed that there is no current DOGE reporting structure, that the Treasury DOGE Team no longer exists, that the relevant Executive Order creating DOGE has expired, and that no DOGE employees remain at Treasury. Rigas Decl., ¶ 3; ECF No. 188.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (cleaned up). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citation omitted). Plaintiffs seek injunctive and declaratory relief pursuant to the APA. Yet there is no longer any action to enjoin. The organization whose employees purportedly accessed Plaintiffs' sensitive data without proper vetting and training, and who shared information outside of Treasury without authorization, no longer exists.

Plaintiffs have not identified any ongoing harm with respect to these claims that require remedy. Indeed, in the appellate brief Plaintiffs filed in the Second Circuit with respect to the pending appeal from the Court's denial of the order to modify the preliminary injunction, Plaintiffs acknowledge that the dissolution of DOGE renders moot APA claims regarding data access by Treasury DOGE team members. *See* Decl. of Nicholas R. Green at 23-25, *New York v. Trump*, No. 25-1860 (2d Cir.), Dkt. No. 81-1.

The challenged agency action has been eliminated by operation of the Executive Order. Accordingly, Plaintiffs' Access Claims are moot. *See Walker v. Kennedy*, 790 F. Supp. 3d 138, 143 (E.D.N.Y. 2025) ("In the context of judicial

review under the APA, the general principles of mootness can be reduced to a 'well-established principle of law: when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot.'" (quoting *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1226 (D.C. Cir. 2021)); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 79 (D.D.C. 2026) ("Unless an exception applies, [an APA] case is 'plainly moot' when the challenged action has been superseded by subsequent agency action.") (citation omitted), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

Plaintiffs nonetheless argue that their Access Claims are not entirely moot because they have asked for relief extending beyond Treasury DOGE employees. ECF No. 186 at 2. Specifically, they seek to enjoin Defendants from providing the States' sensitive data "to any person unless that person has passed all background checks, security clearance, and information security training called for in federal statutes and Treasury regulations." *Id*. Yet the only harms identified by the States in the FAC stem from the grant of access to DOGE personnel. Plaintiffs have not challenged Treasury's data access practices generally, nor have they identified any harm from such practices.[1] That Plaintiffs seek relief untethered to the

---

[1] Nor could Plaintiffs bring an APA claim on such a basis. The APA only permits challenges to final agency action. *See infra* at 14-15. The final agency action that is at issue with respect to the Access Claims is the Treasury's decision to onboard DOGE personnel. *See* ECF No. 171 ("Opp'n") at 13-15. Plaintiffs' APA suit regarding the Treasury DOGE team does not authorize this Court to generally supervise Treasury's personnel decisions and security practices. *See Lujan*, 497 U.S. at 899 (holding that plaintiffs "cannot demand a general judicial review of the [agency]'s day-to-day operations" under the APA).

particularized harms that gave them a concrete stake in the outcome of this litigation does not alter the Court's conclusion that there no longer exists a cognizable case or controversy with respect to the Access Claims.

Plaintiffs also invoke the voluntary cessation doctrine. "Under this principle, a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (cleaned up). "Otherwise, a defendant might strategically alter its conduct in order to prevent or undo a ruling adverse to its interest." *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 395 (2d Cir. 2022) (cleaned up). The voluntary cessation of allegedly illegal activities will render a case moot only if (1) "there is no reasonable expectation of the alleged violation's recurrence[,]" and (2) "interim events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (cleaned up).

But for the doctrine to apply, the cessation must be voluntary. The doctrine does not apply "when the agency did not act in order to avoid litigation," *Alaska*, 17 F.4th at 1229 (cleaned up), but where instead the cessation of the challenged conduct occurred by operation of law or for reasons extrinsic to the litigation. In this case, the expiration of DOGE was set by the originating Executive Order, before this suit was ever filed. The elimination of DOGE was not an action taken in response to this litigation.

Even if it did apply, the requirements for the voluntary cessation doctrine have been met. There is no reasonable possibility that a DOGE Team will be

reinstated at Treasury. While Plaintiffs point out that the President still has authority to issue a new Executive Order, ECF No. 186 at 2, "the mere power to reenact a challenged [policy] is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged [policy] likely will be reenacted." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (citation omitted). As to the second prong, Plaintiffs have not identified any continuing effects from the Treasury DOGE access that could be remedied through the issuance of declaratory or injunctive relief.

The analysis is different for the Automated Review Process Claims. Plaintiffs allege that the Treasury DOGE team created an automatic system capable of pausing federal funding otherwise due to the States. That the team that created this program is no longer employed at Treasury does not lessen the alleged harms experienced by the States as a result of the operation of such a system. The Court therefore holds that the Automated Review Process Claims have not been rendered moot by the expiration of DOGE, and proceeds to examine whether the FAC sufficiently states a claim for relief.

## B. Automated Review Process Claims

### 1. APA Claims

To state a claim under the APA that the Automated Review Process was either arbitrary and capricious or contrary to law, Plaintiffs must first plausibly allege that there has been a "final agency action." 5 U.S.C. § 704. For an agency action to be "final" under the APA, two requirements must be met. "First, the

action must mark the consummation of the agency's decisionmaking process . . . And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

An agency's decisionmaking process is considered consummated when its position is "definitive," *Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990), not "merely tentative" or of an "interlocutory nature." *Bennett*, 520 U.S. at 178. "The practical effect of the [agency's] action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the [agency's] action was 'final.'" *De La Mota v. U.S. Dep't of Educ.*, No. 02-CV-4276 (LAP), 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003).

According to the States, the implementation of the automated program constitutes the final agency action. Opp'n at 15. Yet Plaintiffs have not plausibly alleged that any legal consequences flow from the Automated Review Process itself. The FAC alleges that the program at issue "identif[ies] payments that may be improper under [the President's] Executive Orders" and flags them for further review. *Id.*, ¶ 123. There is no allegation that the automated program makes the determination to cancel the relevant payments.

While an interim pause on a payment due to the States potentially could constitute final agency action, *see New Jersey v. United States Dep't of Transportation*, 835 F. Supp. 3d 477, 510 (S.D.N.Y. 2026); *New York v. Admin. for Child. & Fams.*, 833 F. Supp. 3d 361, 386 (S.D.N.Y. 2026), the FAC does not allege

that any specific payments due to the States were frozen as a result of this Automated Review Process. Accordingly, the motion to dismiss the APA claims for failure to state a claim is granted.

**2. Constitutional Claims**

Article II of the U.S. Constitution mandates the President to "take Care that the Laws be faithfully executed." U.S. Const., art. II § 3. Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President — and his subordinates — do not wield "authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). While the exact bounds of the Take Care Clause are murky, it is well-recognized that "neither the President, nor his executive branch, may unilaterally refuse to carry out a congressional command." *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 56 (S.D.N.Y. 2025).

"Related to Plaintiffs' Take Care Clause claim is their argument that Defendants' actions violate the separation of powers implicit in our constitutional design." *Id.* Article I grants Congress exclusive authority to legislate, U.S. Const., art. I § 8, and the power of the purse, *see id.* art. I § 8. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Accordingly, absent Congressional authorization, the executive branch "may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals"

without running afoul of the Separation of Powers doctrine. *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

Plaintiffs argue that, by directing that the Automated Review Process be implemented, the President has failed to faithfully execute Congressional appropriation laws and violated the Separation of Powers doctrine. Opp'n at 26-27. Yet the FAC is devoid of allegations that any federal funding due to the States was paused by the Automated Review Process, let alone that such funding was ultimately canceled or not disbursed to the States. Setting up a process to flag payments for further review, in order to consider whether such payment should potentially be blocked, does not state a claim for violation of the Take Care Clause or the Separation of Powers doctrine.

**CONCLUSION**

For the reasons stated herein, the Court dismisses the Access Claims as moot. The Court GRANTS the Government's motion to dismiss the remaining claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Clerk of Court is directed to terminate ECF No. 165 and to close the case.

SO ORDERED.

Dated: September 23, 26
New York, New York

JEANNETTE A. VARGAS
United States District Judge